

*1027830442*

IN THE DISTRICT COURT OF TULSA COUNTY
STATE OF OKLAHOMA

DISTRICT COURT
**F I L E D**

NOV 1 4 2014

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

| | | |
|---|---|---|
| ERIC STRAIT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NUMBER: |
| vs. | ) | |
| | ) | **CJ-2014-04377** |
| SHELTER MUTUAL INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | JEFFERSON D. SELLERS |
| Defendant. | ) | |

## COMPLAINT

COME NOW the Plaintiff, Eric Strait, by and through their undersigned counsel, Scott L. Tully of The Tully Law Firm, and for his cause of action against Defendant, states as follows:

1. The Plaintiff, Eric Strait, is a citizen and resident of Tulsa County, State of Oklahoma.

2. The Defendant, Shelter Mutual Insurance Company, is an insurance company with its principal place of business in Columbia, MO, and regularly does business in the State of Oklahoma, United States of America.

3. Venue is proper with this Court as all events giving rise to the causes of action contained herein occurred in Tulsa County, State of Oklahoma.

4. Plaintiff applied for, and purchased, a homeowner insurance policy from Defendant prior to his loss on June 18, 2011. Defendant  issued policy number 35-71-0072308310011 to Plaintiff, which provides certain benefits in the event of a homeowners loss, including loss resulting from water damage.  A copy of the policy of insurance at issue is attached hereto and incorporated herewith as Exhibit "A."

**EXHIBIT**
**1**

5. Immediately following the loss on June 28, 2013, Plaintiff filed the requisite paperwork, and notified Defendant of the loss to collect the proceeds and benefits due and under the homeowner policy issued by Defendant.

6. Upon making presentation of the claim. Defendant failed to pay any benefits due and owing under the policy and eventually denied the claim by letter on July 17, 2013. A copy of the denial letter is attached hereto and incorporated herewith as Exhibit "B."

7. Plaintiff requested a reconsideration of the July 17, 2013 denial.

8. Defendant responded with a letter dated July 25, 2013, this time stating that the loss was below the Plaintiff's deductible of $1,000.00, and denying additional living expenses. A copy of this letter is attached hereto and incorporated herewith as Exhibit "C."

9. On September 11, 2013, counsel (Diane Lee) for Plaintiff provided a letter to Defendant outlining the reasons the loss should be covered, as shown in Exhibit "D."

10. On January 31, 2014, counsel (Scott Tully) for Plaintiff provided a letter to Defendant requesting certain information, including a certified copy of the applicable policy from Defendant regarding the loss, as shown in Exhibit "E."

11. On February 7, 2014 Defendant provided a letter and responsive materials to Plaintiff's request as shown in Exhibit "F."

12. On February 10, 2014 Plaintiff submitted a letter to Defendant requesting clarification, as shown in Exhibit "G."

13. On February 13, 2014 Defendant submitted a letter to Plaintiff providing the requested clarification, as show in Exhibit "H."

14. On February 13, 2014 Defendant submitted a certified copy of Plaintiff's policy as was requested on January 31, 2014, as shown in Exhibit "I."

15. On March 4, 2014 Plaintiff submitted a letter, with policy language, an engineer's report supporting Plaintiff's claim, damage receipts totaling $21,153.83, and a request for compensation of all covered damages, as shown in Exhibit "J."

16. On March 14, 2014, Shelter refused to make any payments without having an engineer of its choice inspect the premises, as shown in Exhibit "K."

17. On March 24, 2014 Plaintiff submitted a letter to Defendant requesting full payment once again based upon the information to date, as shown in Exhibit "L."

18. On March 28, 2014 Defendant submitted a letter to Plaintiff along with a partial payment of $5,126.47.  Said letter also included an estimate of damages totaling $7,132.80, as shown in exhibit "M."

19. On March 31, 2014 Plaintiff submitted a letter to Defendant requesting clarification as to why all submitted damages were not paid, as shown in Exhibit "N."

20. On April 1, 2014 Defendant submitted a letter outlining its reasons for denying coverage to damages submitted by Plaintiff, as shown by Exhibit "O."

21. Defendant was advised by letter of August 25, 2014, that suit would be filed as a result of its lack of good faith handling and breach of contract, along with support from Bad Faith Expert, Dick Cary, as shown in Exhibit P.

## COUNT I:  BREACH OF CONTRACT

22. Plaintiff reasserts and restates the allegations set forth in paragraphs 1-21 as if fully set forth herein.

23. Plaintiff alleges Defendant improperly breached the insurance contract by failing to pay benefits due thereunder and denying the claim.

24. Plaintiff alleges Defendant improperly breached the insurance contract by failing to properly investigate the claim.

25. Plaintiff alleges Defendant improperly breached the insurance contract by failing to handle the claim in the appropriate and customary claims standards, including the standards of Defendant itself.

26. Plaintiff has suffered economic and emotional damages as a result of this breach of contract.

## COUNT II: BAD FAITH AND BREACH OF THE DUTY OF GOOD FAITH CLAIM HANDLING

27. Plaintiff reasserts and restates the allegations set forth in paragraphs 1-26 as if fully set forth herein.

28. The improper refusal to pay policy benefits and failure to properly and thoroughly investigate Plaintiff's claim by Defendant exhibits a lack of good faith claims handling.

29. The refusal to pay policy benefits by Defendant exhibits bad faith claims handling conduct contrary to the laws of Oklahoma.

## COUNT III:  NEGLIGENCE AND GROSS NEGLIGENCE

30. Plaintiff reassert and restate the allegations set forth in paragraphs 1-29 as if fully set forth herein.

31. Defendant was negligent in the claims handling process and investigation of  Plaintiff's claim submitted under Plaintiff's homeowner insurance policy..

32. Defendant's negligence led to the improper denial of policy benefits.

33. Defendant's negligence was of such a repetitive nature and quality and was done with such carelessness so as to be willful, wanton and with reckless disregard of the contractual rights of Plaintiff and obligations of Defendant.

WHEREFORE, premises considered, Plaintiff respectfully requests  this Court grant Plaintiff judgment for all policy benefits of $16,027.36 together with punitive damages in excess of $75,000.00, along with any other such further relief as the Court deems just and reasonable including, but not limited to, reasonable attorney fees and costs and all other relief of any type or nature to which Plaintiff may be entitled.

Respectfully submitted,

Scott L. Tully     OBA#13606
P.O. Box 2141
Broken Arrow, OK 74011
(918) 872-8800
(866) 224-2303  Fax
scott@tullylawfirm.net

ATTORNEY LIEN CLAIMED

# EXHIBIT A



**Shelter
Insurance
Companies**

Claim Number: HO1076116
Policy Number: 35-71-7230831-1

We certify that this is a true and complete copy of
the insurance policy as of June 18, 2013.

Shelter Mutual Insurance Company

By: _____

ShelterInsurance.com • 1-800-SHELTER (743-5837)

1817 West Broadway • Columbia, MO 65218-0001

Policy Issued By
**Shelter Mutual Insurance Co.**
1817 W Broadway
Columbia, MO 65218-0001
1-800-SHELTER, 1-800-743-5837

**Homeowners' Insurance
Policy Declarations**

| Named Insured: | Agent: |
|---|---|
| ERIC STRAIT | JACK W CLEAR |
| 2458 S 107TH EAST AVE | 11111 E 21ST STREET |
| TULSA OK 74129-4812 | TULSA OK 74129 |
| | AGENT #: 35-09239-13 |
| | PHONE: 918-234-3333 |

| | |
|---|---|
| **Policy Number:** 35-71-007230831-0001 | **Effective Date:** November 02, 2012, 12:01 AM Standard Time |
| **Policy Form Number:** HO-3 (01-2007) | **Expiration Date:** November 02, 2013, 12:01 AM Standard Time |

| Primary Location | Description |
|---|---|
| 2458 S 107TH EAST AVE IN TULSA OK | 1 Family Brick Veneer Dwelling |

| Coverages | Limits | Deductible | Endorsement Number | Premium |
|---|---|---|---|---|
| A. Dwelling | $ 106,400 | $1,000* | | $1,283.00 |
| B. Other Structures | $ 10,640 | $1,000* | | |
| C. Personal Property | $ 74,480 | $1,000* | | |
| D. Additional Living Expense | $ 21,280 | | | |
| E. Personal Liab (BI & PD) Each Occurrence | $ 100,000 | | | |
| F. Medical Payments To Others Per Person | $ 1,000 | | | |
| Expanded Restoration Cost Coverage | | | B-327.9-B | $90.00 |
| Back-Up of Sewer or Drain Endorsement | | | B-494.5-B | $54.00 |

*\* We will take only one deductible when multiple coverages apply to losses caused by one accident.*

| Discounts (Reflected In Premiums) | | Total for Term (This is Not a Bill): | $1,427.00 |
|---|---|---|---|
| Protective Device Credit | | | |

| Other Endorsements Attached To This Policy | Endorsement Number |
|---|---|
| Inflation Protection Endorsement | B-697.1-B |
| Amendatory Endorsement - Oklahoma (HO-3) | B-746.16-B |
| Exclusion of Trustor as Named Insured | A-504.2-A |

*Additional information on next page*

(For Office Use Only)
Transaction: RENEW
H. O. CODE: 1,427.00
Policy Term: One Year
Mortgagee Pays Premium
Tier 2000

Protection Class: 03
Zone Code: 67
Date Issued: 10-22-2012
'03052010'

Countersigned By _____

B-223.13-B



MORTGAGEE:
**LOAN NUMBER: 08110010469**
WELLS FARGO BANK NA #708
ISAOA ATIMA
PO BOX 5708
SPRINGFIELD OH  45501-5708

# HOMEOWNERS' INSURANCE POLICY



For information regarding this policy, please contact your Shelter Insurance Agent.

## TO OUR CUSTOMERS – PLEASE NOTE

Please read this policy carefully. If you have questions, contact your Shelter Agent for answers. No agent can know your exact coverage needs or budget considerations, so it is your responsibility to examine the policy and make sure it provides the types of coverage you need in the amounts you requested.

If you suffer a loss, please read this policy again so that you will be reminded of your rights and obligations. **It is very important for you to recognize that this insurance policy is a legally binding contract. If any insured fails to perform an obligation required by this policy, the coverage which it might otherwise provide could be lost.**



HO-3
(01-07)

**SHELTER INSURANCE COMPANIES**
Home Office: Columbia, MO 65218-0001

# THE INDEX
## WHERE YOU CAN FIND IT

**Declarations** - Your Name, Location of Your Residence, Policy Period, Limits of Liability and Deductibles

Beginning on Page

Agreement ........................................................................................................................... 2

Definitions ........................................................................................................................... 2

General Agreements applicable to entire policy .................................................................. 8

Section I - Property Protection ........................................................................................... 11

Coverage A - **Dwelling** ..................................................................................................... 11

Coverage B - Other Structures ........................................................................................... 11

Coverage C - **Personal Property** ..................................................................................... 14

Coverage D - Additional Living Expense and Loss of Rents ............................................... 20

Additional Coverages Under Section I ............................................................................... 20

Special Provisions and Conditions Relating To Section I .................................................... 22

Section II - Personal Liability and Medical Payment Protection ......................................... 27

Coverage E - Personal Liability .......................................................................................... 27

Coverage F - Medical Payments To Others ........................................................................ 29

Coverage G - Damage to Property of Others ...................................................................... 31

Additional Coverages Under Section II ............................................................................... 31

HO-3 (01-07)                              1

**HOMEOWNERS' INSURANCE POLICY**
**SPECIAL COVERAGE FORM 3**
**AGREEMENT**

**We** agree to insure **you** according to all the terms of this policy,
(1) in reliance on **your** statements in the Application and in any Application for Change, both of which are made a part of this policy, and
(2) based on **our** receipt of **your** payment of the premium.
When **we** receive **your** premium, this policy provides the types of insurance, in the limited amount, shown in the **Declarations**. If any premium payment is by check, no insurance is provided if the bank does not honor the check.

## DEFINITIONS USED THROUGHOUT THIS POLICY

In this policy, the words shown in bold type have the meanings stated below unless a different meaning is stated in a particular coverage or endorsement. Words in bold type that are derived from a defined word have the same root meaning. The plural version of a defined word has the same meaning as the singular if it is bolded. If any of these same words are used but not printed in bold type, they have the meaning given them by their common usage as set out in commonly used dictionaries.



1. **Accident** means an action or occurrence, or a series of actions or occurrences, that:
   (a) started abruptly,
   (b) during the policy period, and
   (c) directly resulted in **bodily injury** or **property damage**.
   If an action or occurrence that started abruptly continues over a period of time and ultimately results in **bodily injury** or **property damage** that cannot be definitely attributed to any one specific action or occurrence, all such **bodily injury** or **property damage** is, under this policy definition, only one **accident**. If a series of abrupt actions or occurrences ultimately results in **bodily injury** or **property damage** that cannot be definitely attributed to any one specific action or occurrence, all such actions and occurrences, under this policy definition, constitute only one **accident**.
   **Accident** does not mean:
   (a) an action or occurrence that any **insured** intended to result in **bodily injury**, or **property damage**, of any type;

   (b) an action or occurrence that is intended by any **insured**, if a reasonable **individual** would expect it to result in **bodily injury**, or **property damage**, of any type; or
   (c) an intentional action by any **person** that does not immediately result in **bodily injury** or **property damage**, but ultimately does result in such because of its repetition or the repetition of similar actions.

2. **Accidental direct physical loss** means loss of possession of, or actual physical damage to, a part of the covered property which is caused by an **accident**. It does not include:
   (a) consequential economic damage resulting from such physical damage to that part or to the covered property as a whole,
   (b) consequential economic damage resulting from the inability to restore full monetary value to that part or to the covered property as a whole because of the fact that it has sustained physical damage,
   (c) consequential economic damage resulting from the loss of use of that part or the covered property as a whole,

HO-3 (01-07)                                                    2

(d) consequential economic ██████age resulting from the inability to match the parts which are **repaired** or **replaced** with undamaged adjacent parts, or

(e) any diminution of the pre-loss value of the covered property after the **repair** or **replacement** of its parts.

3. **Actual cash value** means **total restoration cost** less **depreciation**. If the law of the state in which this policy is issued limits the factors which may be considered in determining the **actual cash value**, only the factors allowed by such law will be considered.

4. **Bodily injury** means:
(a) a physical injury;
(b) a sickness or disease of the body;
(c) the physical pain and physical suffering which directly results from (a) or (b), above; and
(d) a death which directly results from (a) or (b), above.

**Bodily injury** does not mean:
(a) a mental injury;
(b) a sickness or disease of the mind;
(c) mental anguish; or
(d) emotional distress;
unless such mental or emotional condition is diagnosed by a medical doctor and directly results from **bodily injury** to the **individual** on whose behalf the **claim** is made.

5. **Business** means any activity for which the **person** engaged in that activity receives compensation of any kind, or reasonably expects to receive compensation of any kind. **Business** does not mean:
(a) the occasional sale of **personal property** at the **residence premises** unless that property was raised, grown, or acquired, for the purpose of selling it;
(b) the occasional **rental** or **leasing**, or the holding for **rental** or **leasing**, of the **dwelling** on the **residence premises** in which **you reside**, for use as a **dwelling**;

(c) the **rental** or l███ng, or the holding for **rental** or **leasing**, of a part of the **dwelling** on the **residence premises** in which **you reside**, for use as a **dwelling**, unless the **rental** or **lease** is to three or more roomers or boarders;

(d) a part-time activity, engaged in by **you** or a **relative**, if the **individual** engaged in that activity is under the age of twenty-five, and is a full time student.

6. **Claim** means a request by any **person** for benefits under this policy as a result of any one **accident**. It includes lawsuits, requests for the payment of money and requests that **we** take any action, or extend any coverage, provided for by this policy.

7. **Compensation Law** means any law under which benefits are paid to a **person** as compensation for the effects of **bodily injury**, without regard to fault, because of that **person's** status as an employee or beneficiary. It includes, but is not limited to, workers' compensation laws, disability laws, the Federal Employers' Liability Act and the Jones Act.

8. **Custom farming** means the maintenance or use of **premises**, other than **insured premises**, for the production of **farm products** and includes all operations reasonably necessary for such production that are performed:
(a) at the request of the **owner** or **renter** of those **premises**; and
(b) in exchange for compensation in the form of money or goods.
**Custom farming** does not mean operations performed as part of an exchange of **farming** services so long as no other compensation is paid.

9. **Declarations** means the part of this policy titled "Homeowner's Insurance Policy Declarations". It sets out many of the individual facts related to **your** policy including the dates, types, and amounts, of the various coverages.

10. **Decorative fixture** means wall covering, floor covering, paint, and molding which is attached to the interior of:

HO-3 (01-07)                          3

(a) **your** dwelling at the residence premises; or

(b) other structures which are permanently attached to the **residence premises**, but not attached to **your dwelling**. If a structure is connected to the **dwelling** by only a utility line or fence, it will not be considered attached to the **dwelling** for purposes of this definition.

11. **Deductible** means an amount of money deducted from the total amount of all losses covered under Section I of this policy, unless the specific coverage under which a loss is covered says otherwise. The amount of **your** deductible is shown in the **Declarations** or in the specific policy provision under which a loss is covered.

12. **Depreciation** means an amount of money that is deducted from the amount **we** actually pay. That amount is based on the decrease in the value of the property since it was new. It applies to any part that must be **repaired** or **replaced** to allow for the **repair** or **replacement** of a damaged part, whether or not that part itself is damaged. The condition, age, extent of use, and obsolescence of the part, and the property as a whole, will be considered in determining **depreciation**. **Depreciation** also applies to the labor and applicable sales tax necessary to complete covered **repairs** and **replacements**. **We** will calculate the percentage by which the materials necessary to the **replacement** have decreased in value, based on the factors stated above, and apply that same percentage when calculating the **depreciation** applicable to the labor and sales tax.

13. **Domestic appliance** means a device operated by mechanical power, fuel, or electric current, which is customarily used inside a **dwelling**. **Domestic appliance** does not include permanently installed:

(a) heating systems;

(b) cooling systems;

(c) water heating systems; or

(d) water softeners.

14. **Dwell** means to live a location with, or without, the intent to make that place one's **residence**.

15. **Dwelling** means the structure in which one **dwells**.

16. **Farming** means the **ownership**, maintenance or use of **premises** for the production of **farm products** and includes all operations reasonably necessary for such production. **Farming** does not include the sale of **farm products**. **Farming** does not include **custom farming**.

17. **Farm products** means:

(a) crops grown, raised, or kept, for the purpose of commercial sale; and

(b) livestock grown, raised, or kept, for the purpose of commercial sale.

18. **General contractors' overhead and profit** means any amount of money included in, or added to, the estimated, or actual, cost of restoring damaged property, to compensate a contractor for something other than:

(a) the materials actually installed in, or on, the damaged property; or

(b) the labor and equipment necessary to install such materials.

19. **Individual** means a human being.

20. **Insured** means:

(a) **You**;

(b) **relatives**;

(c) any other **individual** under the age of 21 residing in **your** household who is in **your** care or the care of a **relative**;

(d) with respect to any vehicle covered by this policy, any employee of a **person** listed in (a), (b) or (c) above, while in the course and scope of such employment; and

(e) any **person** legally responsible for animals or watercraft covered by this policy and **owned** by a **person** listed in (a), (b) or (c) above. But **we** will cover that **person** only with respect to activities directly related to those animals or watercraft. **Insured** does not mean:

(1) any **person** using or having custody of an animal or watercraft in the course of any **business**; or

HO-3 (01-07)                    4

(2) any person ha███ custody of an animal or watercraft without permission of the **owner** of that animal or watercraft.

21. **Insured premises** means:

    (a) the **residence premises**;

    (b) any one or two family **dwelling you** acquire during the term of this policy, if **you** intend to **reside** there during the term of this policy;

    (c) the part of any other **premises** where **you dwell** if it is shown in the **Declarations**;

    (d) the part of any **premises** that are not **owned** by any **insured**, if an **insured** is temporarily using it as a **dwelling**;

    (e) the part of any structures or **premises**, not owned by any **insured**, which an **insured** occasionally **rents** for non-**business** purposes;

    (f) unimproved **premises owned** by, controlled by, or **rented** to, an **insured**, but this does not include **premises**, any part of which are used for **farming** or **custom farming**;

    (g) cemetery plots, or burial vaults, **owned** by an **insured**;

    (h) land on which a single or two family **dwelling** is being built for an **insured**, if the land is **owned** by, or **rented** to, the same **insured**; or

    (i) any structures used by **you** for storage of non-**business** items usually kept on the **residence premises**, and any **premises** to which those structures are attached.

22. **Judgment interest** means interest on any judgment provided for by the law of the state in which the judgment is entered, whether it accrues before or after a judgment.

23. **Land motor vehicle** means:

    (a) a **motorized vehicle** originally designed primarily for travel on **public roadways**;

    (b) a **motorized vehicle** that is licensed for **use** on **public roadways**; or

    (c) a vehicle attached to, or carried on, another vehicle that meets the definition set out in (a) or (b) above.

24. **Lease** mean██ right to possess and use real property or **personal property** for a period of thirty or more consecutive days based upon a written agreement with the **owner** of that property.

25. **Market value** means the price that the damaged part of the covered property would have brought immediately before the loss, if offered for sale by a reasonable **person** who is willing, but not obliged, to sell it, and bought by a reasonable **person** who is desirous of purchasing it, but who is not compelled to do so.

26. **Motorized vehicle** means any type of vehicle capable of transporting one or more people that has ever been powered by an internal combustion engine regardless of the type of fuel used in that engine. This definition applies even if an engine is no longer used to power the vehicle. This definition applies to all vehicles whether they are designed to operate on land, water, or in the air.

27. **Named insured** means any **persons** listed in the **Declarations** under the heading "**Named Insured**" and does not include **persons** listed under other headings unless they are also listed under the heading "**Named Insured**".

28. **Own** means that the **person** referred to holds the legally recognized title to, or is a **leaseholder** of, an item of real property or **personal property**, irrespective of the fact that there may be other **owners**. This definition is not changed by the patterns of usage of the property.

29. **Owner** means any **person** who is a legally recognized titleholder or **leaseholder** of an item of real property or **personal property**, irrespective of the fact that there may be other titleholders or **leaseholders**. An **owner's** status as such is not changed by the patterns of usage of the property.

30. **Person** means an **individual**, a corporation, or an entity, which has separate legal existence under the laws of the state in which this policy is issued.

HO-3 (01-07)               5

31. **Personal property** means items that are not permanently attached to **premises**. It includes buildings on the **residence premises** that are not permanently attached to the **residence premises**. If an item or structure is attached to something only by a utility line it will not be considered permanently attached to it.

32. **Premises** means real estate. It includes land and any improvements permanently attached to the land. For purposes of this policy, all real estate conveyed by one deed granting title to that land will be considered the same **premises**. Lands conveyed by separate deeds will be considered separate **premises**.

33. **Property damage** means physical injury to or destruction of tangible property and includes damages for the loss of its use.

34. **Public roadway** means a roadway maintained by a governmental entity or agency including its adjacent right of ways. The fact that the general public has access to a roadway does not itself make that roadway a **public roadway**.

35. **Punitive damages** means a monetary award imposed to punish a wrongdoer and to deter others from similar conduct. It includes exemplary damages. It also includes any damages, or penalties, based upon any legal theory that requires proof of the same standard of conduct necessary to support an award of **punitive damages** or exemplary damages, under the law of the state in which they are awarded.

36. **Recreational motor vehicle** means a **motorized vehicle** that:
    (a) was not originally designed primarily for travel on **public roadways**, or
    (b) is not currently licensed for use on **public roadways**.
    **Recreational motor vehicle** does not mean:
    (a) a vehicle used, or designed to be used, in competition with other vehicles,
    (b) a vehicle used solely to service the **residence premises**, or
    (c) a vehicle originally designed to assist the physically handicapped, or

(d) a lawnmower used only to mow grass.

37. **Relative** means an **individual** related to **you** by blood, marriage, or adoption, who is primarily a **resident** of, and actually living in, **your** household. It includes **your** unmarried and unemancipated child away at school.

38. **Rent** means a right to possess and use real property or **personal property** for a period of less than thirty consecutive days based upon a written agreement with the **owner** of that property.

39. **Repair** means restoration by the use of labor only on the damaged part of the covered property in order to restore its form and function. Restoration of pre-**accident** value is not included in the definition of **repair**.

40. **Replace** means the installation or provision of materials or parts to, or in place of, the damaged part of the covered property. It includes the installation or provision materials or parts to, or in place of, any undamaged parts that must be **replaced** to allow for **replacement** of the damaged part. It also includes the labor necessary to accomplish such installation. Restoration of pre-**accident** value is not included in the definition of **replace**.

41. **Reside** means to live in a location with the intent to make that place, and no other, one's permanent home. If the parents of a minor child do not **reside** with one another, **we** will consider the child a **resident** of both their households if that child regularly spends time in each of their **residences**.

42. **Residence employee** means an employee of an **insured** whose duties entail the maintenance or use of the **residence premises**, or who performs similar duties elsewhere but not in connection with an **insured's business**.

43. **Residence premises** means:
    (a) any one or two family **dwelling** situated on the **premises** described in the **Declarations** if:
        (1) **you** own that **dwelling**; and

HO-3 (01-07)

(2) **you** presently reside in that **dwelling**, have **resided** there in the last thirty days, or will **reside** there within thirty days of the inception date of this policy; or

(b) a one or two family **dwelling** referred to in the **Declarations** as the "secondary residence premises", if **you own** that **dwelling** at the time of a loss.

That **dwelling**, the grounds, and other structures at the same **premises**, are included in this definition.

44. **Restoration cost** means the amount of money it will, or did, cost to restore the form and function of the damaged part of covered property by:
   (a) **replacing it**; or
   (b) **repairing it**,
   whichever is less expensive.
   **Restoration cost** can be based on a combination of (a) and (b) above, if some parts of the covered property are **replaced** and other parts are **repaired**. **Restoration cost** includes:
   (a) the cost of construction techniques commonly used by the building trades in the geographical area of the covered property; and
   (b) the cost of materials and parts, comparable in quality to the damaged materials and parts, to the extent those are available in the geographical area of the covered property.
   **Restoration cost** does not include:
   (a) consequential economic damage resulting from physical damage to the part or the covered property as a whole,
   (b) consequential economic damage resulting from the inability to restore full monetary value to the part or the covered property as a whole because it has sustained physical damage,

(c) consequential economic damage resulting from the loss of use of the part or the covered property as a whole,
(d) consequential economic damage resulting from the inability to match the parts that are **repaired** or **replaced** with undamaged adjacent parts, except as provided in the insuring agreement with respect to **decorative fixtures**,
(e) any diminution of the pre-loss value of the covered property after the **repair** or **replacement** of its parts,
(f) the cost of **replacing** or **repairing** materials or parts that are unavailable in the geographic area of the covered property with those of like quality,
(g) the cost of using the services of tradesmen or craftsmen who do not regularly offer their services in the geographic area of the covered property, or
(h) **general contractors' overhead and profit**.

45. **Total restoration cost** means the **restoration cost** of all of the damaged parts of the covered property that were damaged in one **accident**.

46. **Unoccupied** means that people were not **residing** in the **residence premises** at the time of the loss.

47. **Vacant** means that **you** have ceased to **dwell** there and that the **dwelling** is devoid of all **personal property** except those items that **you** intend to permanently leave at that location.

48. **War** means armed conflict whether or not officially declared. It includes civil war, insurrection, rebellion, revolution, or any act or condition incident to any of those events.

49. **We**, **us** and **our** mean the Company providing this insurance.

50. **You** means any **person** listed as a **named insured** in the **Declarations** and, if that **person** is an **individual**, his or her spouse.

HO-3 (01-07)                                    7

## GENERAL AGREEMENTS APPLICABLE TO ENTIRE POLICY

1. **WHAT TO DO IN CASE OF BODILY INJURY OR PROPERTY DAMAGE**

   In the event of an **accident** covered under this policy, the **insured** must promptly take all of the following actions:

   (a) Notify **us** or **our** agent as soon as possible. The notice must give:

      (1) **your** name and policy number;

      (2) the time, place and circumstances of the **accident**; and

      (3) the names and addresses of all injured **individuals** and witnesses.

   (b) Cooperate with **us**, and assist **us** in any matter relating to a **claim**.

   (c) Send **us** all correspondence and all legal papers that relate to any **claim**, made by anyone, against **us** or against the **person** seeking such coverage.

   (d) Authorize **us** to obtain any other records that may be relevant to the **claim** or may reasonably be expected to aid **our** investigators in determining the facts relevant to the **claim**.

   (e) Provide **us** with a list of the damaged property if a loss covered under Damage to Property of Others occurs. The **insured** must also exhibit the damaged property to **us** if it is within the **insured's** control.

   (f) Provide any written proofs of loss **we** require.

   (g) Answer, under oath, any questions posed by **us**, and sign a written transcript of such questions and answers.

   If such **claim** is based upon **bodily injury**, the **person** making such **claim** must also:

   (h) submit to physical examinations, at **our** expense, by doctors **we** select as often as **we** may reasonably require;

   (i) authorize **us** to obtain relevant medical records of the **individual** whose **bodily injury** is the basis for such **claim**.

The **insured** must not, except at his or her own cost, voluntarily make any payment, assume any obligation, or incur any expenses related to the **bodily injury** or **property damage**.

2. **ASSIGNMENT**

   Except as provided in Coverage F of this policy, **you** may not assign any of **your** rights and interests under this policy, unless **we** consent to such assignment, in writing and endorse that change on this policy. Such endorsement will then become a part of this policy.

3. **COVERAGE IN THE EVENT OF YOUR DEATH**

   If **you** die, the provisions of this policy will apply to:

   (a) any surviving member of **your** household who was covered under this policy at the time of **your** death, but only while that **individual** is a **resident** of, and actually living in, the **dwelling** on the **insured premises**;

   (b) **your** legal representative while acting within that capacity; and

   (c) any **person** having proper custody of insured property until a legal representative is appointed.

   However, in order to obtain this coverage, any of the people listed in (a), (b) and (c), above, must notify **us** of **your** death. Coverage under this provision will be provided for a maximum of thirty days after **your** death, and will terminate if the policy lapses.

4. **NOTICE TO US**

   Any notice required by this policy may be given by, or on behalf of, the **insured** to **our** authorized agent within this state. If that notice contains sufficient information for **us** to identify the **insured**, **we** will consider it notice to **us**.

5. **LEGAL ACTION AGAINST US**

   Any **person** who makes a **claim** or seeks coverage under this policy agrees not to institute any legal action against **us** unless that **person**

has fully complied with all the terms of this policy. Any legal action seeking a payment or a determination of coverage under this policy or its binder must be brought in the state in which the **residence premises** are located. This policy and its binder are to be interpreted in accordance with the laws of the state in which the **residence premises** are located.

6. CANCELLATION
   Cancellation of this policy will be handled in accordance with the state specific endorsement attached to this policy.

7. REFUSAL TO RENEW
   Refusal to renew this policy will be handled in accordance with the state specific endorsement attached to this policy.

8. CONCEALMENT OR FRAUD
   This entire policy is void as to all **insureds** if any **insured** has:
   (a) intentionally concealed, or misrepresented, any material fact or circumstance relating to the purchase of this policy;
   (b) negligently misrepresented any material fact or circumstance related to the purchase of this policy;
   (c) intentionally concealed or misrepresented any material fact related to any **claim** made under this policy; or
   (d) acted fraudulently, or made false statements, relating to any **claim** made under this policy.

9. CHANGES TO THE POLICY
   This policy includes the printed policy form, its endorsements, the application related to it, any applications for changes to it, and the **Declarations**. Those documents constitute all the agreements between **you** and **us** relating to this insurance. No change or waiver may be effected in this policy except by written endorsement issued by **us**. If a premium adjustment is necessary **we** will make the adjustment as of the effective date of the change. If **we** change this particular policy form so that the insurance it provides is broadened without extra premium, this policy will be broadened as of the date **we** make that change effective in **your** state, and the broader form will apply to **your** claims after that date.

10. **YOUR** OBLIGATION TO NOTIFY **US** OF **YOUR** CHANGES
    The premium charged for this policy is based in large part on information **you** provided to **us**. If that information is incomplete or inaccurate, or if it changes during the policy period, **you** must inform **us** of that, if it relates to any of the following:
    (a) a change in **your** residence;
    (b) a change in the number or types of **businesses** operated on the **insured premises**;
    (c) a change in the **ownership** or management of any **business** operated on the **insured premises**;
    (d) a change in the number of occupants, who are not **relatives**, residing at the **insured premises**;
    (e) an addition or upgrade in the **insured premises**; or
    (f) a change in the number or types of animals kept on the **insured premises**.

11. **OUR** RIGHT TO INSPECT **PREMISES**
    **We** have the right to inspect any **premises** covered by this policy as often as may be reasonable during the term of this policy. **You** agree to allow **us** to come onto those **premises** and into any buildings on those **premises**.

12. **OUR** RIGHT TO RECOVER PAYMENT
    In the event **we** make any payment under this policy, **we** will be subrogated to all rights of recovery, based upon the same damages that an **insured**, or any other **person** receiving the payment, may have against any **person** liable for those damages.
    Any **insured**, or other **person** who receives payment under this policy, agrees to execute and deliver legal instruments to **us**, and to take any reasonable actions necessary to secure **our** rights if **we** ask.

HO-3 (01-07)

Any **insured**, or other **person** who receives payment under this policy, agrees to cooperate with **us** in enforcing **our** rights of recovery acquired under this section and to do nothing to prejudice **our** rights.

This does not apply to the coverages headed "Medical Payments to Others" and "Damage to Property Of Others".

13. POLICY COVERAGE PERIOD

This policy applies only to losses, **bodily injury** or **property damage** that occur during the policy period.

14. OTHER INSURANCE

If this policy and any other insurance, issued by **us**, or by any other company, applies to the same loss, this policy will apply as follows.

(a) With respect to all coverages contained in Section I, the insurance provided by this policy will be prorated, based upon the applicable limits of each policy, up to the highest limit provided by any one policy. This does not apply if a mortgagee, or trustee under a deed of trust, has duplicate coverage because of the ten-day notice provision contained in the section related to mortgagees and trustees. In that instance, the provisions of that section respecting the priority of coverages will control.

(b) With respect to all coverages contained in Section II, the insurance provided by this policy will apply only as excess insurance, and will then apply only in the amount by which its limits exceed the limits of all such other policies.

15. OTHER SOURCES OF COMPENSATION FOR THE LOSS

(a) If an **insured** is entitled to receive full compensation for a loss covered by this policy from another source, this policy will not apply to such loss.

(b) If an **insured** is entitled to receive partial compensation for a loss covered by this policy from another source, this policy will apply only to the amount of the loss for which the **insured** is not entitled to compensation from that source.

16. CONFORMITY TO APPLICABLE LAWS

If the terms of this policy conflict with the laws of any state that are applicable to a covered loss, the conflicting terms are amended to conform to such laws.

17. EFFECT OF POLICY ACCEPTANCE

By acceptance of this policy, **you** agree that the statements in the **Declarations** and in any Application or Application for Change accepted by **us**, are offered as an inducement to **us** to issue, continue, or renew this policy, and are **your** agreements or representations. They are not warranties.

18. CONTINUOUS RENEWAL

Subject to **our** consent and subject to the premiums, rules and forms then in effect for **us**, this policy may be continued in force by payment of the required continuation premium for each successive policy term. Such continuation premium must be paid to **us** before the expiration of the then current policy term and if not paid the policy shall terminate. With respect to any mortgagee (or trustee) named in the **Declarations**, this insurance will continue in force as to only the interest of the mortgagee (or trustee) for 10 days after written notice of termination to the mortgagee (or trustee), and shall then terminate.

HO-3 (01-07)

10

**SECTION I - PROPERTY PROTECTION**

**COVERAGE A - DWELLING**
INSURING AGREEMENTS
1.  We cover **accidental direct physical loss** to the following property, except for those perils and losses excluded under the heading "Exclusions Applicable To Coverages A & B".
    (a) **Your dwelling**, including building structures attached to it, at the **residence premises**, but only if that **dwelling** is used principally as a private **residence**. If a building structure is connected to the **dwelling** by only a utility line or fence, it will not be considered attached to the **dwelling** for purposes of this coverage.
    (b) Attached outdoor equipment used to service the **residence premises** while located on the **residence premises** or temporarily elsewhere.
    (c) Construction material at the **residence premises** that **you** intended to have permanently attached to **your dwelling** located on the **residence premises**, if that material has been at the **residence premises** for ninety days or less.
    (d) Outdoor antennas and reception dishes (including their lead in wires), towers, and masts, if they are located on the **insured premises** and were functional immediately prior to the covered loss. The limit of **our** liability for this coverage is $200. This amount includes the cost of damaged parts and the labor necessary to repair the damage.
2.  We cover **accidental direct physical loss** to **decorative fixtures** and, with respect to **decorative fixtures** only, if consequential economic damage will result from the inability to match parts that are **repaired** or **replaced** with undamaged adjacent parts, **we** will **repair** or **replace** those undamaged adjacent parts to the extent necessary to prevent that economic damage.

3.  **We** cover the reasonable cost **you** incur for temporary **repairs** or **replacement** of **your** property to protect it or other property from eminent losses that would be covered by this policy.

**COVERAGE B - OTHER STRUCTURES**
INSURING AGREEMENTS
1.  **We** cover **accidental direct physical loss** to other structures that are permanently attached to the **residence premises** but not attached to **your dwelling**, except for those perils and losses excluded under the heading "Exclusions Applicable To Coverages A & B". If a structure is connected to the **dwelling** by only a utility line or fence, it will not be considered attached to the **dwelling** for purposes of this coverage.  This coverage does not extend to:
    (a) structures used to any extent for **business**;
    (b) outdoor radio equipment; or
    (c) outdoor television equipment.
2.  **We** cover **accidental direct physical loss** to **decorative fixtures** located in any structure covered under paragraph 1. above; and, with respect to those **decorative fixtures** only, if consequential economic damage will result from the inability to match parts that are **repaired** or **replaced** with undamaged adjacent parts, **we** will **repair** or **replace** those undamaged adjacent parts to the extent necessary to prevent that economic damage.
3.  **We** cover **accidental direct physical loss** to construction material at the **residence premises** that **you** intended to have permanently attached to other structures covered in paragraph 1. of Coverage B, if that material has been at the **residence premises** for ninety days or less.
4.  **We** cover the reasonable cost **you** incur for temporary **repairs** or **replacement** of parts of **your** covered property to protect it or other property from eminent losses that would be covered by this policy.

HO-3 (01-07)                                    11

5. **We** cover **accidental direct physical loss** to fences on the **residence premises** under this coverage only, whether they are attached to **your dwelling** or not. This coverage does not extend to a fence used to any extent for **business** irrespective of the fact that it may also be used for non-**business** purposes.

EXCLUSIONS APPLICABLE TO COVERAGES A & B
**We** do not cover any loss or damage if it would not have occurred in the absence of any event or condition listed below. That loss or damage is excluded from coverage regardless of:

    (a) the proximate cause of that event or condition;
    (b) the fact that other events or conditions, which are not excluded, caused the loss or damage;
    (c) the fact that other events or conditions, which are not excluded, contributed to the loss or damage;
    (d) the sequence of the events or conditions that caused the loss or damage;
    (e) whether the events and conditions that caused the loss or damage occurred suddenly or gradually;
    (f) whether the loss or damage is isolated or widespread; or
    (g) whether the loss or damage arises from natural forces, external forces, or a combination of such forces.

1. Enforcement of any ordinance or law regulating the construction, use, repair or demolition of a building or other structure. This exclusion includes the increased costs incurred to comply with an ordinance or law. **We** do cover loss caused by actions of civil authorities to prevent the spread of a fire, if that fire is caused by a peril **we** insure against.
2. Movement of materials that support, or surround, a structure. **We** do not cover damage to any structure including, but not limited to: a) patios, b) pavement, c) foundations, d) walls, e) floors, f) roofs, g) ceilings, or h) slabs, if that damage is caused by the sinking, rising, shifting, expanding, or contracting, of earth or any other supporting, or surrounding, material. This exclusion applies to earthquakes, volcanic explosions, lava flow, landslides, mudflow, mudslides, sinking of ground, subsidence, erosion, movement resulting from improper construction or compaction, improper site selection, or any other force. **We** do not cover any cost required to replace, rebuild, stabilize, or otherwise restore, the supporting, or surrounding, material. **We** do not cover the cost of any repair technique designed to compensate for, or prevent, the instability of supporting, or surrounding, material. **We** do cover **accidental direct physical loss** that occurs subsequent to any of these causes if that loss is caused by theft, fire, or explosion.

3. (a) Water, or water borne contaminants or materials, that flows on, or under, the surface of the ground; waves; tidal waters; or overflow of a stream or any body of water. **We** do not cover spray from any of these, whether or not driven by wind.
    (b) Water, or water borne contaminants or materials, that escapes from a pool or water system, unless the portion of that pool or water system from which the water escapes is physically located within a building that is permanently attached to the **residence premises**.
    (c) Water, or water borne contaminants or materials, that overflows from sewers, drains, or pumps, if that overflow is caused by the inadequacy of the sewer, drain, or pump system, or by an obstruction of such that is located off of the **residence premises**.
    (d) Water, or water borne contaminants or materials, below the surface of the ground, that exerts pressure on, or flows; seeps, or leaks, through any part of a building or other structure, sidewalk, driveway or pool.

HO-3 (01-07)                    12

(e) Condensation of water vapor.

**We** do cover **accidental direct physical loss** that occurs subsequent to any of the events or conditions listed in 3(a), 3(b), 3(c), 3(d) and 3(e), above, if that loss is caused by theft, fire or explosion.

4. Power, heating, or cooling failure or interruption, unless it results from **accidental direct physical loss** to power, heating or cooling equipment located on the **residence premises** and that loss is caused by a peril **we** insure against. **We** do cover **accidental direct physical loss** that occurs subsequent to any of these events if that loss is caused by theft, fire, or explosion.

5. Neglect of an **insured** to use all reasonable means to protect covered property at and after the time of loss or when property is threatened by a peril **we** insure against.

6. **War.**

7. Nuclear reaction, radiation, radioactive contamination or discharge of a nuclear weapon even if **accidental**, or any consequence of any of these.

8. An intentional act by, or at the direction of, any **insured** that a reasonable **individual** would expect to cause the loss for which the **claim** is made.

9. Any event causing a loss to piers, bulkheads, wharves and docks and anything attached to them.

10. Wear and tear; marring or scratching; deterioration; inherent vice; latent defect; mechanical breakdown; leakage of any chemical or petroleum product from a storage container; rust; mold; mildew; fungus; spores; wet or dry rot; contamination; smog, smoke, or soot from agricultural smudging or industrial operations; continuous or repeated exposure to smoke or soot; birds, rodents, squirrels, raccoons, opossums, vermin, insects, or domestic animals. **We** do cover **accidental direct physical loss** that occurs subsequent to any of these events or conditions if that loss is caused by fire or explosion. **We** do cover **accidental direct physical loss** caused by mold, mildew, fungus

or spores, if the original cause of the mold, mildew, fungus or spores was itself a covered loss. **We** will apply this exclusion to **accidental direct physical loss** to the property, or part of the property, which was actually damaged by the excluded cause or event. **We** will waive this exclusion as it applies to **accidental direct physical loss** to other covered property if that loss was:

(a) caused by the **accidental** discharge or overflow of water or steam from within a plumbing system, heating system, cooling system, fire protection sprinkler system, water heater, water softener, or **domestic appliance**, and

(b) the point at which the water or steam was discharged, or from which it overflowed, is physically located within a structure permanently attached to the **residence premises**.

**Our** limited waiver of this exclusion, stated just above, does not constitute a waiver of exclusion 11, below.

11. Continuous or repeated seepage or leakage of water or steam over a period of fourteen days or more. If this exclusion applies, no part of the loss is covered even though it may have occurred prior to the fourteenth day of the seepage or leakage. **We** do cover **accidental direct physical loss** that occurs subsequent to any of these events or conditions if that loss is caused by fire or explosion.

12. Theft from in or around a **dwelling** or other structure that is undergoing construction, repairs or renovations, unless that **dwelling** is occupied by an **insured** during such construction, repairs or renovations.

13. Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a fence, pavement, patio, swimming pool, foundation or retaining wall. **We** do cover **accidental direct physical loss** that occurs subsequent to any of these events or conditions if that loss is caused by fire or explosion.

HO-3 (01-07)

14. Vandalism, malicious mischief, or breakage of glass and safety glazing materials;
    (a) if the **residence premises** has been **vacant** for more than 30 consecutive days immediately preceding the date on which the loss occurred. For purposes of this exclusion **we** will not treat a building that is undergoing construction, repairs or renovations as being **vacant**; or
    (b) to that part of the **residence premises rented** or **leased** to others.
    **We** do cover **accidental direct physical loss** that occurs subsequent to any of these events if that loss is caused by fire or explosion.
15. Freezing of plumbing, heating systems, cooling systems, water heaters, water softeners, or **domestic appliances** while any building in which such system or appliance is located is **vacant, unoccupied,** under construction, being remodeled or renovated, unless **you** take precautions to:
    (a) shut off the water supply and drain the systems and appliances; or
    (b) maintain heat in the building.
    **We** do cover **accidental direct physical loss** that occurs subsequent to any of these events if that loss is caused by fire or explosion.
16. Freezing of hot tubs, spas or whirlpools attached to the **residence premises** unless **you** use reasonable care to prevent such units from freezing.
17. Illegal activities of any **insured**.
18. Dishonesty of any **insured**.
19. Any defect, inadequacy, fault, unsoundness or weakness in:
    (a) material used for construction or repair;
    (b) site preparation including planning, zoning, surveying, grading, compaction and placement;
    (c) workmanship, design or engineering specifications; or
    (d) maintenance of land, structures, improvements and similar property on or off of the **residence premises**;

if such defect, inadequacy, fault, unsoundness or weakness existed before the **accident** that resulted in the loss. **We** do cover **accidental direct physical loss** that occurs subsequent to any of these events or conditions if that loss is caused by fire or explosion.
20. The action, lack of action, decision, or lack of decision, of any group, organization, or governmental body, or of any **person** on their behalf. **We** do cover loss caused by actions of civil authorities to prevent the spread of a fire, if that fire is caused by a peril **we** insure against. **We** do cover **accidental direct physical loss** that occurs subsequent to any of these events or conditions if that loss is caused by fire or explosion.
21. The conduct of any group, organization, or governmental body, or of any **person** on their behalf, regardless of whether the conduct is negligent, wrongful, intentional, or without fault. **We** do cover **accidental direct physical loss** which occurs subsequent to any of these events if that loss is caused by fire or explosion.

## COVERAGE C–PERSONAL PROPERTY
INSURING AGREEMENT
**We** cover **accidental direct physical loss** to:
1. **personal property owned** or used by the **insured**; and,
2. **personal property you** do not **own** if:
   (a) it is located at the **residence premises** at the time of the loss;
   (b) **you** have been at the **residence premises** during the 45 days immediately preceding the loss; and
   (c) **you** ask **us** to provide this coverage for that property.

These coverages apply only if the loss is caused by one or more of the following perils, and it is not excluded elsewhere in this coverage:
1. Fire or lightning.
   This peril does not include loss caused by nuclear reaction, radiation, radioactive contamination or discharge of a nuclear weapon even if **accidental**, or any consequence of any of these.

2. Wind or hail.
   This peril does not include loss:
   (a) to property in a building, caused by wind, rain, snow, sand, sleet or dust unless the building is first damaged by the direct force of wind or hail, creating an opening through which the wind, rain, snow, sand, sleet or dust enters; or
   (b) to watercraft and their trailers, furnishings, equipment, and motors, unless they are:
      (1) located inside a fully enclosed building at the time of the loss; or
      (2) non-motorized boats or canoes, owned by **you** and are on the **residence premises** at the time of the loss.
3. Explosion.
   This peril does not include loss caused by nuclear reaction, radiation, radioactive contamination or discharge of a nuclear weapon even if **accidental**, or any consequence of any of these.
4. Riot or civil commotion.
5. Aircraft, including self-propelled missiles and spacecraft.
6. Vehicular collision. However, this peril does not apply if the only collision is between the **personal property** and the vehicle in which it is being transported.
7. Smoke or soot. This peril does not apply to losses:
   (a) caused by smoke or soot from agricultural smudging or industrial operations; -
   (b) caused by continuous or repeated exposure to smoke or soot; or
   (c) caused by nuclear reaction, radiation, radioactive contamination or discharge of a nuclear weapon even if **accidental**, or any consequence of any of these.
8. Vandalism or malicious mischief.
   (a) This peril does not apply to vandalism or malicious mischief:
      (1) committed by, or at the direction of, any **insured**, or the husband, wife or child of any **insured**;

      (2) committed in or around a **dwelling** that is undergoing construction, repairs or renovations, unless that **dwelling** is occupied by an **insured** during such construction, repairs or renovations;
   (b) This peril does not apply to vandalism or malicious mischief committed by any **person** who is renting or **leasing** a part of the **residence premises**;
   (c) This peril does not apply to vandalism or malicious mischief to **personal property** located in areas of the **residence premises** rented or leased to others;
   (d) This peril does not apply, away from the **residence premises,** to vandalism or malicious mischief of:
      (1) **personal property** while at any other **premises owned**, **rented** or occupied by an **insured** except while an **insured** is temporarily using that **premises** as a **dwelling**. Property of an **insured** who is a student is covered at a **dwelling** away from home if the student has been at that **dwelling** at any time during the 45 days immediately before the loss;
      (2) watercraft and their equipment; and
      (3) trailers.
9. Theft or attempted theft.
   (a) This peril does not apply to theft:
      (1) committed by, or at the direction of, any **insured**, or the husband, wife or child of any **insured**;
      (2) from in or around a building that is undergoing construction, repairs or renovations, unless that building is at the location where **you** presently **reside**;
      (3) of a precious or semi-precious stone from its setting;
      (4) of any credit card or loss by forgery or alteration of any check, draft, promissory note, bill of exchange, or similar written promise, order, or direction to pay a sum

HO-3 (01-07)                           15

of money. There may be limited coverage for some of these items under the section headed "Additional Coverages Under Section I"; or

(5) that results from a voluntary parting with title or possession of any property by the **insured** or others to whom the **insured** has entrusted the property. This exclusion applies even if such parting of title or possession was induced by a fraudulent scheme, trick, device or false pretense.

(b) This peril does not apply to theft of the following, when a part of the **residence premises** is **rented** or **leased** to others:

(1) money, bank notes, bullion, coins and medals and other numismatic property and precious metals including platinum, gold and silver, but not goldware or silverware;

(2) securities, manuscripts, accounts, deeds, evidences of debt, letters of credit, notes, passports, tickets, stamps and other philatelic property;

(3) jewelry, watches, precious and semi-precious stones and furs, including any article containing fur if that fur accounts for its principal value; or

(4) any **personal property**, if the theft is committed by any **person renting** or **leasing** a part of the **residence premises.**

(c) This peril does not apply, away from the **residence premises**, to theft of:

(1) property while at any other **premises owned, rented** or occupied by an **insured** except while an **insured** is temporarily using that **premises** as a **dwelling.** Property of an **insured** who is a student is covered at a **dwelling** away from home if the student has been at that **dwelling** at any time during the 45 days immediately before the loss;

(2) watercraft and their equipment; and

(3) trailers.

10. Breakage of Glass

**We** cover damage to **personal property** caused by breakage of glass constituting a part of any building on the **insured premises**, however **we** do not cover loss or damage to the glass itself under this coverage.

11. Volcanic Eruption

This peril does not apply to loss caused by earthquake or land shock waves or tremors that occur before, during, or after a volcanic eruption. All eruptions that occur within a period of 72 hours will be considered one volcanic eruption.

12. Falling of objects

This peril does not apply to loss to the property that fell, nor does it apply to other property within a building unless, while it is falling, the object first damages the exterior of a building.

13. Weight of ice, snow or sleet that damages property in the building.

14. Collapse of any part of a building.

This peril does not apply to settling, cracking, shrinkage, bulging or expansion.

15. Cracking, burning, bulging or tearing apart, of a heating or air conditioning system, automatic fire protection sprinkler system or a potable water heating appliance. This peril does not apply to loss that is caused by or results from freezing.

16. Discharge or overflow of water or steam from within a plumbing system, heating system, cooling system, fire protection sprinkler system, water heater, water softener, or **domestic appliance**, if the point from which the water or steam was discharged or overflowed is physically located within a structure permanently attached to the **residence premises**.

This peril does not apply to loss:

(a) to the system or appliance from which the water or steam escapes;

(b) caused by or resulting from freezing;

(c) to property at a building **vacant** for more than 30 consecutive days immediately before the loss;

(d) caused by water leaking from an aquarium;

HO-3 (01-07)                    16

(e) caused by water leaking from a water bed;

(f) caused by water or steam from a hot tub or spa; or

(g) caused by continuous or repeated seepage or leaking over a period of fourteen days or more and if this exclusion applies, no part of the loss is covered even though it may have occurred prior to the fourteenth day of the seepage or leakage.

17. Freezing of a plumbing, heating and air conditioning system, automatic fire protection sprinkler system, or appliance.

This peril does not apply to any loss occurring while the building is vacant, **unoccupied**, under construction, remodeling or renovation, unless **you** use reasonable care to:

(a) shut off the water supply and drain the systems and appliances; or

(b) maintain heat in the building.

This peril does not apply to losses to any appliance, hot tub, spa, whirlpool or equipment located out of doors unless **you** use reasonable care to prevent such units from freezing.

## LIMITATION OF LIABILITY BASED ON LOCATION OF PERSONAL PROPERTY

**We** cover **personal property owned**, or used by an **insured** anywhere in the world. However, this coverage is limited to 10% of the limits of liability for Coverage C - **Personal Property**, stated in the **Declarations** for any loss to **personal property** that is away from the **premises** described in the **Declarations** for more than thirty consecutive days. **Personal property** placed for safekeeping with a bank, trust company, safe deposit company, or a commercial storage facility available to the general public, will be considered to be on the **residence premises**.

## SPECIAL LIMITS ON CERTAIN ITEMS OF PERSONAL PROPERTY

The special limits stated below apply to the corresponding groups of **personal property** and, if a specific peril is set out in the list below, these limits apply only to losses caused by that peril. These limits do not increase the total amount of insurance for **Personal Property** Coverage stated in the **Declarations**. The limit of insurance for each grouping of **personal**

**property** is the maximum **we** will pay in any one twelve month period for all property included in the group.

| Limit of Insurance | Personal Property Group |
|---|---|
| 1. $ 200 | Money, bank notes, bullion, coins and medals and other numismatic property. |
| 2. $1000 | Securities, accounts, deeds, evidence of debt, letters of credit, notes other than bank notes, passports, tickets, stamps and other philatelic property. |
| 3. $1000 | Watercraft, including their trailers, furnishings, equipment & outboard motors. |
| 4. $1000 | Trailers not used to transport watercraft. |
| 5. $1000 | Theft of jewelry, watches, precious and semi-precious stones and precious metals including platinum, gold and silver, and furs, including any article containing fur if that fur accounts for its principal value. |
| 6. $1000 | Manuscripts. |
| 7. $5000 | Theft of silverware and goldware. |
| 8. $2000 | Theft of guns and related equipment. |
| 9. $2000 | Theft of archery equipment. |
| 10. $1000 | Grave Markers (whether or not attached to realty). |
| 11. $2500 | **Business** property, on the **residence premises** if not related to a **business** conducted on the **residence premises**. |
| 12. $ 250 | **Business** property away from the **residence premises**. |
| 13. $1000 | **Recreational motor vehicles**. |
| 14. $1000 | **Personal property you** do not **own**. |
| 15. $ 500 | Audio tapes, video tapes, audio discs, video discs, and all other electronic media while located away from the **residence premises**. |
| 16. $1000 | Collector cards. |
| 17. $1000 | Comic books. |
| 18. $ 500 | Parts and accessories for motorized vehicles that are not permanently attached to a motorized vehicle. This limitation does not apply to parts and accessories for vehicles used solely to service the **residence premises**. |

HO-3 (01-07)

EXCLUSIONS APPLICABLE TO COVERAGE C

**We** do not cover any loss or damage if it would not have occurred in the absence of any event or condition listed below. That loss or damage is excluded from coverage regardless of:

    (a) the proximate cause of that event or condition;

    (b) the fact that other events or conditions, which are not excluded, caused the loss or damage;

    (c) the fact that other events or conditions, which are not excluded, contributed to the loss or damage;

    (d) the sequence of the events or conditions that caused the loss or damage;

    (e) whether the events and conditions that caused the loss or damage occurred suddenly or gradually;

    (f) whether the loss or damage is isolated or widespread; or

    (g) whether the loss or damage arises from natural forces, external forces, or a combination of such forces.

1. Enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure. **We** do cover loss caused by actions of civil authorities to prevent the spread of a fire if that fire is caused by a peril **we** insure against.

2. Movement of materials that support, or surround, a structure. **We** do not cover losses resulting from damage to any structure including, but not limited to: a) patios, b) pavement, c) foundations, d) walls, e) floors, f) roofs, g) ceilings, or h) slabs, caused by the sinking, rising, shifting, expanding, or contracting, of earth or any other supporting, or surrounding, material. This exclusion applies to losses resulting from earthquakes, volcanic explosions, lava flow, landslides, mudflow, mudslides, sinking of ground, subsidence, erosion, movement resulting from improper construction or compaction, site selection, or

any other force. **We** do cover **accidental direct physical loss** that occurs subsequent to any of these causes if that loss is caused by theft, fire, or explosion.

3.     (a) Water, or water borne contaminants or materials, that flows on, or under, the surface of the ground; waves; tidal waters; or overflow of a stream or any body of water. **We** do not cover spray from any of these, whether or not driven by wind.

    (b) Water, or water borne contaminants or materials, that escapes from a pool or water system, unless the portion of that pool or water system from which the water escapes is physically located within a building that is permanently attached to the **residence premises**.

    (c) Water, or water borne contaminants or materials, that overflows from sewers, drains, or pumps, if that overflow is caused by the inadequacy of the sewer, drain, or pump system, or by an obstruction of such that is located off of the **residence premises**.

    (d) Water, or water borne contaminants or materials, below the surface of the ground, that exerts pressure on, or flows, seeps, or leaks, through any part of a building or other structure, sidewalk, driveway or pool.

    (e) Condensation of water vapor.

    **We** do cover **accidental direct physical loss** that occurs subsequent to any of the events or conditions listed in 3(a), 3(b), 3(c), 3(d) and 3(e), above, if that loss is caused by theft, fire or explosion.

4. Power, heating, or cooling failure or interruption, unless it results from **accidental direct physical loss** to power, heating or cooling equipment located on the **residence premises** and that loss is caused by a peril **we** insure against. **We** do cover **accidental direct physical loss** that occurs subsequent to any of these events if that loss is caused by theft, fire, or explosion.

HO-3 (01-07)                  18

5. Neglect of an **insured** to use all reasonable means to protect covered property at and after the time of loss or when property is threatened by a peril **we** insure against.
6. **War.**
7. Nuclear reaction, radiation, radioactive contamination or discharge of a nuclear weapon even if **accidental**, or any consequence of any of these.
8. An intentional act by, or at the direction of, any **insured** that a reasonable **individual** would expect to cause the loss for which the **claim** is made.
9. Any event causing loss to outdoor radio and television equipment except as provided in Coverage A.
10. Any event causing loss to piers, bulkheads, wharves and docks and anything attached to them.
11. **Business** activities of any **insured.**
12. Any defect, inadequacy, fault, unsoundness or weakness in:
    (a) material used for construction or repair;
    (b) site preparation including planning, zoning, surveying, grading, compaction and placement;
    (c) workmanship, design or engineering specifications; or
    (d) maintenance of land, structures, improvements and similar property on or off of the **residence premises;**
    if such defect, inadequacy, fault, unsoundness or weakness existed before the **accident** that resulted in the loss.
13. Illegal activities of any **insured.**
14. Dishonesty of any **insured.**

**We** do not cover any peril or loss listed above even if the loss is caused in part by:
    (a) the action, lack of action or decision of any **person**, group, organization or governmental body, or
    (b) the conduct of any **person**, group, organization or governmental body,

regardless of whether that conduct is negligent, wrongful, intentional or without fault;

**We** do cover **accidental direct physical loss** that occurs subsequent to the events or conditions listed in (a) and (b), above, if that loss is caused by fire or explosion.

EXCLUSIONS OF CERTAIN CATEGORIES OF **PERSONAL PROPERTY**

**We** do not cover the following items of **personal property.**
1. Animals.
2. Vehicles that are, or at any time were, motorized and all parts and accessories attached to them, unless those vehicles are:
    (a) used primarily to service the **residence premises;**
    (b) originally designed to assist the physically handicapped; or
    (c) **recreational motor vehicles.**
3. Aircraft, except model airplanes that are not used or designed for transporting cargo or people.
4. Parts and accessories for aircraft.
5. **Personal property** of roomers or boarders who are not related to an **insured.**
6. **Personal property** of tenants.
7. **Business personal property:**
    (a) relating to a **business** conducted on the **residence premises;** or
    (b) books of account, drawings or other paper records; or
    (c) electronic data processing tapes, wires, records, disc or other software media containing **business** data.
8. **Personal property** rented, or held for **rental**, to others by an **insured.** However, **we** do cover that property while on the part of the **residence premises** used exclusively by an **insured**, or by a **person** renting or leasing that portion of the **residence premises.**
9. Electronic devices that may be operated by the electrical system of aircraft, watercraft, **land motor vehicles** or **recreational motor vehicles**

HO-3 (01-07)                                  19

if they are permanently installed in or upon an aircraft, watercraft, **land motor vehicle** or **recreational motor vehicle**. Antennas, wires and brackets for these devices, are not covered while in or upon an aircraft, watercraft, **land motor vehicle** or **recreational motor vehicle**.

10. Film, tape, discs, drums, cells and all other magnetic recording or storage media for electronic data processing. However, **we** do cover such media in unexposed or blank form.

11. Electronic data, digital data, or optical data, stored on any media. This exclusion applies to all forms of such data including, but not limited to, music and photographs. However, **we** do cover commercial data processing software if it is commonly available on the retail market at the time of the loss.

12. **Personal property** specifically, or categorically, insured by any other insurance.

13. **Personal property** specifically, or categorically, listed in any endorsement to this policy except to the extent stated in that endorsement.

**COVERAGE D-ADDITIONAL LIVING EXPENSE AND LOSS OF RENTS**
INSURING AGREEMENT
If **your residence premises** sustains a covered loss that exceeds the applicable **deductible** and, as a direct result of that loss, **your residence premises** is uninhabitable, **we** will pay the increase in **your** living expense reasonably necessary to maintain **your** normal standard of living for the shortest time reasonably necessary:

1. to **repair** or **replace** the damaged property, or
2. for **you** to permanently relocate.

**We** will also pay for **your** loss of income resulting from a covered loss while the part of the **residence premises you** rented or **leased** before the loss is uninhabitable. From that payment **we** will deduct any charges and expenses that do not continue during that time. **We** will pay **you** for this loss of income only for the time reasonably needed to make the **rented** or **leased** part of the **residence premises** habitable.

**We** will not pay for loss or expense due to the cancellation of any **rental** or **lease** agreement.

If a peril **we** insure against causes civil authorities to prohibit occupancy of the **residence premises**, **we** will pay:

1. the reasonable additional living expenses **you** incur for up to two weeks from the day **you** vacate the **residence premises**, and
2. any loss of income **you** incur for a part of the **residence premises** that was actually **rented** or **leased** for up to two weeks from the date **your** tenant vacates the **residence premises**.

The periods of time set out in this section of the policy will not be shortened by the expiration of the policy.

No **deductible** applies to these coverages.

ADDITIONAL COVERAGES UNDER SECTION I
Unless the specific coverage indicates that no **deductible** applies, **we** will pay only for loss to the covered property minus the **deductible**.

1. Hauling Away Of Damaged Property
   **We** will pay the reasonable expenses **you** incur to have the following items hauled away from the **residence premises**:
   (a) the remains of property damaged by a peril **we** insure it against;
   (b) the remains of property that is not covered by this policy but which was damaged by wind, lightning, or explosion, if:
       (1) it caused **accidental direct physical loss** to covered property; and
       (2) this coverage is not provided elsewhere in this policy;
   (c) ash, dust or particles from a volcanic eruption that caused **accidental direct physical loss** to a building or property within a building.

Any amounts paid under this coverage will reduce the limits applicable to the covered

HO-3 (01-07)                                    20

property. However, if damage to covered property plus the cost of the debris removal covered by this section is more than the limit of **our** liability applicable to that covered property, **we** will pay up to an additional 5% of the limit of the applicable coverage for debris removal under this section.

No coverage is provided under this section for the removal of trees, shrubs, plants, and lawns. Coverage for those items, if any, is provided under a specific heading elsewhere in this policy.

No coverage is provided under this section for the fees or expenses **you** incur for tearing off, or tearing out, the remains of covered property. Coverage for those items, if any, is a part of the **restoration cost** associated with the specific loss.

2. Fire Department Charges

   **We** will pay up to $500 for **your** liability under an agreement for service charges made by a fire department when called to protect **your** covered property from a peril **we** insure against. This payment is in addition to the amount of insurance applying to the loss. No **deductible** applies to this coverage.

3. Damage To Covered Property During Emergency Removal

   **We** will pay for covered property damaged in any way while being removed from, or returned to, a premise to protect that covered property from a peril **we** insure against, if that peril is imminent. This coverage is limited to a 30 day period from date of removal. Any amounts paid under this coverage will reduce the limits applicable to the covered property.

4. Losses To Trees, Shrubs, Plants, and Lawns

   **We** will pay for loss to trees, shrubs, plants, and lawns, at the **residence premises** if they are within 200 feet of **your dwelling** and are not grown for **business** purposes. This coverage applies only if the damage to them is caused by any of the following perils: fire, lightning, explosion, riot, civil commotion, aircraft, vandalism, malicious mischief, theft, or vehicles that are not **owned**, or operated, by an **individual** who, at the time of the loss, was living at the **residence premises**.

   **Our** maximum limit of liability for all coverages provided in this section is 5% of the limit of insurance under the Dwelling Coverage, but it will be paid in addition to that limit. Subject to that maximum limit of liability, **we** will pay no more than:

   (a) $500 in any 12 month period for damage to any one covered tree, shrub, or plant; and

   (b) $2500 in any 12 month period for damage to a covered lawn.

5. Hauling Away Of Damaged Trees, Shrubs, Plants, and Lawns

   **We** will pay the reasonable expenses **you** incur to have the remains of trees, shrubs, plants, and lawns, which are covered under the previous section, hauled away from the **residence premises**.

   **We** will pay the reasonable expenses **you** incur, up to an aggregate of $500, to have the remains of trees that are damaged by wind hauled away from the **residence premises**, if those trees:

   (a) are within 200 feet of **your dwelling**; and

   (b) damaged property covered by this policy when they fell.

6. Credit Card, Charge Plate, Fund Transfer Card, Check Forgery and Counterfeit Money Coverages

   **We** will pay an amount not to exceed $1000 for any one loss involving one or more of the following coverages. All loss resulting from a series of acts committed by any one **person**, or in which any one **person** is concerned or implicated, is considered to be one loss. No **deductible** applies to these coverages.

   (a) Credit Card, Charge Plate and Fund Transfer Card Coverage

   If an **insured** is legally required to pay for the unauthorized use of a credit card, charge plate, or card used for deposit, withdrawal

HO-3 (01-07)                                        21

or transfer of funds, issued to the **insured**, **we** will cover the loss. If a **claim** is made or suit is brought against the **insured** for liability under this coverage, **we** will defend the **insured**. **We** will use **our** lawyers and bear the expense. **We** may investigate any **claim** or settle any suit as **we** think appropriate. **We** will not defend after **we** have paid an amount equal to the limit of **our** liability.

**We** do not cover:

(1) use of the credit card, charge plate or card used for deposit, withdrawal or transfer of funds by a **resident** of **your** household;

(2) use by someone to whom an **insured** has given the credit card, charge plate or card used for deposit, withdrawal or transfer of funds; or

(3) any use unless the **insured** has met all the terms under which the card or plate was issued.

(b) Check Forgery Coverage

**We** cover loss to any **insured** caused by forgery or alteration of a check. This includes all negotiable instruments. If a **claim** is made or suit is brought against the **insured** for liability under this coverage, **we** will defend the **insured**. **We** will use **our** lawyers and bear the expense. **We** may at **our** option and at **our** expense, defend the **insured** or that **person's** bank against a suit to enforce payment under this coverage. **We** may investigate any **claim** or settle any suit as **we** think appropriate. **We** will not defend after **we** have paid an amount equal to the limit of **our** liability.

(c) Counterfeit Money Coverage

**We** cover loss sustained by an **insured** through acceptance in good faith of counterfeit United States or Canadian paper currency. However, **we** will not pay more than $50 for counterfeit United States or Canadian paper currency accepted in any one transaction or, regardless of any other provision, more than $100 in the aggregate.

7. Refrigerated Food Products

**We** will pay up to $500 in the aggregate for loss to the contents of all freezer and refrigerator units on the **insured premises**. The contents must be **owned** by **you**. The loss must be caused by change in temperature due to a verifiable interruption of electrical service from generating or transmission equipment outside the structure in which the freezer or refrigerator is located. Any amounts paid under this coverage will reduce the limits applicable to the covered property. No **deductible** applies to this coverage.

SPECIAL PROVISIONS AND CONDITIONS RELATING TO SECTION I

1. What To Do In Case Of Loss

If a covered loss occurs, the **insured** must take all of the following actions if applicable to that loss:

(a) Give **us** immediate notice and, in case of theft or suspected theft, **you** must also notify the police immediately.

(b) Protect the property from further damage. Make necessary and reasonable temporary repairs to protect the property, and keep records of the cost of those repairs.

(c) Send to **us**, within 60 days after its receipt by **you**, a proof of loss signed and sworn to by the **insured**, including:

(1) the time and cause of loss;

(2) the reason for the loss;

(3) the interest of **insureds** and all others in the property;

(4) the total value of the property immediately before and after the loss;

(5) all encumbrances on the property;

(6) other policies covering the loss;

(7) changes in title, use, occupancy or possession of the property;

(8) a list (schedule) of **personal property** damaged or destroyed including all facts known to **you** regarding:

HO-3 (01-07)

22

      (i)   its quantity,

      (ii)   its description,

      (iii)  from whom it was obtained,

      (iv)  the date it was obtained or purchased,

      (v)   whether it was purchased new or used,

      (vi)  the amount of its purchase price,

      (vii) the current **replacement** cost,

      (viii) the cost to **repair** it,

      (ix)  the amount of **your** loss; and

    (9)  if required, any plans and specifications of any damaged building or fixtures;

(d) Show the damaged property to **us** or **our** representative prior to its **replacement** or **repair**, as often as **we** may reasonably require.

(e) Submit to examinations under oath by any **person** named by **us**, out of the presence of any other **individual** other than a licensed attorney and sign the transcript of the examinations.

(f) Produce for examination, and permit **us** to copy, records pertaining to any loss of **rental** or **lease** income, all books of account, bills, invoices, receipts and other vouchers that **we** may reasonably require.

(g) Produce receipts for any increased costs **you** incur to maintain **your** standard of living while **you dwell** elsewhere.

(h) Authorize **us**, in writing, to obtain any other records that may be relevant to the **claim** or may reasonably be expected to aid **our** investigators in determining the facts relevant to the **claim**.

2. Insurable Interest

    **We** will not pay more than the insurable interest an **insured** has in the covered property at the time of loss.

3. Abandoned Property

    **We** are not obliged to accept abandoned property.

4. Loss to a Pair or Set

    **We** may, at **our** option:

(a) **repair** or **replace** any part of a pair or set to restore the pair or set to its **market value** before the loss; or

(b) pay the amount by which the **market value** of the pair or set has diminished because of the loss of, or damage to, the part.

5. Loss Payable Clause

    **We** will adjust any loss with **you**, and make any payment due to **you**. However, if another **person** is named in the **Declarations** as a "loss payee", **we** will include the name of that **person** on any settlement check or draft and deliver it to **you** or such loss payee, at **our** option.

6. Mortgagees and Trustees Under Deeds of Trust

    **We** will adjust any loss with **you**, and make any payment due to **you**. However, if another **person** is named in the **Declarations** as a "mortgagee", or "trustee" under a trust deed, **we** will pay any amount due to that mortgagee or trustee to the extent of its interests. If the name of more than one such **person** appears, **we** will pay them in the order of precedence of their mortgages or trust deeds. This provision does not apply to contracts for deed or any similar method of sale in which **ownership** of the property does not pass to the **insured** until all payments on the purchase loan are made.

    Any payment due to a mortgagee or trustee under this provision will not be invalidated by:

(a) any act or neglect of the mortgagor or **owner** of the insured property;

(b) any foreclosure or other proceedings or notice of sale relating to the property;

(c) any change in the title or **ownership** of the property; or

(d) the occupation of the **premises** for purposes more hazardous than are permitted by this policy.

If the mortgagor or **owner** neglects to pay any premium due under this policy, the mortgagee or trustee must pay it, immediately upon **our** demand.

HO-3 (01-07)             23

Any mortgagee or trustee must notify **us** of any change of:

(a) **ownership**;
(b) occupancy; or
(c) increased risk of a loss to the insured property;

of which it has knowledge within ten days of its acquisition of that knowledge. The mortgagee or trustee must also pay the additional premium for such increased risk of loss for the balance of the term of this policy. Failure to provide such notice or make such payment will result in an immediate loss of coverage to the mortgagee or trustee.

**We** may cancel this policy at any time as provided by its terms, however if **we** do so, it will continue in force as to benefits due the mortgagee or trustee for 10 days after notice is mailed to the mortgagee or trustee of such cancellation. At the end of those 10 days all benefits under this policy will end. This provision does not apply to loss payees.

If another policy of insurance provides coverages similar to those provided in Section I of this policy, the benefits provided under this policy will apply as excess only over those provided by such other policy. In that instance, benefits will be payable under this policy only to the extent the limits of the coverage provided under this policy exceed the limits provided by the other policy.

If **we** pay the mortgagee or trustee any sum for loss under this policy, and **we** contend that **we** had no obligation to pay the mortgagor or **owner**, **we** will be subrogated to all of the rights of the party to whom such payment is made to the extent of such payment. **Our** interest will extend to all securities held as collateral for the mortgage debt. Any mortgagee or trustee so paid agrees to sign whatever documents and take whatever actions **we** may reasonably request to

enforce **our** rights under this provision. **Our** subrogation rights will not be enforced in such a way as to impair the right of the mortgagee or trustee to recover the full amount due under the mortgage.

If **we** pay the mortgagee or trustee any sum for loss under this policy, and **we** contend that **we** had no obligation to pay the mortgagor or **owner**, **we** may, at **our** option, pay the mortgagee or trustee the entire principal sum of the loan, with interest accrued to the date of payment and, if **we** do so, that **person** agrees to make a full assignment and transfer of the mortgage or trust deed and all other securities applicable to the loan to **us**.

7. Suit Against **Us**

Any lawsuit seeking coverage or benefits under Section I of this policy must be brought within one year after the loss or damage occurs, unless the law of the state in which this policy was issued prohibits this contractual limitation period. This period is extended by the number of days between the date of **your** loss and the date **we** deny the **claim** in whole or in part.

8. No Benefit to Bailee

This insurance will not, in any way, benefit any **person** who may be caring for or handling property for a fee.

9. Recovered Property

If **you** recover any lost or stolen property for which **we** have made a payment under this policy, **you** agree to notify **us** of that fact within ten days of its recovery. If **you** want to keep the property **you** may do so if **you** return the entire amount **we** paid **you** because of its loss. If **you** do not want to keep the property, **you** agree to allow **us** to take it, if **we** chose to do so. In that event the property will become **our** property.

If **we** recover any lost or stolen property for which **we** have made a payment under this policy, **we** agree to notify **you** of that fact within ten days of its recovery. If **you** want the property

HO-3 (01-07)                    24

you may take it if you return the entire amount we paid you because of its loss. If you do not want the property, you agree to allow us to keep it, if we chose to do so. In that event the property will become our property.

10. Payments Under This Section Of The Policy
Before we make any payments under Section I of this policy,
   (a) we must receive your completed proof of loss;
   (b) you must comply with all conditions of this policy; and
   (c) the amount of the loss must have been established by either:
      (1) an agreement between you and us, or
      (2) a final judgment of a court of law.
   When these steps are completed, we will make any payments due for a covered loss within 30 days.

11. Appraisal
   Any appraisal that becomes necessary under the terms of this policy will be handled in accordance with the state specific endorsement attached to this policy.

HOW LOSSES UNDER SECTION I ARE SETTLED
(A) These provisions apply to all losses settled under paragraphs (B), (C), (D), and (E), below:
   (1) If the total restoration cost of all covered property damaged in one accident is less than one thousand dollars, we will pay you the total restoration cost.
   (2) The amount of your deductible will be deducted from all losses covered under Section I of this policy, unless the specific coverage under which the loss is covered says otherwise. A single deductible applies to all covered losses caused by any one accident.
   (3) If we cannot agree with you as to the total restoration cost, restoration cost, market value or actual cash value, and agreement is required under this policy in order to conclude a claim, the total restoration

cost, restoration cost, market value or actual cash value, whichever may apply to the specific claim, will be determined in accordance with the appraisal section of the state specific endorsement attached to this policy.

(B) This provision applies to covered losses to all personal property:
   (1) When we agree with you as to the market value of the damaged part of those items, we will, at our option, do one of the following:
      (a) pay the market value of the damaged part of the covered property;
      (b) pay the restoration cost of the damaged part of the covered property;
      (c) pay to replace the damaged part of the covered property, in kind; or
      (d) pay the limit of coverage stated in this policy as applicable to the item, including any special limits, or limits based on the location of the item.
   (2) All payments made under this provision will be applied against the limits of Coverage C.
   (3) If we make a payment to you under this provision, we may, at our option take all or part of the covered item for which that payment was made.

(C) This provision applies to covered losses to structures that are not buildings:
   (1) When we agree with you as to the restoration cost of the damaged part of those items, we will, at our option, do one of the following:
      (a) pay the actual cash value of the damaged part of the covered property;
      (b) pay to replace the damaged part of the covered property, in kind; or
      (c) pay the limit of coverage stated in this policy as applicable to the item.
   (2) All payments made under this provision will be applied against the limits of Coverage B.

HO-3 (01-07)                    25

(3) If **we** make a payment to **you** under this provision, **we** may, at **our** option take all or part of the covered item for which that payment was made.

(D) This provision applies to covered losses to the following items if they are permanently attached to the **residence premises**: (i) antennas, (ii) awnings, (iii) floor surfacing materials, and (iv) **domestic appliances**:

(1) When **we** agree with **you** as to the **restoration cost** of the damaged part of those items, **we** will, at **our** option, do one of the following:

   (a) pay the **actual cash value** of the damaged part of the covered property;
   (b) **replace** the damaged part of the covered property, in kind; or
   (c) pay the limit of coverage stated in this policy as applicable to the item.

(2) All payments made under this provision will be applied against the limits of Coverage A, or B, whichever may apply to the specific loss.

(3) If **we** make a payment to **you** under this provision, **we** may, at **our** option take all or part of the covered item for which that payment was made.

(E) This provision applies to covered losses to all items that are not included in sections (B), (C), or (D), above:

(1) **We** will estimate the **total restoration cost** of the damaged part of those items. Based on that estimate, **we** will estimate the **actual cash value** of the damaged part of those items and will, at **our** option do one of the following:

   (a) pay the estimated **restoration cost** of the damaged part of the covered property;
   (b) pay the estimated **actual cash value** of the damaged part of the covered property;
   (c) pay to **replace** the damaged part of the covered property, in kind; or
   (d) pay the limit of coverage stated in this policy as applicable to the item.

(2) No further payment will be made unless, within one year of the date of the loss:

   (a) all the **repairs** and **replacements** necessary to restore the form and function of the damaged part of the covered property have actually been completed; and
   (b) the **total restoration cost** is agreed upon by **you** and **us**.

   **We** will then pay **you**:

   (c) the difference between the amount **we** have already paid **you** and the **restoration cost** of that particular part, plus
   (d) any reasonable and necessary charges **you** actually incurred for **general contractors' overhead and profit**; or
   (e) if the amount **we** have already paid **you** plus the amounts payable under (c) and (d), immediately above, total more than the limit of liability shown in the **Declarations** applicable to the particular loss, **we** will pay **you** the difference between the amount **we** have already paid **you** and that limit of liability.

(3) All payments made under this provision will be applied against the limits of Coverage A or B, whichever may apply to the specific loss.

(4) If **we** pay to **replace** an item under this provision, **we** may, at **our** option take all or part of the covered item for which that payment was made.

HO-3 (01-07)

26

## SECTION II - PERSONAL LIABILITY AND MEDICAL PAYMENT PROTECTION

**COVERAGE E - PERSONAL LIABILITY**

INSURING AGREEMENT

Subject to the limit of **our** liability stated in this section, **we** will pay on behalf of an **insured**, all sums that such **insured** becomes legally obligated to pay as damages, if those damages result from an **accident**.

**OUR** RIGHT TO INVESTIGATE AND SETTLE **CLAIMS**

**We** may investigate and settle any **claim** as **we** think appropriate.

LIMITS OF LIABILITY

Regardless of the number of **insureds, persons** injured, **claims** made, or locations shown, **our** liability is limited to the limits of liability stated in the **Declarations** under the heading "Personal Liability (Bodily Injury & Property Damage) Each Occurrence". That amount is the limit of **our** liability for all damages resulting from any one **accident**.

With respect to **claims** arising out of the use of watercraft not **owned** by an **insured, our** liability is limited to $100,000 per **accident** regardless of the number of **insureds, persons** injured, or **claims** made, regardless of the limits of liability stated in the **Declarations** under the heading "Personal Liability (Bodily Injury & Property Damage) Each Occurrence".

EXCLUSIONS

**We** do not cover:

1. **Bodily injury** or **property damage** arising out of the **ownership**, maintenance, operation, use, or entrustment of:

    (a)  Aircraft other than miniature aircraft that are not designed to transport cargo or people.

    (b)  **Land motor vehicles**, other than a **recreational motor vehicle**:

    (1)  **owned** by any **insured**;

    (2)  operated by any **insured**;

    (3)  **rented** to any **insured**; or

    (4)  loaned to any **insured**.

    **We** do provide coverage if the **land motor vehicle** is kept in dead storage on the insured premises and is not licensed for use on **public roadways**.

    (c)  **Motorized vehicles**, if the **bodily injury** or **property damage** occurs away from the **insured premises**. This exclusion does not apply to:

    (1)  a golf cart while it is being used for golfing on a golf course;

    (2)  a **motorized vehicle** originally designed to assist the physically handicapped;

    (3)  a **motorized vehicle**, other than a **land motor vehicle**, used in a part-time job related activity by **you** or a **relative**, if the **individual** engaged in that activity is under the age of twenty-five, and is a full time student; or

    (4)  a lawn mower while used to mow other **premises** so long as such mowing is not a **business**.

    (d)  **Motorized vehicles** used, or designed to be used, in competition with other vehicles; or

    (e)  Watercraft, if the **bodily injury** or **property damage** occurs away from the **insured premises**.  This exclusion does not apply if the watercraft:

    (1)  Is **owned** by an **insured**, and has:

    (i)  an outboard propulsion motor with 25 horsepower, or less; or

    (ii)  an inboard, inboard/outdrive, water jet drive, or any other design of propulsion motor with 50 horsepower or less.

    (2)  Is **owned** by an **insured** and is a sailing vessel 25 feet or less in length, with or without, an auxiliary propulsion motor of any size.

    (3)  Is **rented** by an **insured**, and:

    (i)  has a propulsion motor with 200 horsepower or less. This applies to all propulsion motors whether, outboard, inboard, inboard/outdrive, water jet drive, or any other design;

HO-3 (01-07)                                    27

(ii) is a sailing vessel 25 feet or less in length without an auxiliary propulsion motor;or

(iii) is a sailing vessel 25 feet or less in length with an auxiliary propulsion motor with 200 horsepower or less.

2. **Bodily injury** or **property damage** arising out of the rendering or failing to render professional services.

3. **Bodily injury** or **property damage** arising out of the business of any **insured**.

4. **Bodily injury** or **property damage** arising out of the condition of any **premises owned, rented** or controlled by an **insured** that is not an **insured premises**. However, we will cover **bodily injury** to any **residence employee** arising out of, and in the course of, employment by an **insured** at such **premises**.

5. **Bodily injury** or **property damage** that any **insured** intended to cause.

6. **Bodily injury** or **property damage** that a reasonable **individual** would expect to result from the intentional acts of any **insured**.

7. **Bodily injury** or **property damage** arising out of **war**.

8. **Bodily injury** or **property damage** that arises out of the transmission of communicable diseases by any **insured**.

9. Liability that arises solely because of a contract, warranty, or agreement, made by any **insured**.

10. **Property damage** to **personal property**:
    (a) **owned** by any **insured**;
    (b) used by any **insured**;
    (c) **rented** to any **insured**; or
    (d) in the care of any **insured**.

11. **Property damage** to **premises**:
    (a) owned by any **insured**;
    (b) occupied by any **insured**;
    (c) used by any **insured**;
    (d) **rented** to any **insured**; or
    (e) in the care of any **insured**.
    We will cover **property damage** to such **premises** or property caused by fire, smoke or explosion.

12. **Bodily injury** to any **individual** who is entitled to benefits for that **bodily injury** that are provided, or required under any **compensation law** to be provided, by anyone.

13. **Bodily injury** or **property damage** when any **insured** is covered under any nuclear energy liability policy. This exclusion applies even if the limits of liability of that policy have been exhausted.

14. **Bodily injury** to any **resident** of the **insured premises**, except a **residence employee**.

15. **Bodily injury** to a **residence employee** unless written **claim** is made within 12 months after the end of the policy term during which the **accident** occurred.

16. **Bodily injury** to any **insured**. This exclusion applies, even if the **claim** is one seeking contribution toward, or repayment of, damages based upon that **bodily injury**.

17. **Bodily injury** to any **individual** who is on the **insured premises** because of the **business** of any **insured**.

18. **Property damage** to property that is on the **insured premises** because of the **business** of any **insured**.

19. **Bodily injury** or **property damages** arising out of any activity of any **insured** that would constitute a felony under the laws of the state in which such activity occurred, whether or not such **insured** is actually charged with a crime for that activity.

20. Liability of any **insured** for **punitive damages**.

21. **Bodily injury** or **property damage** arising out of, or caused, in whole or in part, by asbestos, radon, mold, lead; paint containing lead, chemicals, petroleum products, or any other substance or material containing lead, or any pollutant.

22. Any legal obligation of any **insured** for indemnification or contribution due because of **bodily injury** or **property damage** caused, in whole or in part, by asbestos, radon, mold, lead, paint containing lead, chemicals, petroleum products, or any other substance or material containing lead, or any pollutant.

HO-3 (01-07)                    28

23. Any loss, cost or expense arising out of any governmental direction or request that any **insured** test for, monitor, clean up, remove, abate, contain, treat or neutralize asbestos, radon, mold, lead, paint containing lead, chemicals, petroleum products or any other substance or material containing lead, or any pollutant.

24. **Property damage** arising out of the intentional or negligent misrepresentation or non-disclosure of any material fact related to the sale, or attempted sale, of property **owned** by any **insured**.

25. **Bodily injury** or **property damage** for which an **insured** may be held liable because of the **ownership** or harboring of animals that are not customarily kept as household pets.

## COVERAGE F - MEDICAL PAYMENTS TO OTHERS
### INSURING AGREEMENT

Subject to the limit of **our** liability stated in this section, **we** will pay the **reasonable charges** for **necessary goods and services** incurred within three years after the date of a **covered injury**.

ADDITIONAL DEFINITIONS USED IN THIS COVERAGE

1. **Covered injury** means a **bodily injury**, caused by an **accident** that occurred:

    (a) while the injured **individual** was on an **insured premises** with the permission of an **insured**, or

    (b) while the injured **individual** was elsewhere, if the **bodily injury**:

    (1) resulted from the condition of the **insured premises**;

    (2) was caused by an **insured**;

    (3) was caused by a **residence employee** in the course of his or her employment by an **insured**;

    (4) was caused by an animal **owned** by, or under the control of, an **insured**; or

    (5) was sustained by a **residence employee** and arose out of, and in the course of, his or her employment by an **insured**.

**Covered injury** does not mean **bodily injury** to any **insured**.

2. **Necessary goods and services** means the goods and services furnished, or prescribed, by a health care provider which, in **our** judgment, are necessary for the proper treatment of a **covered injury** in the most efficient and economical way that it can be safely treated. **We** may employ outside reviewers, consultants and data providers in formulating **our** judgment as to whether the goods and services are **necessary goods and services**. The determination of whether goods and services are **necessary goods and services** may be made after the **individual** making the **claim** has received the goods and services. The fact that a licensed health care provider furnished, rendered, or prescribed the goods and services is not solely determinative of whether they are **necessary goods and services**.

3. **Reasonable charges** means charges incurred for goods and services that, in **our** judgment, are within the range of charges for the same or similar goods and services, in the geographic area in which the services are rendered or the goods are provided. **We** may employ outside reviewers, consultants and data providers in formulating **our** judgment as to whether the charges are **reasonable charges**. The determination of whether charges are **reasonable charges** may be made after the **individual** making the **claim** has received the goods and services for which the charges are made. The fact that a licensed health care provider furnished, rendered, or prescribed the goods and services is not solely determinative of whether the charges made for them are **reasonable charges**.

DUTIES OF AN **INDIVIDUAL** WHO MAKES A **CLAIM**

Any **individual** who makes a **claim** under Coverage F must:

1. authorize **us** to obtain any records that may be relevant to the **claim** or may reasonably be

expected to aid **our** investigators in determining the facts relevant to the **claim**;

2. answer, under oath, any questions posed by **us**, out of the presence of any other **individual**, and sign a written transcript of such questions and answers;

3. submit to physical examinations, at **our** expense, by doctors **we** select as often as **we** may reasonably require; and

4. authorize **us** to obtain relevant medical records of the **bodily injury** that is the basis for such **claim**.

## LIMITS OF LIABILITY

Regardless of the number of **insureds, persons** injured, **claims** made, or locations shown, **our** liability is limited to the limits of liability stated in the **Declarations** under the heading "Medical Payment To Others Per Person". That stated amount is the limit of **our** liability for all medical expenses for **bodily injury** to any one **individual** resulting from any one **accident.**

## PAYMENTS UNDER THIS COVERAGE

**We** will pay any amount due under this coverage directly to the **individual** making the **claim** unless, because of a perfected lien or valid assignment, **we** are obligated to pay someone else. **We** will pay, based upon such an assignment, only if **we** receive a written copy of the assignment before **we** make payment for the services for which the assignment was given.

## EXCLUSIONS

**We** do not cover charges related to:

1. **Bodily injury** to any **insured** or resident of the **insured premises**, except a **residence employee.**

2. **Bodily injury** arising out of the **ownership**, maintenance, operation, use, or entrustment of:

   (a) Aircraft **owned** by or **rented** to any **insured** other than miniature aircraft that are not designed to transport cargo or people.

   (b) **Land motor vehicles**, other than a **recreational motor vehicle:**

   (1) **owned** by any **insured**;
   (2) operated by any **insured**;
   (3) **rented** to any **insured**; or
   (4) loaned to any **insured**.
   **We** do provide coverage if the **land motor vehicle** is kept in dead storage on the **insured premises** if it is not licensed for use on **public roadways**.

   (c) **Motorized vehicles**, if the **bodily injury** occurs away from the **insured premises**. This exclusion does not apply to:

   (1) a golf cart while it is being used for golfing on a golf course;
   (2) a **motorized vehicle** originally designed to assist the physically handicapped;
   (3) a **motorized vehicle**, other than a **land motor vehicle**, used in a part-time job related activity by **you** or a **relative**, if the **individual** engaged in that activity is under the age of twenty-five, and is a full time student; or
   (4) a lawn mower while used to mow other **premises** so long as such mowing is not a **business.**

   (d) **Motorized vehicles** used, or designed to be used, in competition with other vehicles; or

   (e) Watercraft, if the **bodily injury** occurs away from the **insured premises**.

3. **Bodily injury** arising out of the rendering or failing to render professional services.

4. **Bodily injury** arising out of the **business** of any **insured**.

5. **Bodily injury** to any **individual** who is on the **insured premises** because of the **business** of any **insured**.

6. **Bodily injury** arising out of any **premises owned, rented** or controlled by any **insured** that is not an **insured premises**. However, **we** will cover **bodily injury** to a **residence employee** sustained at such **premises** if that injury arises out of, and in the course of, employment by an **insured**.

7. **Bodily injury** that any **insured** intended to cause.

HO-3 (01-07)                                    30

8. **Bodily injury** that a reasonable **individual** would expect to result from the intentional acts of any **insured**.

9. **Bodily injury** arising out of **war**.

10. **Bodily injury** arising out of the transmission of communicable diseases by any **insured**.

11. **Bodily injury** to any **individual** who is entitled to benefits that are provided, or required to be provided, under any **compensation law**.

12. **Bodily injury** arising out of any nuclear reaction, radiation or radioactive contamination or any consequence of any of these.

13. **Bodily injury** arising out of, or caused, in whole or in part, by asbestos, radon, mold, lead, paint containing lead, chemicals, petroleum products, or any other substance or material containing lead, or any pollutant.

14. **Bodily injury** arising out of any activity of any **insured** that would constitute a felony under the laws of the state in which such activity occurred, whether or not such **insured** is actually charged with a crime for that activity.

## COVERAGE G – DAMAGE TO PROPERTY OF OTHERS

### INSURING AGREEMENT

**We** will pay for **property damage** caused by an **insured** to real property or **personal property owned** by others.

### LIMITS OF LIABILITY

**We** will not pay more than the smallest of the following amounts for any one occurrence:

1. the **market value** of the property at the time of loss;
2. the **restoration cost**; or
3. $1,000.

### EXCLUSIONS

**We** will not pay for **property damage**:

1. caused by any **insured** who has attained the age of 13, unless it results from an **accident**;
2. to property **owned** by, or **rented** to:
   (a) any **insured**;
   (b) any tenant of an **insured**; or
   (c) any **resident** of any **insured's** household;

3. arising out of:
   (a) any act or omission related to making **premises owned**, **rented**, or controlled by any **insured** safe, unless those **premises** are the **insured premises**;
   (b) the **business** of anyone;
   (c) the **ownership**, maintenance or use of a **land motor vehicle**, trailer, aircraft or watercraft; or
4. to property insured under Section I of this policy.

## ADDITIONAL COVERAGES UNDER SECTION II

**We** will pay the following costs and expenses if they result from a **claim** covered by Section II of this policy. The payment of these benefits will not reduce **our** limits of liability under this Section:

1. All expenses **we** incur in the settlement of any **claim**.

2. If a lawsuit is filed against the **insured** for damages that are covered under this section of the policy, **we** will defend the **insured** at **our** expense, using lawyers of **our** choice, and **we** will pay all expenses and attorney's fees **we** incur in the defense of that lawsuit. **We** are no longer obligated to provide, or to pay for, such defense after **we**:
   (a) offer to the claimant or judgment creditor, or pay into court, the full amount of **our** limit of liability under Coverage E, exclusive of all **judgment interest**; or
   (b) **we** offer to the judgment creditor, or pay into court, that part of a judgment **we** owe within **our** limit of liability under Coverage E, exclusive of all **judgment interest**.

3. Court costs that are assessed against an **insured** in a civil lawsuit in which **we** have paid the fees of the **insured's** attorney.

4. Pre-judgment interest due on any amount **we** owe within **our** limits of liability under Coverage E of this policy. However, **our** duty to pay pre-judgment interest on any one **claim** ends when **we**:
   (a) offer to the claimant or judgment creditor, or pay into court, the full amount of **our** limit of liability under Coverage E, exclusive of all **judgment interest**; or

HO-3 (01-07)   31

(b) **we** offer to the judgment creditor, or pay into court, that part of a judgment **we** owe within **our** limit of liability under Coverage E, exclusive of all **judgment interest**.

5. Post-judgment interest due on any amount **we** owe within **our** limits of liability under Coverage E. However, **our** duty to pay post-judgment interest on any one **claim** ends when **we** offer to the judgment creditor, or pay into court, that part of the judgment that **we** owe within **our** limits of liability under Coverage E, exclusive of all **judgment interest**.

6. The cost of any bonds required by an appellate court to ensure payment of the cost of an appeal, if that appeal is from a judgment in a civil lawsuit in which **we** have paid the fees of the **insured's** attorney. **We** have no duty to furnish or apply for any bonds. The limit of **our** liability for the cost of all such bonds is ten percent of the limit of liability under Coverage E. **We** do not cover the cost of supersedeas bonds, or bonds necessary to stay execution of a judgment during the pendency of an appeal from that judgment.

7. Up to $250 for each bail bond needed by an **insured** because of any one **accident** or traffic law violation resulting from the operation of a **land motor vehicle** insured under this policy. **We** have no duty to furnish or apply for such bonds.

8. Reimbursement that is requested by an **insured**, for reasonable and necessary expenses incurred at **our** request during the defense of a civil lawsuit. This does not include wages or salary lost by an **insured** who **we** ask to attend any proceedings related to the defense of a civil lawsuit.

## MUTUAL POLICY NOTIFICATION

If the Company named in the **Declarations** is Shelter Mutual Insurance Company, the following provisions apply to this policy.

This policy is issued by a mutual company subject to special legal regulations applicable to its organization, membership, policies, and contracts of insurance. Some of those regulations apply to and form a part of this policy.

**You** are hereby notified that by virtue of purchasing this policy **you** are a member of the Shelter Mutual Insurance Company of Columbia, Missouri and may participate, to the extent, and upon the conditions fixed and determined by the Board of Directors of the Company in its discretion in the distribution of dividends it fixes and determines.

**You** are entitled to vote, either in person or by proxy, at all meetings of that Company. The annual meeting of the Shelter Mutual Insurance Company is held at its Home Office in Columbia, Missouri, on the first Wednesday in April of each year at 10 o'clock A.M.

All of **your** interest in the Shelter Mutual Insurance Company, its goodwill, assets, and guaranty fund, will cease upon termination of this policy, except any **claims** that **you** may then have under this policy and except for any unearned portion of **your** deposit premium.

This policy is non-assessable.

IN WITNESS WHEREOF, the Company named in the **Declarations** has caused this policy to be signed by its President and Chief Executive Officer and its Secretary, and countersigned on the **Declarations** page by a duly authorized representative of the Company.

*Randa Rawlins*
Secretary

*David Moore*
President and CEO

HO-3 (01-07)                                            32

Policy Number:   35-71-007230831-0001

# EXPANDED RESTORATION COST COVERAGE

For an additional premium, **we** agree that, with respect to property **you** own, the section of the policy titled "HOW LOSSES UNDER SECTION I ARE SETTLED" is removed, and the following is substituted in its place. In all other respects the policy remains as it is written and, with respect to property **you** do not **own**, losses will be settled under the provision set forth in the policy as it exists without this endorsement.

## HOW LOSSES UNDER SECTION I ARE SETTLED

(A)  These provisions apply to all losses settled under paragraphs (B), (C), (D), and (E), below:

   (1)  If the **total restoration cost** of all covered property damaged in one **accident** is less than one thousand dollars, we will pay **you** the **total restoration cost.**

   (2)  The amount of **your deductible** will be deducted from all losses covered under Part I of this policy, unless the specific coverage under which the loss is covered says otherwise. A single **deductible** applies to all covered losses caused by any one **accident.**

   (3)  If we cannot agree with **you** as to the **total restoration cost, restoration cost, market value** or **actual cash value,** and agreement is required under this policy in order to conclude a **claim,** the **total restoration cost, restoration cost, market value** or **actual cash value,** whichever may apply to the specific **claim,** will be determined in accordance with the appraisal section of the state specific endorsement attached to this policy.

(B)  This provision applies to covered losses to all **personal property:**

   (1)  **We** will estimate the **market value** and, at **our** option, the **restoration cost,** of the damaged item. Based on that estimate **we** will, at **our** option, do one of the following:

      (a)  pay the estimated **market value** of the damaged property;

      (b)  pay the estimated **restoration cost** of the damaged property;

      (c)  pay to **replace** the damaged property, in kind; or

      (d)  pay the limit of coverage stated in this policy as applicable to the damaged property, including any special limits, or limits based on its location.

   (2)  No further payment will be made unless, within two years of the date of the loss:

      (a)  all the **repairs** and **replacements** necessary to restore the form and function of the damaged property have actually been completed; and

      (b)  the **total restoration cost** is agreed upon by **you** and **us.**

     **We** will then pay **you:**

      (c)  the difference between the amount **we** have already paid **you** and the **restoration cost;** or

      (d)  if the amount **we** have already paid **you** plus the amounts payable under (c), immediately above, total more than the limit of liability shown in the **Declarations** applicable to the particular loss, **we** will pay **you** the difference between the amount **we** have already paid **you** and that limit of liability.

**We** will not make the additional payments as provided in this paragraph for any of the following items:

      (a)  fine art, unique paintings, unique statutes, obsolete items, specially designed or custom built items, and similar items that cannot be **replaced** with new items;

      (b)  antiques, or items that have value primarily because of their age or history;

      (c)  items that are not in working order; or

      (d)  items no longer used on a regular basis.

   (3)  **Our** liability will not exceed the lesser of the following amounts:

      (a)  the cost to replace the item with a new item similar to the item on which the **claim** is based;

      (b)  400% of the current **market value** of the item, but not less than its **market value** on the date **you** first acquired it; or

      (c)  the limit of coverage stated in this policy as applicable to the item, including any special limits, or limits based on its location.

   (4)  All payments made under this provision will be applied against the limits of Coverage C.

   (5)  If **we** make a payment under this provision, we may, at **our** option take all or part of the covered item for which that payment was made.

(C)  This provision applies to covered losses to structures that are permanently attached to the **residence premises** but are not buildings:

   (1)  When **we** agree with **you** as to the **restoration cost** of the damaged part of those items, **we** will, at **our** option, do one of the following:

      (a)  pay the **actual cash value** of the damaged part of the covered property;

      (b)  pay to **replace** the damaged part of the covered property, in kind; or

      (c)  pay the limit of coverage stated in this policy as applicable to the item.

   (2)  All payments made under this provision will be applied against the limits of Coverage B.

   (3)  If **we** make a payment to **you** under this provision, **we** may, at **our** option take all or part of the covered item for which that payment was made.

(D)  This provision applies to covered losses to the following items if they are permanently attached to the **residence premises:** (i) antennas, (ii) awnings, (iii) floor surfaces, and (iv) **domestic appliances:**

   (1)  When **we** agree with **you** as to the **restoration cost** of the damaged part of those items, **we** will, at **our** option, do one of the following:

      (a)  pay the **actual cash value** of the damaged part of the covered property;

      (b)  **replace** the damaged part of the covered property, in kind; or

      (c)  pay the limit of coverage stated in this policy as applicable to the item.

   (2)  No further payment will be made unless, within one year of the date of the loss:

B-327.9-B

(Continued on Next Page)

Policy Number:   35-71-007230831-0001

(a)  all the **repairs** and **replacements** necessary to restore the form and function of the damaged part of the covered property have actually been completed; and

(b)  the **total restoration cost** is agreed upon by **you** and **us**.

**We** will then pay **you**:

(c)  the difference between the amount **we** have already paid **you** and the restoration cost of that particular part, plus

(d)  any reasonable and necessary charges **you** actually incurred for **general contractors' overhead and profit**; or

(e)  if the amount **we** have already paid **you** plus the amounts payable under (c) and (d), immediately above, total more than the limit of liability shown in the **Declarations** applicable to the particular loss, **we** will pay **you** the difference between the amount **we** have already paid **you** and that limit of liability.

(3)  All payments made under this provision will be applied against the limits of Coverage A or B, whichever may apply to the specific loss.

(4)  If **we** make a payment to **you** under this provision, **we** may, at **our** option take all or part of the covered item for which that payment was made.

(E)  This provision applies to covered losses to all items that are not included in sections (B), (C), or (D), above:

(1)  **We** will estimate the **total restoration cost** of the damaged part of those items. Based on that estimate, **we** will estimate the **actual cash value** of the damaged part of those items and will, at **our** option, do one of the following:

(a)  pay the estimated **restoration cost** of the damaged part of the covered property;

(b)  pay the estimated **actual cash value** of the damaged part of the covered property;

(c)  pay to **replace** the damaged part of the covered property, in kind; or

(d)  pay the limit of coverage stated in this policy as applicable to the item.

(2)  No further payment will be made unless, within one year of the date of the loss:

(a)  all the **repairs** and **replacements** necessary to restore the form and function of the damaged part of the covered property have actually been completed; and

(b)  the **total restoration cost** is agreed upon by **you** and **us**.

**We** will then pay **you**:

(c)  the difference between the amount **we** have already paid **you** and the **restoration cost** of that particular part, plus

(d)  any reasonable and necessary charges **you** actually incurred for **general contractors' overhead and profit**; or

(e)  if the amount **we** have already paid **you** plus the amounts payable under (c) and (d), immediately above, total more than the limit of liability shown in the **Declarations** applicable to the particular loss, **we** will pay **you** the difference between the amount **we** have already paid **you** and that limit of liability.

(3)  All payments made under this provision will be applied against the limits of Coverage A or B, whichever may apply to the specific loss.

(4)  If **we** pay to replace an item under this provision, **we** may, at **our** option take all or part of the covered item for which that payment was made.

B-327.9-B

## INFLATION PROTECTION ENDORSEMENT

Coverage limits under **your** policy may be adjusted annually using data from industry sources which report changes in the construction cost index caused by inflation.

At each annual renewal date, **your** renewal billing will reflect the adjustment, if any, in policy limits from the previous renewal date.

**You** agree to:

(a)  Accept all adjustments in limits included in **your** renewal billing; and

(b)  Notify **us** within 90 days of the start of any new building valued at $5000 or more, or any addition to or remodeling of buildings which increases their value by $5000 or more; and

(c)  pay any required premium for such changes in value.

All other provisions of the policy apply.

B-697.1-B

Policy Number:   35-71-007230831-0001

## AMENDATORY ENDORSEMENT - OKLAHOMA
### (HO-3)

It is agreed that under **GENERAL AGREEMENTS APPLICABLE TO ENTIRE POLICY**, 6. CANCELLATION is shown to read as follows:

6.   CANCELLATION AND MODIFICATION

Any **person** who is a **named insured** may cancel or ask **us** to modify this policy, effective on any specific future date by telling **us** what modifications are requested or when the cancellation is to be effective. If a **named insured** does so, **we** are not obligated to send any **person** any notice of such cancellation or modification unless this policy specifically requires it. It is not necessary for all **named insureds** to request or confirm cancellation or modification by any other **named insured**. When there are two or more **named insureds**, each one of them acts for all of them when canceling or requesting modifications to this policy.

This policy may be cancelled by **us** at any time during the policy period for failure to pay any premium when due, whether such premium is payable directly to **us** or **our** agent, by mailing written notice to **you** at **your** address last know to **us** stating when, not less than 10 days thereafter, such cancellation shall be effective.

If this policy has been in effect for less than 60 days, **we** may cancel for any reason not prohibited by law by mailing notice of cancellation to **you** at **your** address last known to **us** stating when, not less than 30 days thereafter, such cancellation shall be effective.

After this policy has been in effect for 60 days, or if it is a renewal, it may be cancelled by **us** for one or more of the following reasons and then only by mailing written notice to **you** at **your** address last known to **us** stating when, not less than 30 days thereafter, such cancellation shall be effective:

(1)   discovery of fraud or material misrepresentation in the procurement of the insurance or with respect to any **claims** submitted thereunder;

(2)   discovery of willful or reckless acts or omissions on the part of a named **insured** which increase any hazard insured against;

(3)   a change in the risk which substantially increases any hazard insured against after insurance coverage has been issued or renewed;

(4)   violation of any local fire, health, safety, building, or construction regulation or ordinance with respect to any insured property or the occupancy thereof which substantially increases any hazard insured against; or

(5)   conviction of the named **insured** of a crime having as one of its necessary elements an act increasing any hazard insured against.

Proof of mailing will be sufficient proof of notice. The policy period will end on the date and time stated in the notice.

Upon cancellation, the **named insured** may be entitled to a premium refund, but payment or tender of a premium refund is not a condition of cancellation. The refund will be pro rata. Refunds may be paid either when the cancellation is effective or as soon as practicable after the effective date of the cancellation. The **named insured** may choose to credit the premium refund toward another policy, if **we** issued that policy.

It is agreed that under **GENERAL AGREEMENTS APPLICABLE TO ENTIRE POLICY**, 7. REFUSAL TO RENEW is shown to read as follows:

7.   REFUSAL TO RENEW

**We** may refuse to renew this policy for any reason not prohibited by law. This policy will terminate automatically on its expiration date if **you** have failed to pay the premium for this policy or any installment thereof. If **we** refuse to renew this policy for a reason other than non-payment of premium, **we** will mail notice to the **named insured's** address last known to **us** at least thirty days before the policy period ends. Notice is not required if **you** have accepted replacement coverage, **you** have requested or agreed to nonrenewal, or the policy is expressly designated as nonrenewable.

Proof of mailing will be sufficient proof of notice. The policy period will end on the date and time stated in the notice.

It is agreed that the following is added to 8. CONCEALMENT OR FRAUD found under **GENERAL AGREEMENTS APPLICABLE TO ENTIRE POLICY**.

WARNING: Any **person** who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds on an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

It is agreed that under SPECIAL PROVISIONS AND CONDITIONS RELATING TO SECTION I, the first sentence of 7. Suit Against **Us** is changed by increasing the "one year" shown to "two years".

B-746.16-B

(Continued on Next Page)

Policy Number:    35-71-007230831-0001

It is agreed that under SPECIAL PROVISIONS AND CONDITIONS RELATING TO SECTION 1, 11. Appraisal is shown to read as follows:

11.   Appraisal
If **you** and **we** fail to agree on the **market value, total restoration cost, actual cash value** or amount of loss, as may be required in the applicable policy provision, either party may make written demand for an appraisal. Each party will select a competent and disinterested appraiser and notify the other of the appraiser's identity within twenty (20) days after the demand is received. The appraisers will select a competent and disinterested umpire. If the appraisers are unable to agree upon an umpire within fifteen (15) days, at **your** or **our** request, after notice of hearing to the other non-requesting party by certified mail, the umpire shall be selected by a judge of a district court in the county where the loss occurred.

The appraisers shall then appraise the loss, stating separately the **market value, total restoration cost, actual cash value** or loss to each item, as may be required in the applicable policy provision. If the appraisers submit a written report of an agreement to **us**, the amount agreed upon shall be the **market value, total restoration, cost actual cash value** or amount of loss, as may be required in the applicable policy provision. If they cannot agree, they will submit their differences to the umpire. A written award by two when filed with **us** will determine the **market value, total restoration cost, actual cash value** or amount of loss. Each party will pay the appraiser it chooses, and equally pay expenses for the umpire and all other expenses of the appraisal.

Under HOW LOSSES UNDER SECTION I ARE SETTLED, (E) (2) does not apply to a roof or roof surfacing. The payment of **actual cash value** for the roof or roof surfacing will constitute the full and final payment for the damage.

B-746.16-B

## BACK-UP OF SEWER OR DRAIN ENDORSEMENT

For an additional premium, the following changes apply.

Under EXCLUSIONS APPLICABLE TO COVERAGES A & B, Exclusion 3(c) is deleted.
Under EXCLUSIONS APPLICABLE TO COVERAGE C, Exclusion 3(c) is deleted.

All other provisions of this policy apply.

B-494.5-B

## EXCLUSION OF TRUSTOR AS NAMED INSURED

No coverage provided for in this insurance policy will apply to the trustor of the trust for which the trustee of the trust is shown as an **insured** in the **Declarations**.

A-504.2-A

# EXHIBIT
# B

 **SHELTER**
**INSURANCE**
**COMPANIES**
SHELTER MUTUAL
SHELTER GENERAL

July 17, 2013

ERIC STRAIT
2458 S 107TH EAST AVE
TULSA, OK  74129-4812

RE:     Claim Number:     HO0000001076116
        Insured:          STRAIT, ERIC
        Date of Loss:     06/18/2013

Dear Mr. Strait:

According to Shelter's records your Homeowners' Policy, 35-71-7230831-1, was in force when this loss occurred.  Your policy provides coverage subject to its terms, conditions, and exclusions.  If you need another copy of your policy, please let us know.

This loss was reported to us as occurring on June 18, 2013.  Our investigation revealed that contractors found leaking pipes under your slab while they were installing foundation piers.

Your policy states:

### COVERAGE A – DWELLING

INSURING AGREEMENTS

**1. We cover accidental direct physical loss** to the following property, except for those perils and losses excluded under the heading "Exclusions Applicable To Coverages A & B".

(a) **Your dwelling**, including building structures attached to it, at the **residence premises**, but only if that **dwelling** is used principally as a private **residence**. If a building structure is connected to the **dwelling** by only a utility line or fence, it will not be considered attached to the **dwelling** for purposes of this coverage.

* * *

EXCLUSIONS APPLICABLE TO COVERAGES A & B




RE: HO0000001076116                            2 of 4

**We** do not cover any loss or damage if it would not have occurred in the absence of any event or condition listed below. That loss or damage is excluded from coverage regardless of:

    (a) the proximate cause of that event or condition;

    (b) the fact that other events or conditions, which are not excluded, caused the loss or damage;

    (c) the fact that other events or conditions, which are not excluded, contributed to the loss or damage;

    (d) the sequence of the events or conditions that caused the loss or damage;

    (e) whether the events and conditions that caused the loss or damage occurred suddenly or gradually;

    (f) whether the loss or damage is isolated or widespread; or

    (g) whether the loss or damage arises from natural forces, external forces, or a combination of such forces.

* * *

2. Movement of materials that support, or surround, a structure. **We** do not cover damage to any structure including, but not limited to: a) patios, b) pavement, c) foundations, d) walls, e) floors, f) roofs, g) ceilings, or h) slabs, if that damage is caused by the sinking, rising, shifting, expanding, or contracting, of earth or any other supporting, or surrounding, material. This exclusion applies to earthquakes, volcanic explosions, lava flow, landslides, mudflow, mudslides, sinking of ground, subsidence, erosion, movement resulting from improper construction or compaction, improper site selection, or any other force. **We** do not cover any cost required to replace, rebuild, stabilize, or otherwise restore, the supporting, or surrounding, material. **We** do not cover the cost of any repair technique designed to compensate for, or prevent, the instability of supporting, or surrounding, material. **We** do cover **accidental direct physical loss** that occurs subsequent to any of these causes if that loss is caused by theft, fire, or explosion.

* * *

10. Wear and tear; marring or scratching; deterioration; inherent vice; latent defect; mechanical breakdown; leakage of any chemical or petroleum product from a storage container; rust; mold; mildew; fungus; spores; wet or dry rot; contamination; smog, smoke, or soot from agricultural smudging or industrial operations; continuous or repeated exposure to smoke or soot; birds, rodents, squirrels, raccoons, opossums, vermin, insects, or domestic animals. **We** do cover **accidental direct physical loss** that occurs subsequent to any of these events or conditions if that loss is caused by fire or explosion. **We** do cover **accidental direct physical loss** caused by mold, mildew, fungus or spores, if the original cause of the mold, mildew, fungus or spores was itself a covered loss. **We** will apply this exclusion to **accidental direct physical loss** to the property, or part of the property, which was actually



RE: HO0000001076116                    3 of 4

damaged by the excluded cause or event. **We will waive this exclusion as it applies to accidental direct physical loss** to other covered property if that loss was:

> (a) caused by the **accidental** discharge or overflow of water or steam from within a plumbing system, heating system, cooling system, fire protection sprinkler system, water heater, water softener, or **domestic appliance**, and

> (b) the point at which the water or steam was discharged, or from which it overflowed, is physically located within a structure permanently attached to the **residence premises**.

**Our** limited waiver of this exclusion, stated just above, does not constitute a waiver of exclusion 11, below.

11. Continuous or repeated seepage or leakage of water or steam over a period of fourteen days or more. If this exclusion applies, no part of the loss is covered even though it may have occurred prior to the fourteenth day of the seepage or leakage. **We do cover accidental direct physical loss** that occurs subsequent to any of these events or conditions if that loss is caused by fire or explosion.

Based on our investigation and this policy language, Shelter believes the policy does not cover this claim. Specifically, the pipes broke due to wear and tear, deterioration and rust which caused a leak that has occurred for longer than fourteen days. The policy also excludes movement of materials that support, or surround a structure and earthquake damage.

Therefore, Shelter denies coverage for this claim under this policy.

We did not discover any mold while investigating this claim. As mentioned, however, we did discover moisture and want you to know that water damage can lead to mold or mildew if not properly treated. Therefore, we recommend that you hire a qualified expert to find the source of this water, stop it, and dry the area. We also recommend that the expert apply an appropriate anti-microbial agent (fungicide or mildewcide) to help guard against any future mold growth. You will have to pay for these services.

If you have any other information that you believe suggests this policy or any other Shelter Insurance policy covers this claim, please provide it to me immediately so that Shelter may review it for coverage.

Sincerely,

Jeff Hammons
Claims Department
Phone:   918-277-1163
Fax:     888-742-5671
Email:   JTHammons@ShelterInsurance.com
CL42

 **SHELTER
INSURANCE
COMPANIES**
SHELTER MUTUAL
SHELTER GENERAL

February 7, 2014

Tully Law Firm LLC
Scott L. Tully
P.O. Box 2141
Broken Arrow, OK 74013-2141

RE:     Claim Number:     HO0000001076116
        Date of Loss:      06/18/2013
        Insured:           STRAIT, ERIC

Dear Mr. Tully:

Thank you for your letter dated January 31, 2014. While some of the materials you are requesting are not subject to disclosure, we are providing the following responsive information attached as Strait 1-36 and Strait-photos.

I am glad to answer any questions.

Sincerely,

Jeff Hammons
Claims Department
Phone:    918-294-2239
Fax:      888-742-5671
Email:    JTHammons@ShelterInsurance.com

cc:

 **SHELTER
INSURANCE
COMPANIES**
SHELTER MUTUAL
SHELTER GENERAL

July 17, 2013

ERIC STRAIT
2458 S 107TH EAST AVE
TULSA, OK 74129-4812

RE:   Claim Number:     HO0000001076116
      Insured:          STRAIT, ERIC
      Date of Loss:     06/18/2013

Dear Mr. Strait:

According to Shelter's records your Homeowners' Policy, 35-71-7230831-1, was in force when this loss occurred. Your policy provides coverage subject to its terms, conditions, and exclusions. If you need another copy of your policy, please let us know.

This loss was reported to us as occurring on June 18, 2013. Our investigation revealed that contractors found leaking pipes under your slab while they were installing foundation piers.

Your policy states:

### COVERAGE A – DWELLING

INSURING AGREEMENTS

1. **We** cover **accidental direct physical loss** to the following property, except for those perils and losses excluded under the heading "Exclusions Applicable To Coverages A & B".

   (a) **Your dwelling**, including building structures attached to it, at the **residence premises**, but only if that **dwelling** is used principally as a private **residence**. If a building structure is connected to the **dwelling** by only a utility line or fence, it will not be considered attached to the **dwelling** for purposes of this coverage.

                        * * *

EXCLUSIONS APPLICABLE TO COVERAGES A & B

RE: HO0000001076116                    2 of 4

We do not cover any loss or damage if it would not have occurred in the absence of any event or condition listed below. That loss or damage is excluded from coverage regardless of:

> (a) the proximate cause of that event or condition;

> (b) the fact that other events or conditions, which are not excluded, caused the loss or damage;

> (c) the fact that other events or conditions, which are not excluded, contributed to the loss or damage;

> (d) the sequence of the events or conditions that caused the loss or damage;

> (e) whether the events and conditions that caused the loss or damage occurred suddenly or gradually;

> (f) whether the loss or damage is isolated or widespread; or

> (g) whether the loss or damage arises from natural forces, external forces, or a combination of such forces.

* * *

2. Movement of materials that support, or surround, a structure. We do not cover damage to any structure including, but not limited to: a) patios, b) pavement, c) foundations, d) walls, e) floors, f) roofs, g) ceilings, or h) slabs, if that damage is caused by the sinking, rising, shifting, expanding, or contracting, of earth or any other supporting, or surrounding, material. This exclusion applies to earthquakes, volcanic explosions, lava flow, landslides, mudflow, mudslides, sinking of ground, subsidence, erosion, movement resulting from improper construction or compaction, improper site selection, or any other force. We do not cover any cost required to replace, rebuild, stabilize, or otherwise restore, the supporting, or surrounding, material. We do not cover the cost of any repair technique designed to compensate for, or prevent, the instability of supporting, or surrounding, material. We do cover **accidental direct physical loss** that occurs subsequent to any of these causes if that loss is caused by theft, fire, or explosion.

* * *

10. Wear and tear; marring or scratching; deterioration; inherent vice; latent defect; mechanical breakdown; leakage of any chemical or petroleum product from a storage container; rust; mold; mildew; fungus; spores; wet or dry rot; contamination; smog, smoke, or soot from agricultural smudging or industrial operations; continuous or repeated exposure to smoke or soot; birds, rodents, squirrels, raccoons, opossums, vermin, insects, or domestic animals. We do cover **accidental direct physical loss** that occurs subsequent to any of these events or conditions if that loss is caused by fire or explosion. We do cover **accidental direct physical loss** caused by mold, mildew, fungus or spores, if the original cause of the mold, mildew, fungus or spores was itself a covered loss. We will apply this exclusion to **accidental direct physical loss** to the property, or part of the property, which was actually

Strait 002



RE: HO0000001076116                3 of 4

damaged by the excluded cause or event. **We** will waive this exclusion as it applies to **accidental direct physical loss** to other covered property if that loss was:

> (a) caused by the **accidental** discharge or overflow of water or steam from within a plumbing system, heating system, cooling system, fire protection sprinkler system, water heater, water softener, or **domestic appliance,** and

> (b) the point at which the water or steam was discharged, or from which it overflowed, is physically located within a structure permanently attached to the **residence premises.**

**Our** limited waiver of this exclusion, stated just above, does not constitute a waiver of exclusion 11, below.

11. Continuous or repeated seepage or leakage of water or steam over a period of fourteen days or more. If this exclusion applies, no part of the loss is covered even though it may have occurred prior to the fourteenth day of the seepage or leakage. **We** do cover **accidental direct physical loss** that occurs subsequent to any of these events or conditions if that loss is caused by fire or explosion.

Based on our investigation and this policy language, Shelter believes the policy does not cover this claim. Specifically, the pipes broke due to wear and tear, deterioration and rust which caused a leak that has occurred for longer than fourteen days. The policy also excludes movement of materials that support, or surround a structure and earthquake damage.

Therefore, Shelter denies coverage for this claim under this policy.

We did not discover any mold while investigating this claim. As mentioned, however, we did discover moisture and want you to know that water damage can lead to mold or mildew if not properly treated. Therefore, we recommend that you hire a qualified expert to find the source of this water, stop it, and dry the area. We also recommend that the expert apply an appropriate anti-microbial agent (fungicide or mildewcide) to help guard against any future mold growth. You will have to pay for these services.

If you have any other information that you believe suggests this policy or any other Shelter Insurance policy covers this claim, please provide it to me immediately so that Shelter may review it for coverage.

Sincerely,


Jeff Hammons
Claims Department
Phone:   918-277-1163
Fax:     888-742-5671
Email:   JTHammons@ShelterInsurance.com

CL42

RE: HO0000001076116          4 of 4

Strait 004



# RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS

A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS AT LAW
FRISCO BUILDING
502 WEST SIXTH STREET
TULSA, OKLAHOMA 74119-1016
(918) 587-9762
Fax (918) 585-1142
(800) 722-0302

August 23, 2013

*Via E-Mail: JTHammons@shelterinsurance.com and Regular U.S. Mail*

Mr. Jeff Hammons
Claims Department
Shelter Insurance Companies
P.O. Box 6008
Columbia, MO  65205-6008

AUG 28 2013

RE:    Claim No.:        HQ0000001076116
        Your Insured:    Eric Strait
        Date of Loss:    06/18/2013

Dear Mr. Hammons:

I am writing on behalf of Eric Strait and in response to your letter to him dated July 17, 2013, wherein you are denying coverage of this loss on the basis that the sewer line connected to the kitchen drain was leaking. The exclusion provision you cite to support your denial requires continuous or repeated leakage of water.

I disagree with your determination and analysis. The engineering report indicates that the water leakage which caused damages to the kitchen and entry hall areas was the result of the sewer line being clogged with earth and other debris. Mr. Strait pays an extra premium in the amount of $54 for insurance to cover damage resulting from back-up of a sewer or drain. This is precisely what happened. You attempt to exclude coverage which is specifically included by way of an endorsement.

We request your reconsideration of this denial on the grounds noted above. I have reviewed this claim in good faith, taking into consideration the entire policy and the endorsements. As the first party insurer of Mr. Strait, so should you.

TULSA • OKLAHOMA CITY • DENVER

Strait 005

August 26, 2013
Page 2

Please respond within seven (7) business days.

Sincerely,

G. Diane Lee
FOR THE FIRM

GDL/trg
Cc: Eric K. Strait
I: 590964

 **SHELTER
INSURANCE
COMPANIES**
SHELTER MUTUAL
SHELTER GENERAL

September 6, 2013

Ms. Diane Lee, Esq.
Riggs, Abney, Neal, Turpin, Orbison & Lewis
502 W. 6th St.
Tulsa, OK  741119

RE:   Claim Number:     HO0000001076116
      Insured:          STRAIT, ERIC
      Date of Loss:     06/18/2013

Dear Ms. Lee:

I am in receipt of your letter dated August 23, 2013 in regards to your client and our customer Eric Strait's claim on June 18, 2013.

Mr. Strait submitted a claim that contractors had found leaking pipes under the slab of his dwelling while they were placing piers. Our investigation revealed that the drain lines were worn out, deteriorated, and rusted. They no longer contained water. As explained in my letter dated July 17, 2013, damages caused by wear and tear, deterioration, and rust are excluded under Mr. Strait's policy. There is no coverage for repairs to the pipe or access to the pipe.

The resulting water damage to the interior of the house is covered by the policy. There was an estimate written for the water damage to the dwelling. The estimate was for water damage to the trim and drywall in the kitchen. The estimate total was below Mr. Strait's deductible of $1000.00.

In your letter, you reference the Back Up of a Sewer or Drain Endorsement. This endorsement deletes the policy language found in Exclusion 3(c) in the HO-3 Home Owners Insurance Policy.

The endorsement reads in its entirety as follows:

### BACK-UP OF SEWER OR DRAIN ENDORSEMENT

For an additional premium, the following changes apply

Under EXCLUSIONS APPLICABLE TO COVERAGES A & B, Exclusion 3(c) is deleted.

Shelter Insurance Companies • TU • PO Box 6008 • Columbia, MO 65205-6008

Strait 007

RE: HO0000001076116                    2 of 2

Under EXCLUSIONS APPLICABLE TO COVERAGE C, Exclusion 3(c) is deleted.

All other provisions of this policy apply.

This deletes the following language from Mr. Strait's policy:

**EXCLUSIONS APPLICABLE TO COVERAGES A & B**

**We** do not cover any loss or damage if it would not have occurred in the absence of any event or condition listed below.

. . .

3.

. . .

(c) Water, or water borne contaminants or materials, that overflows from sewers, drains, or pumps, if that overflow is caused by the inadequacy of the sewer, drain, or pump system, or by an obstruction of such that is located off of **the residence premises.**

. . .

We did not rely on Exclusion 3(c) for the denial of the damage to Mr. Strait's pipes. Exclusion 3(c) is no longer in Mr. Strait's policy.

As stated above, we did not exclude the water damage to the dwelling. Our estimate for the damage was below Mr. Strait's deductible.

You also indicated there was an engineering report. Please provide that report or any other information that you believe suggests this policy or any other Shelter Insurance policy covers this claim, please provide it to me immediately so that Shelter may review it for coverage.

Sincerely,


Jeff Hammons
Claims Department
Phone:   918-294-2239
Fax:       888-742-5671
Email:    jthammons@ShelterInsurance.com
CL42

**RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS**
A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS AT LAW
FRISCO BUILDING
502 WEST SIXTH STREET
TULSA, OKLAHOMA 74119-1016
(918) 587-9762
Fax (918) 585-1142
(800) 722-0302

September 11, 2013

*Via E-Mail: JTHammons@shelterinsurance.com and Regular U.S. Mail*

SEP 17 2013

Mr. Jeff Hammons
Claims Department
Shelter Insurance Companies
P.O. Box 6008
Columbia, MO 65205-6008

RE:    Claim No.:        HO0000001076116
       Your Insured:     Eric Strait
       Date of Loss:     06/18/2013

Dear Mr. Hammons:

This is a follow-up to my last letter to you dated August 23, 2013 and in response to your letter dated September 6, 2013. Mr. Strait's Back-up of Sewer or Drain Endorsement (B-494.5-B) provides that damages to his residence premises by water that overflows from sewers or drains when the overflow is caused by the inadequacy of the sewer or drain is a covered loss. He pays a premium for this precise coverage.

Your July 17, 2013 and September 6 letters refer to the investigation you conducted that revealed contractors found leaking pipes under Mr. Strait's slab while they were installing foundation piers. Please provide the documentation or a report summary which details that investigation and how that even relates to his loss. Mr. Strait did not even own the home at the time the foundation piers were installed.

Mr. Strait noticed the water leak in his kitchen over a period of two days. There was not continuous or repeated leakage of water over a period of fourteen (14) days or more. The sewer line and kitchen drain line were inadequate, and as a result, the water overflowed, causing the damages, necessitating the foundation be torn in several locations, the sewer line and drain line repaired, flooring repaired, all of which should be covered under his policy. Furthermore, the exclusion you reference for wear and tear and deterioration is waived when the accidental direct physical loss to other covered property is caused by the accidental overflow of water from within a plumbing system and the point at which the water overflowed is physically located within a structure permanently attached to the residence premises. The overflow came from within the plumbing system and the point of the overflow was in the kitchen.

TULSA • OKLAHOMA CITY • DENVER

·September 11, 2013
Page 2

This is a substantial loss for Mr. Strait. Enclosed are the repair bills totaling $19,957.48. The work estimated by the 24/7 Disaster Group has not been done, nor has the flooring been repaired to date. I also understand that a subsequent claim for sewer back-up was filed for damages that occurred last weekend.

Shelter owes Mr. Strait the duty to promptly investigate, evaluate and pay any loss covered under the policy. Failing to even have an adjuster out to inspect brings in issue whether Shelter acted to discharge that duty in good faith. Also, requiring Mr. Strait to determine the cause of the loss, which is obviously one that is covered under the Back-up of Sewer or Drain Endorsement (B-494.5-B), does not indicate that Shelter is dealing fairly with Mr. Strait. Shelter should be looking for coverage rather than a way to exclude it, and, as you know or should know, any ambiguities in the policy will be construed in favor of Mr. Strait under Oklahoma law.

We would urge you to reconsider Shelter's denial of Mr. Strait's claim. You should also take whatever steps are necessary to preserve Shelter's claim file relative to Mr. Strait's claim, including electronically stored information.

Sincerely,

G. Diane Lee
FOR THE FIRM

GDL/trg
Cc: Eric Strait
**I: 590964**

Strait 010

HO 1076116   Jeff Hammons          SEP 17 2013

# WILLIAMS
## PLUMBING & DRAIN
### SLAB LEAKS

10321 E. 47th Pl.
Tulsa, OK 74146
Phone: 918-794-5555
Fax: 918-794-5556

WILLIAMS PLUMBING AND DRAIN SERVICE, INC.
YOUR PLUMBING HEADQUARTERS™        99472

| CUSTOMER ORDER # | PHONE 918-510-0824 | DATE 7-19-13 |
|---|---|---|
| LAST NAME Straight  Eric | FIRST NAME | |
| ADDRESS 2458 S 67th E Ave | | |
| CITY Tulsa | | ZIP CODE |

TECHNICIAN # 96

BILLING / INSURANCE INFO.
COMPANY/BILL TO: — CLAIM NUMBER/P.O. #
ADJ. NAME/ADDRESS
PHONE # — FAX #

**DESCRIPTION OF WORK**

6-18-13 - Ran Hydrostatic Drain Test & failed - Ran Camera & found break under kitchen sink $450
7-11-13 - jackhammered slab in kitchen - tunneled under cabinet & found break on lead piping - went to
make necessary repairs & were unable to due to bad piping where lead tie onto
cast iron. Continued to follow cast iron looking for solid piping to tie onto.
7-12-13 Continued following piping looking for solid pipe to tie onto - Jackhammering, chipping,
7-15-13 & removing dirt. Tunneled inner walls. Eventually found good piping in master
7-16-13 bathroom. Piped in a retstub. Tulsa City inspector came out & "specked"
7-17-13 work & passed it (Permit # 321466)
7-18-13 Back filled with sand, packed, & concrete. Hauled off spoils.
7-19-13

| LABOR | | DATE | | AMOUNT |
|---|---|---|---|---|
| | | $ | $ | |
| 6-18-13 Invoice # 99457 | | | | 450 |
| 7-11-13 18 Day 2 Men & all Equipment | | 1750 | | 1750 |
| 7-12-13 - 7-19-13 - Back add'l men & all equipment | | 1650 (x6) | | 9900 |
| | | | | |
| 7-19-13 Additional men $70 per hr | 8 | 70 | | 560 |

LIMITED WARRANTY: All materials, parts and equipment are warranted by the manufacturers' or suppliers' written warranty only. All labor performed by the above named companies is warranted for 30 days or as otherwise indicated in writing. The above named companies makes no other warranties, express or implied, and its agents or technicians are not authorized to make any such warranties on behalf of above named companies. Drains guaranteed for 30 days unless stoppage caused by paint, rags, debris, grease, paper pulp, broken settled pipe, orangeburg-fiber sewer lines, femine products, or roof main lines.

Variable fees:  Dump Charges
Sand
Concrete
Plastic/misc
permit inspection        372

| ACCOUNT | CASH | CHECK # / CREDIT CARD # Paid $3000 (Ck #44319) 7-19-13 Pd $7000 (Ck #74473) 7-24-13 | TIME TO MAKE REPAIR & PARTS USED 34 $ 13,339 |

PLEASE PAY FROM THIS INVOICE.   PAYMENT DUE UPON JOB COMPLETION.
All Charge Accounts Must Be Approved Through Office Before Work is Started. $20 will be added to all accounts 30 days past due and/or 18% APR. In the event of default, customer agrees to pay additional collection and/or attorney fees that are permissible by law.

+ tax to make repairs - 2 men = 347
$12,982
Discounted Total = $10,000

I hereby authorize the work described above and agree to the terms and conditions as stated on this form, I recognize that agreed and deteriorated plumbing fixtures, heating, air conditioning equipment, piping, appendages, etc., may no longer be serviceable, and I agree to hold Williams Plumbing and Drain Service, Inc. blameless for any damages or destruction to those items as a result of these conventional repair efforts.

I agree that the above described work was performed to my satisfaction. The parts, labor, and materials were installed as agreed. I agree to pay the total amount in full or represent the party that will pay in full. If Insurance/Warranty Company does not pay any portion of the work performed, I understand that I am responsible for the balance of entire invoice. All warranty issues performed during normal business hours.

SIGNATURE X          PRINTED NAME Eric K. Strait   TITLE owner   7-19-2013

**THANK YOU**          **CALL AGAIN!**

Strait 011

# WILLIAMS
## PLUMBING & DRAIN
### SLAB LEAKS

10321 E. 47th Pl.
Tulsa, OK 74146
Phone: 918-794-5555
Fax: 918-794-5556

**WILLIAMS PLUMBING AND DRAIN SERVICE, INC.**
*YOUR PLUMBING HEADQUARTERS™*

9945

| CUSTOMER ORDER # | PHONE: 918-3,3 3574 | DATE: 6-15-8 |
|---|---|---|
| LAST NAME Stratten | FIRST NAME | |
| ADDRESS 2458 S 117th Ct | | ZIP CODE |
| CITY Tulsa | | |

| TECHNICIAN # 96 | BILLING / INSURANCE INFO | |
|---|---|---|
| | COMPANY/BILL TO: | CLAIM NUMBER/P.O. # |
| | ADJ. NAME/ADDRESS | |
| | PHONE # | FAX # |

**DESCRIPTION OF WORK**

- Ran thermostats test kicked
- Ran lines + run break on line tec. located and huset
- Recommends repairs ASAP to prevent furter damage

| LABOR | HRS. | RATE | AMOUNT |
|---|---|---|---|
| | $ | $ | |
| thermostat test | | | 150 |
| locate | | | 350 |

**LIMITED WARRANTY:** All materials, parts and equipment are warranted by the manufacturers' or suppliers' written warranty only. All labor performed by the above named companies is warranted for 30 days or as otherwise indicated in writing. The above named companies makes no other warranties, express or implied, and its agents or technicians are not authorized to make any such warranties on behalf of above named companies. Drains guaranteed for 30 days unless stoppage caused by paint, rags, debris, grease, paper pulp, broken settled pipe, orangeburg-fiber sewer lines, femine products, or roof main lines.

| ACCOUNT | CASH | CHECK # / CREDIT CARD # | TIME TO MAKE REPAIR & PARTS USED |
|---|---|---|---|
| Bill and Bill | | | # 435 |

**PLEASE PAY FROM THIS INVOICE.**  PAYMENT DUE UPON JOB COMPLETION.
All Charge Accounts Must Be Approved Through Office Before Work is Started. $20 will be added to all accounts 30 days past due and/or 18% APR. In the event of default, customer agrees to pay additional collection and/or attorney fees that are permissible by law.

I hereby authorize the work described above and agree to the terms and conditions as stated on this form. I recognize that aged and deteriorated plumbing fixtures, heating, air conditioning equipment, piping, appendages, etc, may no longer be serviceable, and I agree to hold Williams Plumbing and Drain Service, Inc. blameless for any damages or destruction to those items as a result of those conventional repair efforts.

I agree that the above described work was performed to my satisfaction. The parts, labor, and materials were installed as agreed. I agree to pay the total amount in full or represent the party that will pay in full. If Insurance/Warranty Company does not pay any portion of the work performed, I understand that I am responsible for the balance of entire invoice. All warranty issues performed during normal business hours.

| SIGNATURE X | PRINTED NAME | TITLE | DATE |
|---|---|---|---|

**THANK YOU**          **CALL AGAIN!**



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

| | | | |
|---|---|---|---|
| Client: | Eric Strait | Home: | (918) 510-0824 |
| Property: | 2458 S 107th E Ave | | |
| | Tulsa, OK 74129 | | |
| | | | |
| Operator: | WILL | | |
| | | | |
| Estimator: | Will Rohleder | Cellular: | (918) 845-4004 |
| | | E-mail: | will@247disastergroup.com |
| | | | |
| Reference: | | Business: | (918) 779-4900 |
| Company: | 24/7 Disaster Group | | |
| Business: | 3139 E. 145th St. S | | |
| | Bixby, OK 74008 | | |

| | | | |
|---|---|---|---|
| Type of Estimate: | <NONE> | | |
| Date Entered: | 8/6/2013 | Date Assigned: | 8/6/2013 |
| Date Est. Completed: | 8/6/2013 | Date Job Completed: | |

| | |
|---|---|
| Price List: | OKTU8X_JUL13 |
| Labor Efficiency: | Restoration/Service/Remodel |
| Estimate: | 2013-08-06-1533 |



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

### 2013-08-06-1533
### Main Level

**Main Level**

| DESCRIPTION | QTY | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| Dumpster load - Approx. 12 yards, 1-3 tons of debris | 1.00 EA | | 358.64 | 0.00 | 0.00 | 71.72 | 430.36 |
| Content Manipulation charge - per hour, Contents move out and back in. | 4.00 HR | | 0.00 | 26.86 | 0.00 | 21.48 | 128.92 |
| Contents Evaluation and/or Supervisor/Admin - per hour | 2.00 HR | | 0.00 | 48.69 | 0.00 | 19.48 | 116.86 |
| Clean ductwork - Interior (PER REGISTER) | 11.00 EA | | 0.00 | 28.93 | 0.00 | 63.64 | 381.87 |
| Clean ductwork from airborne concrete dust and debris from the jackhammer and sawcutting of concrete to slab from the sewer line replacement. Includes HVAC plenum. | | | | | | | |
| Heat/AC register - Mechanically attached - Detach & reset | 11.00 EA | | 0.00 | 11.46 | 0.00 | 25.22 | 151.28 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total: Main Level | | | | | 0.00 | 201.54 | 1,209.29 |

**Kitchen**                                                                 **Height: 8'**

368.78 SF Walls                    161.23 SF Ceiling
530.01 SF Walls & Ceiling          161.23 SF Floor
17.91 SY Flooring                  44.58 LF Floor Perimeter
53.67 LF Ceil. Perimeter

Missing Wall - Goes to Floor          5' 9" X 6' 8"          Opens into Exterior
Missing Wall - Goes to Floor          3' 4" X 6' 8"          Opens into ENTRY_FOYER

| DESCRIPTION | QTY | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| Remove Additional labor to remove tile from concrete slab | 132.15 SF | | 1.30 | 0.00 | 0.00 | 34.36 | 206.16 |
| Floor leveling cement - Heavy | 25.00 SF | | 0.00 | 2.03 | 2.68 | 10.70 | 64.13 |
| Leveling on concrete repair from plumbers work to existing slab. | | | | | | | |
| R&R Tile floor covering | 132.15 SF | | 1.81 | 6.40 | 38.16 | 224.64 | 1,347.75 |
| R&R Underlayment - sound/crack membrane - 70+ to 90 mil | 30.00 SF | | 0.67 | 2.05 | 3.78 | 17.08 | 102.46 |
| Membrane over concrete repair from plumber to new slab. If shifting occurs, membrane protects against tile cracking. | | | | | | | |
| Cabinetry. Repairs to cabinet under kitchen sink. | 1.00 EA | | 0.00 | 306.80 | 10.71 | 63.50 | 381.01 |
| 5 hours labor total. $50 in material. | | | | | | | |
| Drywall Repair - Minimum Charge - Labor and Material | 1.00 EA | | 0.00 | 221.50 | 1.17 | 44.54 | 267.21 |

2013-08-06-1533                                      8/6/2013          Page: 2

Strait 014



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

### CONTINUED - Kitchen

| DESCRIPTION | QTY | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| Repair to drywall under kitchen sink where drain lines and water lines are. | | | | | | | |
| Detach & Reset Baseboard - 3 1/4" | 33.58 LF | 1.61 | 0.00 | 0.00 | 0.06 | 10.84 | 64.96 |
| R&R Re-skin toe kick | 22.75 LF | | 1.35 | 5.97 | 6.01 | 34.50 | 207.04 |
| Around perimeter of cabinetry in kitchen. | | | | | | | |
| Mask and prep for paint - tape only (per LF) | 147.00 LF | | 0.00 | 0.45 | 0.50 | 13.34 | 79.99 |
| Paint baseboard - two coats | 33.58 LF | | 0.00 | 1.00 | 0.31 | 6.78 | 40.67 |
| Paint door/window trim & jamb - Large - 2 coats (per side) | 2.00 EA | | 0.00 | 26.60 | 0.75 | 10.80 | 64.75 |
| Refrigerator - Remove & reset | 1.00 EA | | 0.00 | 24.94 | 0.00 | 4.98 | 29.92 |
| Dishwasher - Detach & reset | 1.00 EA | | 0.00 | 187.16 | 0.00 | 37.44 | 224.60 |
| Containment Barrier/Airlock/Decon. Chamber | 45.00 SF | | 0.00 | 0.77 | 0.27 | 7.00 | 41.92 |
| Plastic containment to prevent dust from removing tile from spreading into entire house. | | | | | | | |
| Clean the walls and ceiling | 530.01 SF | | 0.00 | 0.21 | 0.45 | 22.36 | 134.11 |
| Clean baseboard | 33.58 LF | | 0.00 | 0.20 | 0.00 | 1.34 | 8.06 |
| Clean cabinetry - lower - faces only | 23.00 LF | | 0.00 | 4.04 | 0.10 | 18.60 | 111.62 |
| Clean cabinetry - upper - faces only | 18.00 LF | | 0.00 | 4.04 | 0.08 | 14.56 | 87.36 |
| Clean ceramic tile | 132.15 SF | | 0.00 | 0.41 | 0.11 | 10.86 | 65.15 |
| Clean cooktop | 1.00 EA | | 0.00 | 13.83 | 0.01 | 2.76 | 16.60 |
| Clean countertop | 36.00 SF | | 0.00 | 0.47 | 0.03 | 3.38 | 20.33 |
| Clean dishwasher - exterior | 1.00 EA | | 0.00 | 8.90 | 0.00 | 1.78 | 10.68 |
| Clean door / window opening (per side) | 3.00 EA | | 0.00 | 7.39 | 0.01 | 4.44 | 26.62 |
| Clean light fixture | 2.00 EA | | 0.00 | 6.04 | 0.01 | 2.42 | 14.51 |
| Clean range - exterior | 1.00 EA | | 0.00 | 18.06 | 0.03 | 3.62 | 21.71 |
| Clean refrigerator - exterior | 1.00 EA | | 0.00 | 11.06 | 0.02 | 2.22 | 13.30 |
| Clean sink | 1.00 EA | | 0.00 | 7.39 | 0.00 | 1.48 | 8.87 |
| Totals: Kitchen | | | | | 65.25 | 610.32 | 3,661.49 |

Strait 015



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com



| Entry/Foyer | | | | Height: 8' |
|---|---|---|---|---|
| 136.00 SF Walls | | | 32.55 SF Ceiling | |
| 168.55 SF Walls & Ceiling | | | 32.55 SF Floor | |
| 3.62 SY Flooring | | | 15.33 LF Floor Perimeter | |
| 25.33 LF Ceil. Perimeter | | | | |

| | | |
|---|---|---|
| Missing Wall - Goes to Floor | 3' 7" X 6' 8" | Opens into Exterior |
| Missing Wall - Goes to Floor | 3' 1" X 6' 8" | Opens into HALL_UTILITY |
| Missing Wall - Goes to Floor | 3' 4" X 6' 8" | Opens into KITCHEN |

| DESCRIPTION | QTY | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| Remove Additional labor to remove tile from concrete slab | 32.55 SF | | 1.30 | 0.00 | 0.00 | 8.46 | 50.78 |
| Floor leveling cement - Heavy | 15.00 SF | | 0.00 | 2.03 | 1.61 | 6.42 | 38.48 |
| Leveling on concrete repair from plumbers work to existing slab. | | | | | | | |
| R&R Tile floor covering | 32.55 SF | | 1.81 | 6.40 | 9.40 | 55.32 | 331.96 |
| R&R Underlayment - sound/crack membrane - 70+ to 90 mil | 20.00 SF | | 0.67 | 2.05 | 2.52 | 11.38 | 68.30 |
| Membrane over concrete repair from plumber to new slab.  If shifting occurs, membrane protects against tile cracking. | | | | | | | |
| Detach & Reset Baseboard - 3 1/4" | 15.33 LF | 1.61 | 0.00 | 0.00 | 0.03 | 4.94 | 29.65 |
| Mask and prep for paint - tape only (per LF) | 30.67 LF | | 0.00 | 0.45 | 0.10 | 2.78 | 16.68 |
| Paint baseboard - two coats | 15.33 LF | | 0.00 | 1.00 | 0.14 | 3.08 | 18.55 |
| Paint door/window trim & jamb - Large - 2 coats (per side) | 2.00 EA | | 0.00 | 26.60 | 0.75 | 10.80 | 64.75 |
| Containment Barrier/Airlock/Decon. Chamber | 21.00 SF | | 0.00 | 0.77 | 0.13 | 3.26 | 19.56 |
| Plastic containment to prevent dust from removing tile from spreading into entire house. | | | | | | | |
| Clean the walls and ceiling | 168.55 SF | | 0.00 | 0.21 | 0.14 | 7.10 | 42.64 |
| Clean baseboard | 15.33 LF | | 0.00 | 0.20 | 0.00 | 0.62 | 3.69 |
| Clean door (per side) | 1.00 EA | | 0.00 | 4.17 | 0.01 | 0.84 | 5.02 |
| Clean door / window opening (per side) | 1.00 EA | | 0.00 | 7.39 | 0.00 | 1.48 | 8.87 |
| Clean light fixture | 1.00 EA | | 0.00 | 6.04 | 0.00 | 1.20 | 7.24 |
| Totals:  Entry/Foyer | | | | | 14.83 | 117.68 | 706.17 |

Strait 016



## 24/7 Disaster Group

phone 918.779.4900
www.247disastergroup.com



| **Hall/Utility** | | | | | **Height: 8'** |
|---|---|---|---|---|---|

382.11 SF Walls  
481.41 SF Walls & Ceiling  
11.03 SY Flooring  
52.83 LF Ceil. Perimeter  

99.30 SF Ceiling  
99.30 SF Floor  
46.75 LF Floor Perimeter  

Missing Wall - Goes to Floor     3' X 6' 8"       Opens into Exterior
Missing Wall - Goes to Floor     3' 1" X 6' 8"     Opens into ENTRY_FOYER

| DESCRIPTION | QTY | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| Remove Additional labor to remove tile from concrete slab | 99.30 SF | | 1.30 | 0.00 | 0.00 | 25.82 | 154.91 |
| Floor leveling cement - Heavy | 15.00 SF | | 0.00 | 2.03 | 1.61 | 6.42 | 38.48 |
| Leveling on concrete repair from plumbers work to existing slab. | | | | | | | |
| R&R Tile floor covering | 99.30 SF | | 1.81 | 6.40 | 28.67 | 168.78 | 1,012.70 |
| R&R Underlayment - sound/crack membrane - 70~ to 90 mil | 20.00 SF | | 0.67 | 2.05 | 2.52 | 11.38 | 68.30 |
| Membrane over concrete repair from plumber to new slab. If shifting occurs, membrane protects against tile cracking. | | | | | | | |
| Detach & Reset Baseboard - 3 1/4" | 46.75 LF | 1.61 | 0.00 | 0.00 | 0.08 | 15.08 | 90.43 |
| Mask and prep for paint - tape only (per LF) | 93.50 LF | | 0.00 | 0.45 | 0.32 | 8.48 | 50.88 |
| Paint baseboard - two coats | 46.75 LF | | 0.00 | 1.00 | 0.44 | 9.44 | 56.63 |
| Paint door/window trim & jamb - Large - 2 coats (per side) | 4.00 EA | | 0.00 | 26.60 | 1.49 | 21.58 | 129.47 |
| Containment Barrier/Airlock/Decon. Chamber | 21.00 EA | | 0.00 | 0.77 | 0.13 | 3.26 | 19.56 |
| Plastic containment to prevent dust from removing tile from spreading into entire house. | | | | | | | |
| Washing machine - Remove & reset | 1.00 EA | | 0.00 | 20.79 | 0.00 | 4.16 | 24.95 |
| Detach & Reset Dryer - Gas | 1.00 EA | 70.59 | 0.00 | 0.00 | 0.00 | 14.12 | 84.71 |
| Clean the walls and ceiling | 481.41 SF | | 0.00 | 0.21 | 0.41 | 20.30 | 121.81 |
| Clean baseboard | 46.75 LF | | 0.00 | 0.20 | 0.00 | 1.88 | 11.23 |
| Clean ceramic tile | 99.30 SF | | 0.00 | 0.41 | 0.08 | 8.16 | 48.95 |
| Clean door (per side) | 2.00 EA | | 0.00 | 4.17 | 0.03 | 1.66 | 10.03 |
| Clean door / window opening (per side) | 2.00 EA | | 0.00 | 7.39 | 0.01 | 2.96 | 17.75 |
| Clean light fixture | 3.00 EA | | 0.00 | 6.04 | 0.01 | 3.62 | 21.75 |
| Totals: Hall/Utility | | | | | 35.80 | 327.10 | 1,962.54 |

Strait 017



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

| Mechanical | | | | | | Height: 8' |
|---|---|---|---|---|---|---|

125.31 SF Walls
139.08 SF Walls & Ceiling
1.53 SY Flooring
15.66 LF Ceil. Perimeter

13.77 SF Ceiling
13.77 SF Floor
15.66 LF Floor Perimeter

| DESCRIPTION | QTY | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| Remove Additional labor to remove tile from concrete slab | 13.77 SF | | 1.30 | 0.00 | 0.00 | 3.58 | 21.48 |
| Floor leveling cement - Heavy | 6.00 SF | | 0.00 | 2.03 | 0.64 | 2.56 | 15.38 |
| Leveling on concrete repair from plumbers work to existing slab. | | | | | | | |
| R&R Tile floor covering | 13.77 SF | | 1.81 | 6.40 | 3.98 | 23.40 | 140.43 |
| R&R Underlayment - sound/crack membrane - 70+ to 90 mil | 6.00 SF | | 0.67 | 2.05 | 0.76 | 3.42 | 20.50 |
| Membrane over concrete repair from plumber to new slab. If shifting occurs, membrane protects against tile cracking. | | | | | | | |
| Detach & Reset Baseboard - 3 1/4" | 15.66 LF | 1.61 | 0.00 | 0.00 | 0.03 | 5.04 | 30.28 |
| Mask and prep for paint - tape only (per LF) | 31.33 LF | | 0.00 | 0.45 | 0.11 | 2.84 | 17.05 |
| Paint baseboard - two coats | 15.66 LF | | 0.00 | 1.00 | 0.15 | 3.18 | 18.99 |
| Paint door/window trim & jamb - Large - 2 coats (per side) | 1.00 EA | | 0.00 | 26.60 | 0.37 | 5.40 | 32.37 |
| Interior door - Detach & reset - slab only | 1.00 EA | | 0.00 | 12.70 | 0.00 | 2.54 | 15.24 |
| Clean the walls and ceiling | 139.08 SF | | 0.00 | 0.21 | 0.12 | 5.86 | 35.19 |
| Clean baseboard | 15.66 LF | | 0.00 | 0.20 | 0.00 | 0.62 | 3.75 |
| Clean ceramic tile | 13.77 SF | | 0.00 | 0.41 | 0.01 | 1.14 | 6.80 |
| Clean door (per side) | 1.00 EA | | 0.00 | 4.17 | 0.01 | 0.84 | 5.02 |
| Clean door / window opening (per side) | 1.00 EA | | 0.00 | 7.39 | 0.00 | 1.48 | 8.87 |
| Clean light fixture | 1.00 EA | | 0.00 | 6.04 | 0.00 | 1.20 | 7.24 |
| Totals: Mechanical | | | | | 6.18 | 63.10 | 378.59 |



| Bathroom | | | | Height: 8' |
|---|---|---|---|---|

249.33 SF Walls
302.25 SF Walls & Ceiling
5.88 SY Flooring
31.17 LF Ceil. Perimeter

52.92 SF Ceiling
52.92 SF Floor
31.17 LF Floor Perimeter

2013-08-06-1533

8/6/2013          Page: 6

Strait 018



**24/7 Disaster Group**
phone 918.779.4900
www.247disastergroup.com

### CONTINUED - Bathroom

| DESCRIPTION | QTY | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| Remove Additional labor to remove tile from concrete slab | 28.00 SF | | 1.30 | 0.00 | 0.00 | 7.28 | 43.68 |
| Floor leveling cement - Heavy | 7.00 SF | | 0.00 | 2.03 | 0.75 | 3.00 | 17.96 |
| Leveling on concrete repair from plumbers work to existing slab. Looks like floor is built up with floor leveling cement. After demolition, floor will be evaluated to see if extra work is needed to build floor back up. | | | | | | | |
| R&R Tile floor covering | 52.92 SF | | 1.81 | 6.40 | 15.28 | 89.96 | 539.72 |
| R&R Underlayment - sound/crack membrane - 70+ to 90 mil | 9.00 SF | | 0.67 | 2.05 | 1.13 | 5.12 | 30.73 |
| Membrane over concrete repair from plumber to new slab. If shifting occurs, membrane protects against tile cracking. | | | | | | | |
| Detach & Reset Baseboard - 3 1/4" | 12.00 LF | 1.61 | 0.00 | 0.00 | 0.02 | 3.86 | 23.20 |
| Mask and prep for paint - tape only (per LF) | 24.00 LF | | 0.00 | 0.45 | 0.08 | 2.18 | 13.06 |
| Paint baseboard - two coats | 12.00 LF | | 0.00 | 1.00 | 0.11 | 2.42 | 14.53 |
| Paint door/window trim & jamb - Large - 2 coats (per side) | 2.00 EA | | 0.00 | 26.60 | 0.75 | 10.80 | 64.75 |
| Containment Barrier/Airlock/Decon. Chamber | 21.00 SF | | 0.00 | 0.77 | 0.13 | 3.26 | 19.56 |
| Plastic containment to prevent dust from removing tile from spreading into entire house. | | | | | | | |
| Interior door - Detach & reset - slab only | 2.00 EA | | 0.00 | 12.70 | 0.00 | 5.08 | 30.48 |
| R&R Threshold - natural marble | 6.00 LF | | 2.36 | 42.06 | 13.25 | 55.98 | 335.75 |
| Toilet - Detach & reset | 1.00 EA | | 0.00 | 167.41 | 0.38 | 33.56 | 201.35 |
| Clean the walls and ceiling | 302.25 SF | | 0.00 | 0.21 | 0.26 | 12.76 | 76.49 |
| Clean baseboard | 31.17 LF | | 0.00 | 0.20 | 0.00 | 1.24 | 7.47 |
| Clean bathroom fan | 1.00 EA | | 0.00 | 15.97 | 0.00 | 3.20 | 19.17 |
| Clean bathroom fixtures | 1.00 EA | | 0.00 | 48.28 | 0.03 | 9.66 | 57.97 |
| Clean cabinetry - lower - faces only | 5.00 LF | | 0.00 | 4.04 | 0.02 | 4.04 | 24.26 |
| Clean cabinetry - upper - faces only | 3.00 LF | | 0.00 | 4.04 | 0.01 | 2.42 | 14.55 |
| Clean ceramic tile | 28.00 SF | | 0.00 | 0.41 | 0.02 | 2.30 | 13.80 |
| Clean countertop | 10.00 SF | | 0.00 | 0.47 | 0.01 | 0.94 | 5.65 |
| Clean door (per side) | 2.00 EA | | 0.00 | 4.17 | 0.03 | 1.66 | 10.03 |
| Clean door / window opening (per side) | 2.00 EA | | 0.00 | 7.39 | 0.01 | 2.96 | 17.75 |
| Clean light fixture | 1.00 EA | | 0.00 | 6.04 | 0.00 | 1.20 | 7.24 |
| Clean mirror | 18.00 SF | | 0.00 | 0.42 | 0.02 | 1.52 | 9.10 |
| Clean shower | 1.00 EA | | 0.00 | 24.63 | 0.01 | 4.92 | 29.56 |
| Clean sink | 1.00 EA | | 0.00 | 7.39 | 0.00 | 1.48 | 8.87 |
| Clean toilet | 1.00 EA | | 0.00 | 12.55 | 0.00 | 2.52 | 15.07 |

Strait 019

 **24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

## CONTINUED - Bathroom

| DESCRIPTION | QTY | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| Totals: Bathroom | | | | | 32.30 | 275.32 | 1,651.75 |
| Total: Main Level | | | | | 154.36 | 1,595.06 | 9,569.83 |

**Labor Minimums Applied**

| DESCRIPTION | QTY | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| Cabinetry labor minimum | 1.00 EA | | 0.00 | 32.40 | 0.00 | 6.48 | 38.88 |
| Hazardous waste/mold rem. labor min | 1.00 EA | | 0.00 | 74.68 | 0.00 | 14.94 | 89.62 |
| Door labor minimum | 1.00 EA | | 0.00 | 90.30 | 0.00 | 18.06 | 108.36 |
| Tile / marble labor minimum | 1.00 EA | | 0.00 | 30.50 | 0.00 | 6.10 | 36.60 |
| Heat, vent, & air cond. labor minimum | 1.00 EA | | 0.00 | 95.15 | 0.00 | 19.04 | 114.19 |
| Totals: Labor Minimums Applied | | | | | 0.00 | 64.62 | 387.65 |
| Line Item Totals: 2013-08-06-1533 | | | | | 154.36 | 1,659.68 | 9,957.48 |

## Grand Total Areas:

| | | | | | |
|---|---|---|---|---|---|
| 1,261.53 | SF Walls | 359.77 | SF Ceiling | 1,621.30 | SF Walls and Ceiling |
| 359.77 | SF Floor | 39.97 | SY Flooring | 153.50 | LF Floor Perimeter |
| 0.00 | SF Long Wall | 0.00 | SF Short Wall | 178.66 | LF Ceil. Perimeter |
| | | | | | |
| 359.77 | Floor Area | 410.35 | Total Area | 1,261.53 | Interior Wall Area |
| 1,017.28 | Exterior Wall Area | 122.17 | Exterior Perimeter of Walls | | |
| | | | | | |
| 0.00 | Surface Area | 0.00 | Number of Squares | 0.00 | Total Perimeter Length |
| 0.00 | Total Ridge Length | 0.00 | Total Hip Length | | |

2013-08-06-1533

Strait 020



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

## Summary

| | |
|---|---:|
| Line Item Total | 8,143.44 |
| Material Sales Tax | 154.36 |
| Subtotal | 8,297.80 |
| Overhead | 829.84 |
| Profit | 829.84 |
| Replacement Cost Value | $9,957.48 |
| Net Claim | $9,957.48 |

Will Rohleder

Strait 021

 **24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

### Recap of Taxes, Overhead and Profit

| | Overhead (10%) | Profit (10%) | Material Sales Tax (8.517%) | Manuf. Home Tax (8.517%) | Storage Rental Tax (8.517%) |
|---|---|---|---|---|---|
| Line Items | 829.84 | 829.84 | 154.36 | 0.00 | 0.00 |
| Total | 829.84 | 829.84 | 154.36 | 0.00 | 0.00 |

Strait 022

 **24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

## Recap by Room

Estimate: 2013-08-06-1533

| | | |
|---|---:|---:|
| **Area: Main Level** | **1,007.75** | **12.37%** |
| Kitchen | 2,985.92 | 36.67% |
| Entry/Foyer | 573.66 | 7.04% |
| Hall/Utility | 1,599.64 | 19.64% |
| Mechanical | 309.31 | 3.80% |
| Bathroom | 1,344.13 | 16.51% |
| | | |
| Area Subtotal:  Main Level | 7,820.41 | 96.03% |
| Labor Minimums Applied | 323.03 | 3.97% |
| | | |
| **Subtotal of Areas** | **8,143.44** | **100.00%** |
| | | |
| **Total** | **8,143.44** | **100.00%** |

2013-08-06-1533                                           8/6/2013        Page: 11

Strait 023



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

## Recap by Category

| O&P Items | Total | % |
|---|---|---|
| APPLIANCES | 303.48 | 3.05% |
| CABINETRY | 475.02 | 4.77% |
| CLEANING | 1,334.28 | 13.40% |
| CONTENT MANIPULATION | 107.44 | 1.08% |
| CONT: PACKING,HANDLNG,STORAGE | 97.38 | 0.98% |
| GENERAL DEMOLITION | 1,456.52 | 14.63% |
| DOORS | 128.40 | 1.29% |
| DRYWALL | 221.50 | 2.22% |
| FLOOR COVERING - CERAMIC TILE | 2,428.71 | 24.39% |
| FINISH CARPENTRY / TRIMWORK | 198.54 | 1.99% |
| HAZARDOUS MATERIAL REMEDIATION | 157.84 | 1.59% |
| HEAT, VENT & AIR CONDITIONING | 221.21 | 2.22% |
| MARBLE - CULTURED OR NATURAL | 252.36 | 2.53% |
| PLUMBING | 167.41 | 1.68% |
| PAINTING | 562.85 | 5.65% |
| TIL | 30.50 | 0.31% |
| O&P Items Subtotal | 8,143.44 | 81.78% |
| Material Sales Tax | 154.36 | 1.55% |
| Overhead | 829.84 | 8.33% |
| Profit | 829.84 | 8.33% |
| Total | 9,957.48 | 100.00% |

2013-08-06-1533

8/6/2013          Page: 12

Strait 024

 **Shelter Insurance**
PO Box 6008
Columbia, MO 65205-6008
Fax:  888-742-5671

| CLAIM NO.:HO000000107...  Reinspection☐ | INSURED |
|---|---|
| **Policy No.:** 35-71-7230831-1 | ERIC STRAIT |
| **Date of Loss:** 06/18/2013   6:00 AM | 2458 S 107TH EAST AVE |
| **Type of Loss:** Water Damage-Plumbing/Heat... | TULSA, OK, 74129-4812 |
| **Deductible:** $1,000.00 | Home phone:  (918) 510-0824 |
| **Year Built:**           **Cat No.:** | Business phone:  (918) 510-0824 |
|  | Mobile phone: |
| **Adjuster:**   Jeff Hammons | Bus. Fax: |
| **Phone:**   (918) 294-2239 | Contact: |
| **Email:**   JTHammons@ShelterInsurance.com | **Loss address:** 2458 S 107TH EAST AVE  TULSA, OK, 74129-4812 |

**Status:** 🕐 Claim Closed       **Age:** 37d 06h    **Assignees:** Jeff Hammons

**Originated:** 06/18/2013, 7:44 AM    by  First Admin (Shelter Insurance)

| DATES | | POLICY 35-71-7230831-1 | | | |
|---|---|---|---|---|---|
| **Created:** 06/18/2013 | **Assigned:** 06/18/2013 | **Policy Type:**  HO-3 | | | |
| **Received:** 06/21/2013 | **Contacted:** 06/21/2013 | **Renewed:**       time(s) | | | |
| **Inspected:** 07/24/2013 | **Estimated:** 07/25/2013 | **Effective from:** 11/02/2012  **to:** 11/02/2013 | | | |
| **Approved:** | **Job Started:** | Coverage | Limits | Deductible | Reserve |
| **Completed:** 07/25/2013 | **Closed:** 07/25/2013 | HOME/DWELLING | $106,400.00 | $1,000.00 | |
| | | HOME/OTHRST... | $10,640.00 | | |
| **Overall risk condition:** | | HOME/PERSPROP | $74,480.00 | | |
| | | HOME/ALE | $21,280.00 | | |

## INITIAL LOSS REPORT

A-504.2-A
B-327.9-B
B-494.5-B
B-697.1-B
B-746.16-B

## CAUSE

## DAMAGES

Storm Priority: Requires emergency repairs to protect it from future damage (3)
Loss Description: leak under the house, plumber says it needs to be fixed to prevent damage to the
foundation, estimate to fix is 1900-2800 dollars
Other Parties Involved: N
Injuries: N

Contact Info: ERIC STRAIT, 918-510-0824, 918-510-0824,
Additional Info:

## GENERAL COMMENTS
Financial Interest:

WELLS FARGO BANK NA #708 ISAOA



**Shelter Insurance**
PO Box 6008
Columbia, MO 65205-6008
Fax: 888-742-5671

## Roofplan:





**Shelter Insurance**
PO Box 6008
Columbia, MO 65205-6008
Fax: 888-742-5671



## Floorplan:

Claim HO000000107116

07/25/2013
Strait 028

Kitchen



**Shelter Insurance**
PO Box 6008
Columbia, MO 65205-6008
Fax: 888-742-5671

| Description | Action | Quantity | Unit Price | Per | RC | Depreciation | ACV |
|---|---|---|---|---|---|---|---|
| **ESTIMATE:** Structure (Shelter Insurance) | | | | | Claim #HO0000001076116, ERIC STRAIT | | |
| Completed | | | | | | | |
| **ROOFPLAN: Roofplan** | | | | | | | |
| **Roofplan - Subtotal** (0 item) | | | | | **$0.00** | **$0.00** | **$0.00** |

| **FLOORPLAN: Floorplan** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Kitchen** | | | | | | | |

Length: 16'11"    Width: 9'    Height: 8' Flat

Walls: 414.66 SF    Walls-subs: 322.66 SF    Walls-subs-cas-bsbd: 258.46 SF

Doors: 0.00 SF    Windows: 0.00 SF    Openings: 92.00 SF    Missing Walls: 0.00 SF

Floor: 152.25 SF    Ceiling: 152.25 SF    Perim (F): 39.84 LF    Perim (C): 42.84 LF

| | Description | Action | Quantity | Unit Price | Per | RC | Depreciation | ACV |
|---|---|---|---|---|---|---|---|---|
| 1 | Minimum Charge, Cabinetry | | 1 | $231.88 | LS | $231.88 | $0.00 | $231.88 |
| 2 | Minimum Charge, Paint | | 1 | $200.00 | LS | $200.00 | $20.00 ✓ | $180.00 |
| 3 | Cabinet Toe Kick Solid Wood | Tear Out | 3.00 | $0.82 | LF | $2.46 | $0.00 | $2.46 |
| 4 | Cabinet Toe Kick Solid Wood | Replace | 3.00 | $4.12 | LF | $12.36 | $0.00 | $12.36 |
| 5 | Drywall Patch 1 to 4 SF | | 1 | $80.38 | EA | $80.38 | $0.00 | $80.38 |
| | **Kitchen - Subtotal** (5 items) | | | | | **$527.08** | **$20.00** | **$507.08** |
| | **Floorplan - Subtotal** (5 items) | | | | | **$527.08** | **$20.00** | **$507.08** |



**Shelter Insurance**
PO Box 6008
Columbia, MO 65205-6008
Fax: 888-742-5671

**ESTIMATE:** Structure (Shelter Insurance)                    Claim #HO0000001076116, ERIC STRAIT
Completed

## ROOFPLAN: Roofplan

| Roof area | Quantity |
|---|---|
| Squares | 0.00 SF |
| Ridge | 0.0 SQ |
| Gutters | 0.00 LF |
| Soffit | 0.00 LF |
| | 0.00 SF |

## FLOORPLAN: Floorplan

| Walls | Quantity |
|---|---|
| Walls and Ceilings | 414.66 SF |
| Floors | 566.91 SF |
| Floor Perimeter | 152.25 SF |
| Ceilings | 39.84 LF |
| Ceiling Perimeter | 152.25 SF |
| | 42.84 LF |

### Recap by Area

| | Materials | Percentage |
|---|---|---|
| Roofplan | $0.00 | 0.00% |
| Kitchen | $46.18 | 100.00% |
| **Total, all areas** | **$46.18** | **100.00%** |

### Recap by Category

| | Materials | Percentage |
|---|---|---|
| CAB - Cabinetry - CAB - Labor / Minimum Charge | $21.60 | 46.77% |
| CAB - Cabinetry - CAB - Lower Cabinets | $3.69 | 7.99% |
| DRY - Drywall - DRY - Ceiling & Walls | $4.69 | 10.16% |
| PNT - Painting - PNT - Labor / Minimum Charge | $16.20 | 35.08% |
| **Total, all categories** | **$46.18** | **100.00%** |





## Shelter Insurance
PO Box 6008
Columbia, MO 65205-6008
Fax: 888-742-5671

**ESTIMATE:** Structure (Shelter Insurance)                    Claim #HO0000001076116, ERIC STRAIT

☑ Completed

| MATERIALS | Quantity | Purchase Qty | Total |
|---|---|---|---|
| Cabinet Toe Kick Solid Wood (Replace) | 3.00 LF | n/a | $3.69 |
| Drywall Patch 1 to 4 SF | 1 EA | n/a | $4.69 |
| Minimum Charge, Cabinetry | 1 LS | n/a | $21.60 |
| Minimum Charge, Paint | 1 LS | n/a | $16.20 |
| | | | **$46.18** |

| LABOR | Quantity | Rate | Total |
|---|---|---|---|
| 1 CRPT | ~4.00 hrs | $52.57 | $210.28 |
| 1 FINISH CRPT | ~0.15 hrs | $57.83 | $8.67 |
| 1 LBR | ~0.07 hrs | $37.71 | $2.46 |
| 1 LTHR | ~1.77 hrs | $42.73 | $75.69 |
| 1 PNTR | ~4.00 hrs | $45.95 | $183.80 |
| | **~9.99 hrs** | | **$480.90** |



**Shelter Insurance**
PO Box 6008
Columbia, MO 65205-6008
Fax:  888-742-5671

| ESTIMATE: Structure (Shelter Insurance) | Claim #HO000D0001076116, ERIC STRAIT |
|---|---|
| Completed | |

| | |
|---|---|
| Total Materials: | $46.18 |
| Total Labor: | $480.90 |
| **Subtotal:** | **$527.08** |
| | |
| **Adjustments for minimum charges (taxes are applied):** | |
| Minimum Charge, Drywall 2 Trips: | $272.26 |
| **Subtotal:** | **$799.34** |
| | |
| Sales Tax 8.517% (applies to materials and equipment): | $27.12 |
| **Subtotal:** | **$826.46** |
| | |
| Add 10.00% overhead: | $52.71 |
| Add 10.00% profit: | $52.71 |
| **Replacement Cost Value:** | **$931.88** |
| | |
| Less Recoverable Depreciation (includes taxes and O&P): | $(24.14) |
| Less Non-Recoverable Depreciation (includes taxes and O&P): | $0.00 |
| **Net ACV Estimate:** | **$907.74** |
| | |
| Deductible: | $(1,000.00) |
| **Net Estimate:** | **$(92.26)** |
| | |
| Total Recoverable Depreciation: | $24.14 |
| **Net Estimate if Depreciation is Recovered:** | **$(68.12)** |

Finalization



**Shelter Insurance**
PO Box 6008
Columbia, MO 65205-6008
Fax: 888-742-5671

07/25/2013

ERIC STRAIT
2458 S 107TH EAST AVE
TULSA, OK, 74129-4812

<u>Re:</u>  Business Name:
Insured:              ERIC STRAIT
Claim Number:   HO0000001076116
Policy Number:  35-71-7230831-1
Date of Loss:      06/18/2013
Loss Location:    2458 S 107TH EAST AVE

Dear  ERIC STRAIT

Shelter has been notified about this loss involving the property at the loss location.

We inspected your damages and it showed the damages are below the policy's $1,000.00 deductible.  Enclosed is a copy of our estimate for your records.

If you have any questions or additional information, please contact us.

Mr. Stubblefield had inquired about additional living expense
The following is the part of your policy that explains additional living expense.

COVERAGE D-ADDITIONAL LIVING EXPENSE AND
LOSS OF RENTS
INSURING AGREEMENT
If your residence premises sustains a covered loss
that exceeds the applicable deductible and, as a
direct result of that loss, your residence premises
is uninhabitable, we will pay the increase in your living
expense reasonably necessary to maintain your
normal standard of living for the shortest time
reasonably necessary:
1. to repair or replace the damaged property, or
2. for you to permanently relocate.

Strait 033

Sincerely,

Jeff Hammons
Material Damage Adjuster
(918) 294-2239

Strait 034

# FAX COVER SHEET

| TO | |
|---|---|
| COMPANY | |
| FAX NUMBER | 18887425671 |
| FROM | Scott Tully |
| DATE | 2014-01-31 17:39:11 GMT |
| RE | Corrected Letter for Claim HO0000001076116 |

## COVER MESSAGE

Please see corrected letter.

—

Scott L. Tully
Tully Law Firm LLC
2017 S. Elm Place
Suite 107
P.O. Box 2141
Broken Arrow, OK 74013
(918) 872-8800 (Office)
(918) 845-1874 (Cell)
(866) 224-2303 (Fax)
scott@tullylawfirm.net  email
www.tullylawfirm.net  website
Licensed In Alabama & Oklahoma

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message. Thank you.

Strait 035

# TULLY LAW FIRM LLC
## SCOTT L. TULLY
ATTORNEY AT LAW
2017 S. Elm Place, Suite 107, Broken Arrow, OK 74012

| | |
|---|---|
| P.O. Box 2141 | (918) 872-8800 (W) |
| Broken Arrow, OK 74013-2141 | (918) 845-1874 (C) |
| scott@tullylawfirm.net | (866) 224-2303 (F) |
| | *Also Admitted in Alabama |

January 31, 2014

Shelter Insurance Companies
Jeff Hammons
PO Box 6008
Colombia, MO 65205

Fax:   888-742-5671
Email:  JTHammons@shelterinsurance.com

Re:   Claim:          HO0000001076116
      Insured:        Eric Strait
      Reported Loss:  6/18/13
      Loss Location:  2458 S. 107th East Ave., Tulsa, OK 74129

Dear Mr. Hammons:

Please be advised that I have been retained as counsel for Eric Strait in regard to your denial of his claim by letter of July 17, 2013, and subsequent below deductible letter of July 25, 2013.  At this time, I am requesting the following within ten days:

1) All emails between my client and any representative of Shelter Insurance Companies;
2) Certified copy of the applicable policy including all endorsements, application, and agent notes;
3) All letters to and from my client;
4) All letters to and from Shelter Insurance Companies regarding the subject loss;
5) All estimates completed on the subject loss;
6) All expert opinions relied upon in making your decision to deny the claim;
7) All recorded conversations of any representative of my client;
8) All photographs taken of the loss by your representative;
9) All relevant information used in denying the claim;
10) Complete copy of claims file.

Thank you for your time and assistance in this matter.

Very truly yours,

Scott L. Tully

cc:   Eric Strait

Strait 036

































# EXHIBIT
# G

# TULLY LAW FIRM LLC

### SCOTT L. TULLY
ATTORNEY AT LAW
2017 S. Elm Place, Suite 107, Broken Arrow, OK 74012

| | |
|---|---|
| P.O. Box 2141 | (918) 872-8800 (W) |
| Broken Arrow, OK 74013-2141 | (918) 845-1874 (C) |
| scott@tullylawfirm.net | (866) 224-2303 (F) |
| | *Also Admitted in Alabama |

February 10, 2014

Shelter Insurance Companies
Jeff Hammons
PO Box 6008
Colombia, MO 65205

Fax:   888-742-5671
Email: JTHammons@shelterinsurance.com

Re:   Claim:          HO0000001076116
      Insured:        Eric Strait
      Reported Loss:  6/18/13
      Loss Location:  2458 S. 107th East Ave., Tulsa, OK 74129

Dear Mr. Hammons:

I wanted to follow up my recent email wherein I confirmed receipt of your February 7, 2014 letter and attachments.  Once again, I am requesting clarification from you in regard to what items (1-10) are not subject to disclosure.  The items are listed herein again for your convenience:

1) **All emails between my client and any representative of Shelter Insurance Companies;**
2) **Certified copy of the applicable policy including all endorsements, application, and agent notes;**
3) **All letters to and from my client;**
4) **All letters to and from Shelter Insurance Companies regarding the subject loss;**
5) **All estimates completed on the subject loss;**
6) **All expert opinions relied upon in making your decision to deny the claim;**
7) **All recorded conversations of any representative of my client;**
8) **All photographs taken of the loss by your representative;**
9) **All relevant information used in denying the claim;**
10) **Complete copy of claims file.**

In addition, please clarify what number above was provided in your response of February 7, 2014.  I am not aware of any privilege you can exercise in regard to my requests.  It is my hope to have an entire picture of your handling of this claim in order to determine if my client has a viable claim.  There would not seem to be any necessity of withholding information that would substantiate your claims handling and contractual obligations to your insured, Mr. Strait.

I am also uncertain what sort of privilege that you could possibly be asserting that would prevent me from obtaining a certified copy of Mr. Straits relevant policy and endorsements.  It is vitally important for your

clarification since your letter of February 7, 2014 would lead me to believe that you are not going to provide any further requested information.

Thank you for your time and assistance in this matter.

Very truly yours,

Scott L. Tully

cc:    Eric Strait

From: NoReply@MyFax.com
Subject: Successful transmission to 18887425671. Re: Claim HO0000001076116
Date: February 10, 2014 at 11:27 AM
To: scott@tullylawfirm.net

# EXHIBIT

# H



**SHELTER INSURANCE COMPANIES**
SHELTER MUTUAL
SHELTER GENERAL

February 13, 2014

Tully Law Firm LLC
P.O. Box 2141
Broken Arrow, OK  74013-2141

RE:     Claim Number:    HO0000001076116
        Date of Loss:    06/18/2013
        Insured:         STRAIT, ERIC

Dear Mr. Tully:

In response to your letter from February 10, 2014, we have disclosed what we were able to address under these circumstances as follows:

1)   All emails between your client and any representative of Shelter Insurance Companies;
     (We have no emails among and between your client, or his representatives, and any Shelter personnel.)

2)   Certified copy of the applicable policy including all endorsements, application and agent notes;
     (A certified copy of the policy and endorsements has been requested and will be mailed directly from our Home Office.)

3)   All letters to and from your client;
     (This information was provided February 7, 2014 referenced as Strait 33-34)

4)   All letters to and from Shelter Insurance Companies regarding the subject loss;
     (This information was provided February 7, 2014 referenced as Strait 5-10)

5)   All estimates completed on the subject loss;
     (This information was provided February 7, 2014 referenced as Strait 11-32)

6)   All expert opinions relied upon in making our decision to deny the claim;
     (The only engineer's report was referenced by Diane Lee with Riggs, Abney, Neal, Turpen, Orbison & Lewis in her letter on August 23rd, 2013. –Strait 5-6  We requested a copy of the report but have never received one.  Additionally, the Williams Plumbing estimate and invoicing indicate some technical opinions- Strait 11-12)



RE: HO0000001076116                    2 of 2

7)   All recorded conversations of any representative of your client;
     (We have located no formal recorded statements or conversations of your client).

8)   All photographs taken of the loss by our representative;
     (This information was provided February 7th, 2014- (unnumbered)

9)   All relevant information used in denying the claim; and
     (This information provided February 7, 2014 as Strait 1-36)

10)  Complete copy of claims file.
     (Certain materials are not subject to disclosure under these circumstances).

We are certainly glad to review any additional material or information you believe may support coverage under any Shelter insurance policy.

Sincerely,

Jeff Hammons
Claims Department
Phone:    918-294-2239
Fax:      888-742-5671
Email:    JTHammons@ShelterInsurance.com

cc:

# EXHIBIT

# I



**SHELTER INSURANCE COMPANIES**

Virna Camacho
Litigation Paralegal
573.214.6357
VCamacho@ShelterInsurance.com

February 13, 2014

Mr. Scott L. Tully
Tully Law Firm, LLC
P.O. Box 2141
Broken Arrow, OK 74013-2141

*Received 2/20/14*

RE:     Requested Certified Policy
        Insured:        Erick Strait
        Claim No:       HO1076116
        DOL:            6/18/13

Dear Mr. Tully:

Enclosed please find the requested certified policy in place as of June 18, 2013 regarding the above referenced claim.

For any other questions concerning the claim in question or for coverage questions, please contact the adjuster handling the claim.

Sincerely,

Virna Camacho
Litigation Paralegal

Enc.
Cc:     Jamie Adams

# EXHIBIT

# J

# TULLY LAW FIRM LLC
## SCOTT L. TULLY
### ATTORNEY AT LAW
2017 S. Elm Place, Suite 107, Broken Arrow, OK 74012

P.O. Box 2141
Broken Arrow, OK 74013-2141
scott@tullylawfirm.net

(918) 872-8800 (W)
(918) 845-1874 (C)
(866) 224-2303 (F)
*Also Admitted in Alabama

March 4, 2014

Shelter Insurance Companies
Jeff Hammons
PO Box 6008
Colombia, MO 65205

Fax:    888-742-5671
Email:  JTHammons@shelterinsurance.com

Re:   Claim:        HO0000001076116
      Insured:      Eric Strait
      Reported Loss: 6/18/13
      Loss Location: 2458 S. 107th East Ave., Tulsa, OK 74129

Dear Mr. Hammons:

As you are already aware, Eric Stait has retained this office with respect to the above referenced claim. Thank you for your letter of clarification of February 13, 2014 as well as a copy of the certified policy received on February 18, 2014. It would appear that I have all information from Shelter Insurance Companies to proceed with a review of your denial of coverage. Pursuant to my review of the materials I am respectfully requesting that Shelter Insurance Companies reconsider the denial of this claim as set forth in your letter of July 17, 2013, as well as your below deductible letter dated July 25, 2013.

Based upon the facts of the claim, prior attorney communications, the relevant policy provisions and endorsements, expert opinions and content of Shelter Insurance Companies investigation I sincerely believe that Shelter has improperly denied this claim and is presently in breach of its obligations to its insured, Eric Stait. We demand Shelter Insurance Companies immediately provide coverage for loss sustained by Mr. Strait due to this incident as his damages continue to mount and he is forced to incur monetary expenses loss for what is clearly a covered claim.

## SHELTER INSRUANCE COMPANY DENIAL LETTER OF JULY 17, 2013

This letter states that "(O)ur investigation revealed that contractors found leaking pipes under your slab while they were installing foundation piers." It would appear that from this statement, Shelter has cited three policy provisions to demonstrate that this should be denied: 1) Movement; 2) Wear and tear; 3) Continuous repeated seepage water over a period of fourteen days or more. In fact, Shelter states "(S)pecifically, the pipes broke due to wear and tear, deterioration and rust which caused a leak that occurred for longer than fourteen days. The policy also excludes movement of materials that support, or surround a structure and earthquake damage." The letter peculiarly states that "Our investigation revealed that contractors found leaking pipes under your slab while they were installing foundation piers."

I have carefully reviewed all material that you have submitted and fail to see any mention by any party that leaking pipes were found under the slab while installing piers. In fact, Mr. Strait would testify that he purchased the subject home, and policy, in October 2009. Mr. Strait has never been advised of leaking pipes since the inception of his policy until this claim. It is believed that the record would demonstrate that piering was done by the previous owner in June 2008. There appears to be absolutely no evidence to support your primary statement for denial. It is equally troublesome that this loss was reported on June 18, 2013, and the denial was prepared on July 17, 2013 without any actual premise inspection by Shelter Insurance Companies.

## SHELTER INSRUANCE COMPANY BELOW DEDUCTIBLE LETTER OF JULY 25, 2013

The letter of July 25, 2013 is very brief and simply states two positions by Shelter: 1) The damages from the loss are below the insured's $1,000.00 deductible; 2) There would be no coverage for Additional Living Expenses since the loss was below deductible. This letter is the first mention of an inspection of the loss location. Further information submitted by Shelter indicates that the loss was reported at 7:44 a.m. on June 18, 2013. Although June 18, 2013 was a Tuesday, Shelter did not make contact with the insured until sometime June 21, 2103, three days after the reported loss. The same information provided by Shelter shows that the first inspection of the loss by Shelter occurred on July 24, 2013 (36 days after the loss was reported). The claim was then closed on July 25, 2013, and appears to remain so.

## ENGINEER'S REPORT

Although it is Shelter Insurance Companies duty to determine the cause of loss, they did not obtain an expert opinion to investigate the loss. In fact, the information provided by Shelter Insurance Companies demonstrates that the loss was denied prior to any inspection at all. Based upon the lack of investigation by Shelter Insurance Companies, Eric Strait took it upon himself to obtain an engineer's opinion regarding the cause of loss. The engineer that was contacted was Mike Herndon of Herndon Engineering, Inc. It is my understanding that Mr. Herndon is an engineer that is used at the behest of most local insurance companies for opinions of this nature.

Although it was not Mr. Straits obligation to obtain a cause of loss report, he hired Mr. Herndon at a personal cost of $475.00. I have attached a copy of Mr. Herndon's July 29, 2013 Moisture Infiltration Inspection report. Although the report was written on July 29, 2013, Mr. Herndon inspected the premises on July 17, 2013. On page 2 of the report, please note that Mr. Herndon states, "(I)n summary, it appears that the sewer line was completely clogged with earth and other debris causing a backup of the plumbing line beneath the kitchen sink. This caused significant water damage to the kitchen base cabinets in the ceramic tile of the kitchen and entry hall areas."

## POLICY PROVISIONS

It is Mr. Strait's position that the provisions noted in the July 17, 2013 letter of Shelter Insurance do not support a denial even as stated. Shelter has failed to ever acknowledge that Mr. Strait purchased the **Back-Up of Sewer or Drain Endorsement.** According to the certified policy provided, the sewer and drain endorsement eliminates exclusion "3(c) Water or water borne contaminants or materials, that overflows from sewers, drains, or pumps, **if that overflow is caused by the inadequacy of the sewer drain or pump system..."** Given the additional information provided herein, especially the engineer report, this is clearly a covered claim.

Mr. Strait's policy is an all risk policy less exclusions. The exclusions listed in your denial of July 17, 2013 references numbers 2, 10 and 11. Exclusion number 2 is for earth movement. Nothing contained within your file, nor the information submitted herein supports that there was any sort of earth movement

that caused this loss.  Exclusion number 10 is the wear, tear and deterioration exclusion.  Exclusions
within a policy often have a give-back provision within.  That is the case with exclusion number 10.
Subsections (a) and (b) apply as the give back provision giving coverage in this instance.  The exclusions
are **waived** if the loss was "(a) caused by the accidental discharge or overflow of water or steam fromm
within a plumbing system,... and (b) the point at which the water or steam was discharged, or from which
it overflowed, is physically located within a structure permanently attached to the residence premises."
Thus exclusion 10 should have been waived per the policy in this loss.

Your July 17, 2013 denial language continues with exclusion number 11.  It would be suggested that the
waiver in exclusion 10 does not apply if there is some sort of evidence that there has been a "continuous
or repeated seepage or leakage of water or steam over a period of fourteen days or more."  First of all,
your insured stated that there had been evidence of water for approximately two days.  Other than that,
there is no contradiction to Mr. Strait's allegation.  Second, Shelter did not even inspect the loss for 36
days after report, and could not possibly have known how long the water had leaked.

The only exclusion that applies in this case is the actual place that the pipe was replaced due to wear and
tear or corrosion.  The access, the resultant damages, and the expert opinion are all covered per the policy
language.

## DAMAGES

Mr. Strait has incurred the following damages to date:

| | | |
|---|---|---|
| 1) | $10,000.00 | Williams Plumbing & Drain (see invoice) |
| 2) | $9,957.48 | 24/7 Disaster Group estimate for repairs |
| 3) | $475.00 | Herndon Engineering Report |
| 4) | $221.35 | Hotel Charges fro 7/13/13-7/17/13 (ALE) |
| 5) | $500.00 | Additional Meals and Living Expenses |

In addition, Mr. Strait has extra contractual damages of:

| | | |
|---|---|---|
| 6) | $10,000.00 | Attorney Fee to date |
| 7) | $100,000.00 | Punitive Bad Faith Damages |

Total:  $131,153.83

## CONCLUSION

Eric Strait has incurred significant costs in relation to this claim, and still hasn't been able to effectuate
the repairs to his home caused by the covered loss.  As outlined above, Shelter Insurance Companies has
wrongfully denied coverage for Mr. Strait's loss, and is currently in breach of it's obligations under
Policy Number 35-71-7230831-1 and affiliated Claim Number HO1076116.  Shelter's actions, and
inactions continue to amount to bad faith toward Mr. Strait.  I respectfully request Shelter Insurance
Companies reconsider its denial in light of our position herein, and will issue a reversal of its denial by
March 18, 2014.  Should no reversal occur, and payment of agreed damages, by March 18, 2014, please
be advised that Eric Strait will file suit without further notice.

Nothing contained in the foregoing should be construed as a waiver of any rights of Eric Strait has under
the relevant policy.  Mr. Strait specifically reserves all of his rights under the policy and at law.  Thank
you for your attention to this request.

Thank you for your time and assistance in this matter.

Very truly yours,

Scott L. Tully

cc:    Eric Strait

# EXHIBIT K

 **SHELTER INSURANCE COMPANIES**
SHELTER MUTUAL
SHELTER GENERAL

March 14, 2014

Tully Law Firm
P.O. Box 2141
Broken Arrow, OK  74013

RE:   Claim Number:   HO0000001076116
      Date of Loss:    06/18/2013
      Insured:         STRAIT, ERIC

Dear Mr. Tully:

Please allow this letter to acknowledge your most recent correspondence dated March 4, 2014. We appreciate you providing us with the July 29, 2013 Herndon Engineering Report as well. We had requested the engineering report from Attorney Diane Lee in writing on September 6, 2013 and received no compliance. With the benefit of this additional information, we would like to inspect the property and retain an engineer of our own, Ford Engineering. Shelter would request to inspect and consider potentially making some supplemental payments under the subject policy, based upon some of the findings in Mr. Herndon's report.

Please advise when the property can be available for inspection. Additionally, please provide us with the photographs referenced in Mr. Herndon's report in the last line of page 1.

We appreciate your cooperation in this regard.

Sincerely,

Jamie Adams
Claims Department
Phone:   918-294-2242
Fax:     888-742-5671
Email:   JAdams@ShelterInsurance.com

cc:

# EXHIBIT

# L



# TULLY LAW FIRM LLC

### SCOTT L. TULLY
ATTORNEY AT LAW
2017 S. Elm Place, Suite 107, Broken Arrow, OK 74012

P.O. Box 2141
Broken Arrow, OK 74013-2141
scott@tullylawfirm.net

(918) 872-8800 (W)
(918) 845-1874 (C)
(866) 224-2303 (F)
*Also Admitted in Alabama

March 24, 2014

Shelter Insurance Companies
Jamie Adams
PO Box 6008
Colombia, MO 65205

Fax:   888-742-5671
Email: jadams@shetlterinsurance.com

Re:   Claim:          HO0000001076116
       Insured:        Eric Strait
       Reported Loss:  6/18/13
       Loss Location:  2458 S. 107th East Ave., Tulsa, OK 74129

Dear Ms. Adams:

Thank you for your letter of March 14, 2014. It would appear that you have taken over the handling of this claim from Mr. Hammons. If this is incorrect, please let me know immediately.

I am somewhat concerned by your request to finally have an expert inspect the property nine months after the date of loss. My letter of March 4, 2014 clearly states that this loss was covered per the policy language whether you wanted to allege the cause of losses in your denial, or those found by expert engineer Mike Herndon. I am even more concerned that it would appear that Shelter Insurance does not trust the opinion of engineer Mike Herndon. Please let me know your reservations about proceeding with the expert opinion of Mr. Herndon. Please let me know if Shelter Insurance is of the opinion that Mr. Herndon is not qualified to render an opinion in a loss of this nature. I am uncertain why Shelter would request a second opinion when, in fact, they have used Herndon Engineering for similar losses recently. Perhaps you could elaborate your need for another opinion this late, and also your concerns about Mr. Herndon, prior to us deciding whether to file suit at this time. The photographs that you have also requested were attached to the report of Mr. Herndon previously.

Lastly, your letter states that "Shelter would request to inspect and consider potentially making some supplemental payments under the subject policy, based upon some of the findings in Mr. Herndon's report." This statement would lead me to believe that payments can be made at this time solely based upon Mr. Herndon's report. If that is the case, please advise which payments can be made prior to going forward. Once you have clarified the subjects listed herein, we can advise how we will proceed. Thank you for your time and assistance in this matter.

Very truly yours,

Scott L. Tully

cc:     Eric Strait

# EXHIBIT M

 **SHELTER
INSURANCE
COMPANIES**
SHELTER MUTUAL
SHELTER GENERAL

March 28, 2014

Tully Law Firm LLC
P.O. Box 2141
Broken Arrow, OK  74013-2141

RE:   Claim Number:   HO0000001076116
       Date of Loss:      06/18/2013
       Insured:            STRAIT, ERIC

CERTIFIED MAIL - RETURN RECEIPT REQUESTED

Dear Mr. Tully:

This letter is in response to your March 24th letter. I have assumed the handling of the claim and you may fax any correspondence to 888-742-5671 and/or use my email address, jadams@shelterinsurance.com.

With the benefit of reviewing Mr. Herndon's report which Shelter initially received on March 4, 2014, we are enclosing the estimate of damages that are covered under Mr. Strait's policy. A draft for payment of these damages is also enclosed. Additional Living Expense is also available during the kitchen repairs to pay for meals while the kitchen is inoperable. If the damages are disputed or additional damages are found, we again request to schedule a re-inspection of the home with Ford Engineering.

Finally, the faxed report with the photographs received by Shelter on March 4, 2014, with Mr. Herndon's report are in black and white. We ask that you provide the color photos, or alternatively authorize us to speak with Mr. Herndon about his report so we may request the color digital images from him directly.

Sincerely,

Jamie Adams
Jamie Adams
Claims Department
Phone:   918-294-2242
Fax:      888-742-5671
Email:    JAdams@ShelterInsurance.com

Shelter Insurance Companies • TU • PO Box 6008 • Columbia, MO 65205-6008

RE: HO0000001076116

4 of 4

# EXHIBIT C



**Shelter Insurance**
PO Box 6008
Columbia, MO 65205-6008
Fax: 888-742-5671

07/25/2013


ERIC STRAIT
2458 S 107TH EAST AVE
TULSA, OK, 74129-4812


<u>**Re:**</u>  Business Name:
      Insured:        ERIC STRAIT
      Claim Number:   HO0000001076116
      Policy Number:   35-71-7230831-1
      Date of Loss:   06/18/2013
      Loss Location:   2458 S 107TH EAST AVE


Dear  ERIC STRAIT

Shelter has been notified about this loss involving the property at the loss location.

We inspected your damages and it showed the damages are below the policy's $1,000.00 deductible.  Enclosed is a copy of our estimate for your records.

If you have any questions or additional information, please contact us.


Mr. Stubblefield had inquired about additional living expense
The following is the part of your policy that explains additional living expense.

COVERAGE D-ADDITIONAL LIVING EXPENSE AND
LOSS OF RENTS
INSURING AGREEMENT
If your residence premises sustains a covered loss
that exceeds the applicable deductible and, as a
direct result of that loss, your residence premises
is uninhabitable, we will pay the increase in your living
expense reasonably necessary to maintain your
normal standard of living for the shortest time
reasonably necessary:
1. to repair or replace the damaged property, or
2. for you to permanently relocate.

Sincerely,

Jeff Hammons
Material Damage Adjuster
(918) 294-2239

# EXHIBIT D

**...SS, ABNEY, NEAL, TURPEN, ORBISON ...EWIS**

A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS AT LAW
502 WEST SIXTH STREET
FRISCO BUILDING
TULSA, OKLAHOMA 74119-1016
(918) 587-9762
Fax (918) 585-1142
(800) 722-0302

September 11, 2013

<u>*Via E-Mail: JTHammons@shelterinsurance.com and Regular U.S. Mail*</u>

Mr. Jeff Hammons
Claims Department
Shelter Insurance Companies
P.O. Box 6008
Columbia, MO 65205-6008

    RE:    **Claim No.:**    **HO0000001076116**
           **Your Insured:**    **Eric Strait**
           **Date of Loss:**    **06/18/2013**

Dear Mr. Hammons:

    This is a follow-up to my last letter to you dated August 23, 2013 and in response to your letter dated September 6, 2013. Mr. Strait's Back-up of Sewer or Drain Endorsement (B-494.5-B) provides that damages to his residence premises by water that overflows from sewers or drains when the overflow is caused by the inadequacy of the sewer or drain is a covered loss. He pays a premium for this precise coverage.

    Your July 17, 2013 and September 6 letters refer to the investigation you conducted that revealed contractors found leaking pipes under Mr. Strait's slab while they were installing foundation piers. Please provide the documentation or a report summary which details that investigation and how that even relates to his loss. Mr. Strait did not even own the home at the time the foundation piers were installed.

    Mr. Strait noticed the water leak in his kitchen over a period of two days. There was not continuous or repeated leakage of water over a period of fourteen (14) days or more. The sewer line and kitchen drain line were inadequate, and as a result, the water overflowed, causing the damages, necessitating the foundation be torn in several locations, the sewer line and drain line repaired, flooring repaired, all of which should be covered under his policy. Furthermore, the exclusion you reference for wear and tear and deterioration is waived when the accidental direct physical loss to other covered property is caused by the accidental overflow of water from within a plumbing system and the point at which the water overflowed is physically located within a structure permanently attached to the residence premises. The overflow came from within the plumbing system and the point of the overflow was in the kitchen.

September 11, 2013
Page 2

This is a substantial loss for Mr. Strait. Enclosed are the repair bills totaling $19,957.48. The work estimated by the 24/7 Disaster Group has not been done, nor has the flooring been repaired to date. I also understand that a subsequent claim for sewer back-up was filed for damages that occurred last weekend.

Shelter owes Mr. Strait the duty to promptly investigate, evaluate and pay any loss covered under the policy. Failing to even have an adjuster out to inspect brings in issue whether Shelter acted to discharge that duty in good faith. Also, requiring Mr. Strait to determine the cause of the loss, which is obviously one that is covered under the Back-up of Sewer or Drain Endorsement (B-494.5-B), does not indicate that Shelter is dealing fairly with Mr. Strait. Shelter should be looking for coverage rather than a way to exclude it, and, as you know or should know, any ambiguities in the policy will be construed in favor of Mr. Strait under Oklahoma law.

We would urge you to reconsider Shelter's denial of Mr. Strait's claim. You should also take whatever steps are necessary to preserve Shelter's claim file relative to Mr. Strait's claim, including electronically stored information.

Sincerely,

G. Diane Lee
FOR THE FIRM

GDL/trg
Cc: Eric Strait
I: 590964

# WILLIAMS
## PLUMBING & DRAIN
### SLAB LEAKS

10321 E. 47th Pl.
Tulsa, OK 74146
Phone: 918-794-5555
Fax: 918-794-5556

**WILLIAMS PLUMBING AND DRAIN SERVICE, INC.**
*YOUR PLUMBING HEADQUARTERS™*

99470

| CUSTOMER ORDER #: | PHONE: 918-510-0824 | DATE: 7-19-13 |
|---|---|---|

LAST NAME: Straight  FIRST NAME: Eric

ADDRESS: 2458 S 67th E Ave

CITY: Tulsa   ZIP CODE:

TECHNICIAN # 96

**BILLING / INSURANCE INFO.**

COMPANY/BILL TO:

ADJ. NAME/ADDRESS

CLAIM NUMBER/P.O. #

PHONE #    FAX #

## DESCRIPTION OF WORK

6-18-13 - Ran thru slab Drain Test + failed - Ran Camera + found break under ketch - set $99.50

7-11-13 - Jackhammerd slab in Kitchen - tunneled under cabinet + find break on lead pipping - went to make necessary repairs + were unable to due to bad piping where lead thru out Cast iron. Contract to follow Castiron looking for solid piping to the onto.

7-12-13 Continued following piping looking for solid pipe to ½ onto - Jackhammering + tipping.

7-15-13 + removing dirt. Tunneled under walls. Eventually find good piping in mast.

7-16-13 bathroom. Piped in + refished. Tulsa City inspector came out + spected

7-17-13 + passed. (Permit # 321466)

7-18-13 Backfild with sand, packed, + concreted. Hauled off spoils.

7-19-13

| LABOR | HRS | RATE | AMOUNT |
|---|---|---|---|
| | | $ | $ |
| 6-18-13 Invoice # 99457 | | | 450 |
| 7-11-13 18 Day 2 men + all equipment | | 1750 | 1750 |
| 7-12-13 - 7-19-13 - Each add'l and day 2 Men + all equipment | | 1650 (x6) | 9900 |
| 7-19-13 Additional men $70 per hr | 8 | 70 | 560 |

**LIMITED WARRANTY:** All materials, parts and equipment are warranted by the manufacturers' or suppliers' written warranty only. All labor performed by the above named companies is warranted for 30 days or as otherwise indicated in writing. The above named companies makes no other warranties, express or implied, and its agents or technicians are not authorized to make any such warranties on behalf of above named companies. Drains guaranteed for 30 days unless stoppage caused by paint, rags, debris, grease, paper pulp, broken settled pipe, orangeburg-fiber sewer lines, femine products, or root main lines.

Variable fees: Dump Charges
Sand
Concrete
Plastry/mud
Permit / Inspection

322

| ACCOUNT | CASH | CHECK # / CREDIT CARD # |
|---|---|---|
| | | Paid $3000 (S)149(R)(R) 7-11-13 |
| | | Paid $7000 (S)147(R)477 7-29-13 |

TIME TO MAKE REPAIR & PARTS USED  342
$13,329
- time to make repair + parts = 347
$12,982

Discounted Total = $10,000

**PLEASE PAY FROM THIS INVOICE.** PAYMENT DUE UPON JOB COMPLETION.
All Charge Accounts Must Be Approved Through Office Before Work is Started. $20 will be added to all accounts 30 days past due and/or 18% APR. In the event of default, customer agrees to pay additional collection and/or attorney fees that are permissible by law.

I hereby authorize the work described above and agree to the terms and conditions as stated on this form. I recognize that aged and deteriorated plumbing fixtures, heating, air conditioning equipment, piping, appendages, etc, may no longer be serviceable, and I agree to hold Williams Plumbing and Drain Service, Inc. blameless for any damages or destruction to those items as a result of these conventional repair efforts.

I agree that the above described work was performed to my satisfaction. The parts, labor, and materials were installed as agreed. I agree to pay the total amount in full or represent the party that will pay in full. If Insurance/Warranty Company does not pay any portion of the work performed, I understand that I am responsible for the balance of entire invoice. All warranty issues performed during normal business hours.

SIGNATURE: X Eric Strait   PRINTED NAME: Eric K. Strait   TITLE: owner   1-24-2013

**THANK YOU**          **CALL AGAIN!**

# WILLIAMS
## PLUMBING & DRAIN
### SLAB LEAKS

10321 E. 47th Pl.
Tulsa, OK 74146
Phone: 918-794-5555
Fax: 918-794-5556

**WILLIAMS PLUMBING AND DRAIN SERVICE, INC.**
*YOUR PLUMBING HEADQUARTERS™*

9945

| CUSTOMER ORDER #: | PHONE: 918-355-0524 | DATE: 6-18-13 |
|---|---|---|
| LAST NAME | | FIRST NAME |
| ADDRESS 3455 S 177 E Ct | | |
| CITY | | ZIP CODE |

**BILLING / INSURANCE INFO.**

| TECHNICIAN # | COMPANY/BILL TO: | CLAIM NUMBER/P.O. # |
|---|---|---|
| | ADJ. NAME/ADDRESS | |
| | PHONE # | FAX # |

## DESCRIPTION OF WORK

| LABOR | HRS | RATE | AMOUNT |
|---|---|---|---|
| | $ | $ | 150 |
| | | | 350 |

**LIMITED WARRANTY:** All materials, parts and equipment are warranted by the manufacturers' or suppliers' written warranty only. All labor performed by the above named companies is warranted for 30 days or as otherwise indicated in writing. The above named companies makes no other warranties, express or implied, and its agents or technicians are not authorized to make any such warranties on behalf of above named companies. Drains guaranteed for 30 days unless stoppage caused by paint, rags, debris, grease, paper pulp, broken settled pipe, orangeburg-fiber sewer lines, femine products, or roof main lines.

**TIME TO MAKE REPAIR & PARTS USED**

$420

| ACCOUNT | CASH | CHECK # / CREDIT CARD # |
|---|---|---|

**PLEASE PAY FROM THIS INVOICE.   PAYMENT DUE UPON JOB COMPLETION.**
All Charge Accounts Must Be Approved Through Office Before Work is Started. $20 will be added to all accounts 30 days past due and/or 18% APR. In the event of default, customer agrees to pay additional collection and/or attorney fees that are permissible by law.

I hereby authorize the work described above and agree to the terms and conditions as stated on this form, I recognize that aged and deteriorated plumbing fixtures, heating, air conditioning equipment, piping, appendages, etc, may no longer be serviceable, and I agree to hold Williams Plumbing and Drain Service, Inc. blameless for any damages or destruction to those items as a result of these conventional repair efforts.

I agree that the above described work was performed to my satisfaction. The parts, labor, and materials were installed as agreed. I agree to pay the total amount in full or represent the party that will pay in full. If Insurance/Warranty Company does not pay any portion of the work performed, I understand that I am responsible for the balance of entire invoice. All warranty issues performed during normal business hours.

| SIGNATURE X | PRINTED NAME | TITLE | DATE |
|---|---|---|---|

## THANK YOU                          CALL AGAIN!



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

Client:   Eric Strait
Property:   2458 S 107th E Ave
   Tulsa, OK 74129

Home:  (918) 510-0824

Operator:   WILL

Estimator:   Will Rohleder

Cellular:  (918) 845-4004
E-mail:  will@247disastergroup.com

Reference:
Company:   24/7 Disaster Group
Business:   3139 E. 145th St. S
   Bixby, OK 74008

Business:  (918) 779-4900

Type of Estimate:   <NONE>
Date Entered:   8/6/2013
Date Est. Completed:   8/6/2013

Date Assigned:   8/6/2013
Date Job Completed:

Price List:   OKTU8X_JUL13
Labor Efficiency:   Restoration/Service/Remodel
Estimate:   2013-08-06-1533



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

2013-08-06-1533

**Main Level**

## Main Level

| DESCRIPTION | QTY | | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Dumpster load – Approx. 12 yards, 1-3 tons of debris | 1.00 | EA | | 358.64 | 0.00 | 0.00 | 71.72 | 430.36 |
| Content Manipulation charge – per hour,  Contents move out and back in. | 4.00 | HR | | 0.00 | 26.86 | 0.00 | 21.48 | 128.92 |
| Contents Evaluation and/or Supervisor/Admin – per hour | 2.00 | HR | | 0.00 | 48.69 | 0.00 | 19.48 | 116.86 |
| Clean ductwork – Interior (PER REGISTER) | 11.00 | EA | | 0.00 | 28.93 | 0.00 | 63.64 | 381.87 |

Clean ductwork from airborne concrete dust and debris from the jackhammer and sawcutting of concrete to slab from the sewer line replacement. Includes HVAC plenum.

| DESCRIPTION | QTY | | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Heat/AC register – Mechanically attached – Detach & reset | 11.00 | EA | | 0.00 | 11.46 | 0.00 | 25.22 | 151.28 |

| | | | | | | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Total: Main Level | | | | | | 0.00 | 201.54 | 1,209.29 |

**Kitchen**                                                                 Height: 8'

| | |
|---|---|
| 368.78  SF Walls | 161.23  SF Ceiling |
| 530.01  SF Walls & Ceiling | 161.23  SF Floor |
| 17.91  SY Flooring | 44.58  LF Floor Perimeter |
| 53.67  LF Ceil. Perimeter | |

| Missing Wall – Goes to Floor | 5' 9" X 6' 8" | Opens into Exterior |
|---|---|---|
| Missing Wall – Goes to Floor | 3' 4" X 6' 8" | Opens into ENTRY_FOYER |

| DESCRIPTION | QTY | | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Remove Additional labor to remove tile from concrete slab | 132.15 | SF | | 1.30 | 0.00 | 0.00 | 34.36 | 206.16 |
| Floor leveling cement – Heavy | 25.00 | SF | | 0.00 | 2.03 | 2.68 | 10.70 | 64.13 |

Leveling on concrete repair from plumbers work to existing slab.

| DESCRIPTION | QTY | | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|---|
| R&R Tile floor covering | 132.15 | SF | | 1.81 | 6.40 | 38.16 | 224.64 | 1,347.75 |
| R&R Underlayment – sound/crack membrane – 70+ to 90 mil | 30.00 | SF | | 0.67 | 2.05 | 3.78 | 17.08 | 102.46 |

Membrane over concrete repair from plumber to new slab.  If shifting occurs, membrane protects against tile cracking.

| DESCRIPTION | QTY | | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Cabinetry.  Repairs to cabinet under kitchen sink. | 1.00 | EA | | 0.00 | 306.80 | 10.71 | 63.50 | 381.01 |

5 hours labor total.  $50 in material.

| DESCRIPTION | QTY | | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Drywall Repair – Minimum Charge – Labor and Material | 1.00 | EA | | 0.00 | 221.50 | 1.17 | 44.54 | 267.21 |



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

### CONTINUED - Kitchen

| DESCRIPTION | QTY | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| Repair to drywall under kitchen sink where drain lines and water lines are. | | | | | | | |
| Detach & Reset Baseboard - 3 1/4" | 33.58 LF | 1.61 | 0.00 | 0.00 | 0.06 | 10.84 | 64.96 |
| R&R Re-skin toe kick | 22.75 LF | | 1.35 | 5.97 | 6.01 | 34.50 | 207.04 |
| Around perimeter of cabinetry in kitchen. | | | | | | | |
| Mask and prep for paint - tape only (per LF) | 147.00 LF | | 0.00 | 0.45 | 0.50 | 13.34 | 79.99 |
| Paint baseboard - two coats | 33.58 LF | | 0.00 | 1.00 | 0.31 | 6.78 | 40.67 |
| Paint door/window trim & jamb - Large - 2 coats (per side) | 2.00 EA | | 0.00 | 26.60 | 0.75 | 10.80 | 64.75 |
| Refrigerator - Remove & reset | 1.00 EA | | 0.00 | 24.94 | 0.00 | 4.98 | 29.92 |
| Dishwasher - Detach & reset | 1.00 EA | | 0.00 | 187.16 | 0.00 | 37.44 | 224.60 |
| Containment Barrier/Airlock/Decon. Chamber | 45.00 SF | | 0.00 | 0.77 | 0.27 | 7.00 | 41.92 |
| Plastic containment to prevent dust from removing tile from spreading into entire house. | | | | | | | |
| Clean the walls and ceiling | 530.01 SF | | 0.00 | 0.21 | 0.45 | 22.36 | 134.11 |
| Clean baseboard | 33.58 LF | | 0.00 | 0.20 | 0.00 | 1.34 | 8.06 |
| Clean cabinetry - lower - faces only | 23.00 LF | | 0.00 | 4.04 | 0.10 | 18.60 | 111.62 |
| Clean cabinetry - upper - faces only | 18.00 LF | | 0.00 | 4.04 | 0.08 | 14.56 | 87.36 |
| Clean ceramic tile | 132.15 SF | | 0.00 | 0.41 | 0.11 | 10.86 | 65.15 |
| Clean cooktop | 1.00 EA | | 0.00 | 13.83 | 0.01 | 2.76 | 16.60 |
| Clean countertop | 36.00 SF | | 0.00 | 0.47 | 0.03 | 3.38 | 20.33 |
| Clean dishwasher - exterior | 1.00 EA | | 0.00 | 8.90 | 0.00 | 1.78 | 10.68 |
| Clean door / window opening (per side) | 3.00 EA | | 0.00 | 7.39 | 0.01 | 4.44 | 26.62 |
| Clean light fixture | 2.00 EA | | 0.00 | 6.04 | 0.01 | 2.42 | 14.51 |
| Clean range - exterior | 1.00 EA | | 0.00 | 18.06 | 0.03 | 3.62 | 21.71 |
| Clean refrigerator - exterior | 1.00 EA | | 0.00 | 11.06 | 0.02 | 2.22 | 13.30 |
| Clean sink | 1.00 EA | | 0.00 | 7.39 | 0.00 | 1.48 | 8.87 |
| Totals:  Kitchen | | | | | 65.25 | 610.32 | 3,661.49 |



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com



| Entry/Foyer | | | | | | Height: 8' |
|---|---|---|---|---|---|---|

| 136.00 SF Walls | 32.55 SF Ceiling |
|---|---|
| 168.55 SF Walls & Ceiling | 32.55 SF Floor |
| 3.62 SY Flooring | 15.33 LF Floor Perimeter |
| 25.33 LF Ceil. Perimeter | |

| Missing Wall - Goes to Floor | 3' 7" X 6' 8" | Opens into Exterior |
|---|---|---|
| Missing Wall - Goes to Floor | 3' 1" X 6' 8" | Opens into HALL_UTILITY |
| Missing Wall - Goes to Floor | 3' 4" X 6' 8" | Opens into KITCHEN |

| DESCRIPTION | QTY | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| Remove Additional labor to remove tile from concrete slab | 32.55 SF | | 1.30 | 0.00 | 0.00 | 8.46 | 50.78 |
| Floor leveling cement - Heavy | 15.00 SF | | 0.00 | 2.03 | 1.61 | 6.42 | 38.48 |
| Leveling on concrete repair from plumbers work to existing slab. | | | | | | | |
| R&R Tile floor covering | 32.55 SF | | 1.81 | 6.40 | 9.40 | 55.32 | 331.96 |
| R&R Underlayment - sound/crack membrane - 70+ to 90 mil | 20.00 SF | | 0.67 | 2.05 | 2.52 | 11.38 | 68.30 |
| Membrane over concrete repair from plumber to new slab. If shifting occurs, membrane protects against tile cracking. | | | | | | | |
| Detach & Reset Baseboard - 3 1/4" | 15.33 LF | 1.61 | 0.00 | 0.00 | 0.03 | 4.94 | 29.65 |
| Mask and prep for paint - tape only (per LF) | 30.67 LF | | 0.00 | 0.45 | 0.10 | 2.78 | 16.68 |
| Paint baseboard - two coats | 15.33 LF | | 0.00 | 1.00 | 0.14 | 3.08 | 18.55 |
| Paint door/window trim & jamb - Large - 2 coats (per side) | 2.00 EA | | 0.00 | 26.60 | 0.75 | 10.80 | 64.75 |
| Containment Barrier/Airlock/Decon. Chamber | 21.00 SF | | 0.00 | 0.77 | 0.13 | 3.26 | 19.56 |
| Plastic containment to prevent dust from removing tile from spreading into entire house. | | | | | | | |
| Clean the walls and ceiling | 168.55 SF | | 0.00 | 0.21 | 0.14 | 7.10 | 42.64 |
| Clean baseboard | 15.33 LF | | 0.00 | 0.20 | 0.00 | 0.62 | 3.69 |
| Clean door (per side) | 1.00 EA | | 0.00 | 4.17 | 0.01 | 0.84 | 5.02 |
| Clean door / window opening (per side) | 1.00 EA | | 0.00 | 7.39 | 0.00 | 1.48 | 8.87 |
| Clean light fixture | 1.00 EA | | 0.00 | 6.04 | 0.00 | 1.20 | 7.24 |

| Totals: Entry/Foyer | | | | | 14.83 | 117.68 | 706.17 |
|---|---|---|---|---|---|---|---|



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com



**Hall/Utility**                                                                   **Height: 8'**

382.11 SF Walls                                99.30 SF Ceiling
481.41 SF Walls & Ceiling                      99.30 SF Floor
11.03 SY Flooring                              46.75 LF Floor Perimeter
52.83 LF Ceil. Perimeter

| Missing Wall - Goes to Floor | 3' X 6' 8" | Opens into Exterior |
|---|---|---|
| Missing Wall - Goes to Floor | 3' 1" X 6' 8" | Opens into ENTRY_FOYER |

| DESCRIPTION | QTY | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| Remove Additional labor to remove tile from concrete slab | 99.30 SF | | 1.30 | 0.00 | 0.00 | 25.82 | 154.91 |
| Floor leveling cement - Heavy | 15.00 SF | | 0.00 | 2.03 | 1.61 | 6.42 | 38.48 |
| Leveling on concrete repair from plumbers work to existing slab. | | | | | | | |
| R&R Tile floor covering | 99.30 SF | | 1.81 | 6.40 | 28.67 | 168.78 | 1,012.70 |
| R&R Underlayment - sound/crack membrane - 70+ to 90 mil | 20.00 SF | | 0.67 | 2.05 | 2.52 | 11.38 | 68.30 |
| Membrane over concrete repair from plumber to new slab. If shifting occurs, membrane protects against tile cracking. | | | | | | | |
| Detach & Reset Baseboard - 3 1/4" | 46.75 LF | 1.61 | 0.00 | 0.00 | 0.08 | 15.08 | 90.43 |
| Mask and prep for paint - tape only (per LF) | 93.50 LF | | 0.00 | 0.45 | 0.32 | 8.48 | 50.88 |
| Paint baseboard - two coats | 46.75 LF | | 0.00 | 1.00 | 0.44 | 9.44 | 56.63 |
| Paint door/window trim & jamb - Large - 2 coats (per side) | 4.00 EA | | 0.00 | 26.60 | 1.49 | 21.58 | 129.47 |
| Containment Barrier/Airlock/Decon. Chamber | 21.00 SF | | 0.00 | 0.77 | 0.13 | 3.26 | 19.56 |
| Plastic containment to prevent dust from removing tile from spreading into entire house. | | | | | | | |
| Washing machine - Remove & reset | 1.00 EA | | 0.00 | 20.79 | 0.00 | 4.16 | 24.95 |
| Detach & Reset Dryer - Gas | 1.00 EA | 70.59 | 0.00 | 0.00 | 0.00 | 14.12 | 84.71 |
| Clean the walls and ceiling | 481.41 SF | | 0.00 | 0.21 | 0.41 | 20.30 | 121.81 |
| Clean baseboard | 46.75 LF | | 0.00 | 0.20 | 0.00 | 1.88 | 11.23 |
| Clean ceramic tile | 99.30 SF | | 0.00 | 0.41 | 0.08 | 8.16 | 48.95 |
| Clean door (per side) | 2.00 EA | | 0.00 | 4.17 | 0.03 | 1.66 | 10.03 |
| Clean door / window opening (per side) | 2.00 EA | | 0.00 | 7.39 | 0.01 | 2.96 | 17.75 |
| Clean light fixture | 3.00 EA | | 0.00 | 6.04 | 0.01 | 3.62 | 21.75 |

Totals: Hall/Utility                                                35.80    327.10    1,962.54



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com



| Mechanical | | | | | | Height: 8' |
|---|---|---|---|---|---|---|
| 125.31 SF Walls | | | | 13.77 SF Ceiling | | |
| 139.08 SF Walls & Ceiling | | | | 13.77 SF Floor | | |
| 1.53 SY Flooring | | | | 15.66 LF Floor Perimeter | | |
| 15.66 LF Ceil. Perimeter | | | | | | |

| DESCRIPTION | QTY | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| Remove Additional labor to remove tile from concrete slab | 13.77 SF | | 1.30 | 0.00 | 0.00 | 3.58 | 21.48 |
| Floor leveling cement - Heavy | 6.00 SF | | 0.00 | 2.03 | 0.64 | 2.56 | 15.38 |
| Leveling on concrete repair from plumbers work to existing slab. | | | | | | | |
| R&R Tile floor covering | 13.77 SF | | 1.81 | 6.40 | 3.98 | 23.40 | 140.43 |
| R&R Underlayment - sound/crack membrane - 70+ to 90 mil | 6.00 SF | | 0.67 | 2.05 | 0.76 | 3.42 | 20.50 |
| Membrane over concrete repair from plumber to new slab.  If shifting occurs, membrane protects against tile cracking. | | | | | | | |
| Detach & Reset Baseboard - 3 1/4" | 15.66 LF | 1.61 | 0.00 | 0.00 | 0.03 | 5.04 | 30.28 |
| Mask and prep for paint - tape only (per LF) | 31.33 LF | | 0.00 | 0.45 | 0.11 | 2.84 | 17.05 |
| Paint baseboard - two coats | 15.66 LF | | 0.00 | 1.00 | 0.15 | 3.18 | 18.99 |
| Paint door/window trim & jamb - Large - 2 coats (per side) | 1.00 EA | | 0.00 | 26.60 | 0.37 | 5.40 | 32.37 |
| Interior door - Detach & reset - slab only | 1.00 EA | | 0.00 | 12.70 | 0.00 | 2.54 | 15.24 |
| Clean the walls and ceiling | 139.08 SF | | 0.00 | 0.21 | 0.12 | 5.86 | 35.19 |
| Clean baseboard | 15.66 LF | | 0.00 | 0.20 | 0.00 | 0.62 | 3.75 |
| Clean ceramic tile | 13.77 SF | | 0.00 | 0.41 | 0.01 | 1.14 | 6.80 |
| Clean door (per side) | 1.00 EA | | 0.00 | 4.17 | 0.01 | 0.84 | 5.02 |
| Clean door / window opening (per side) | 1.00 EA | | 0.00 | 7.39 | 0.00 | 1.48 | 8.87 |
| Clean light fixture | 1.00 EA | | 0.00 | 6.04 | 0.00 | 1.20 | 7.24 |
| Totals: Mechanical | | | | | 6.18 | 63.10 | 378.59 |



| Bathroom | | | | | | Height: 8' |
|---|---|---|---|---|---|---|
| 249.33 SF Walls | | | | 52.92 SF Ceiling | | |
| 302.25 SF Walls & Ceiling | | | | 52.92 SF Floor | | |
| 5.88 SY Flooring | | | | 31.17 LF Floor Perimeter | | |
| 31.17 LF Ceil. Perimeter | | | | | | |

 



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

### CONTINUED - Bathroom

| DESCRIPTION | QTY | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| Remove Additional labor to remove tile from concrete slab | 28.00 SF | | 1.30 | 0.00 | 0.00 | 7.28 | 43.68 |
| Floor leveling cement - Heavy | 7.00 SF | | 0.00 | 2.03 | 0.75 | 3.00 | 17.96 |

Leveling on concrete repair from plumbers work to existing slab.  Looks like floor is built up with floor leveling cement.  After demolition, floor will be evaluated to see if extra work is needed to build floor back up.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| R&R Tile floor covering | 52.92 SF | | 1.81 | 6.40 | 15.28 | 89.96 | 539.72 |
| R&R Underlayment - sound/crack membrane - 70+ to 90 mil | 9.00 SF | | 0.67 | 2.05 | 1.13 | 5.12 | 30.73 |

Membrane over concrete repair from plumber to new slab.  If shifting occurs, membrane protects against tile cracking.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Detach & Reset Baseboard - 3 1/4" | 12.00 LF | 1.61 | 0.00 | 0.00 | 0.02 | 3.86 | 23.20 |
| Mask and prep for paint - tape only (per LF) | 24.00 LF | | 0.00 | 0.45 | 0.08 | 2.18 | 13.06 |
| Paint baseboard - two coats | 12.00 LF | | 0.00 | 1.00 | 0.11 | 2.42 | 14.53 |
| Paint door/window trim & jamb - Large - 2 coats (per side) | 2.00 EA | | 0.00 | 26.60 | 0.75 | 10.80 | 64.75 |
| Containment Barrier/Airlock/Decon. Chamber | 21.00 SF | | 0.00 | 0.77 | 0.13 | 3.26 | 19.56 |

Plastic containment to prevent dust from removing tile from spreading into entire house.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Interior door - Detach & reset - slab only | 2.00 EA | | 0.00 | 12.70 | 0.00 | 5.08 | 30.48 |
| R&R Threshold - natural marble | 6.00 LF | | 2.36 | 42.06 | 13.25 | 55.98 | 335.75 |
| Toilet - Detach & reset | 1.00 EA | | 0.00 | 167.41 | 0.38 | 33.56 | 201.35 |
| Clean the walls and ceiling | 302.25 SF | | 0.00 | 0.21 | 0.26 | 12.76 | 76.49 |
| Clean baseboard | 31.17 LF | | 0.00 | 0.20 | 0.00 | 1.24 | 7.47 |
| Clean bathroom fan | 1.00 EA | | 0.00 | 15.97 | 0.00 | 3.20 | 19.17 |
| Clean bathroom fixtures | 1.00 EA | | 0.00 | 48.28 | 0.03 | 9.66 | 57.97 |
| Clean cabinetry - lower - faces only | 5.00 LF | | 0.00 | 4.04 | 0.02 | 4.04 | 24.26 |
| Clean cabinetry - upper - faces only | 3.00 LF | | 0.00 | 4.04 | 0.01 | 2.42 | 14.55 |
| Clean ceramic tile | 28.00 SF | | 0.00 | 0.41 | 0.02 | 2.30 | 13.80 |
| Clean countertop | 10.00 SF | | 0.00 | 0.47 | 0.01 | 0.94 | 5.65 |
| Clean door (per side) | 2.00 EA | | 0.00 | 4.17 | 0.03 | 1.66 | 10.03 |
| Clean door / window opening (per side) | 2.00 EA | | 0.00 | 7.39 | 0.01 | 2.96 | 17.75 |
| Clean light fixture | 1.00 EA | | 0.00 | 6.04 | 0.00 | 1.20 | 7.24 |
| Clean mirror | 18.00 SF | | 0.00 | 0.42 | 0.02 | 1.52 | 9.10 |
| Clean shower | 1.00 EA | | 0.00 | 24.63 | 0.01 | 4.92 | 29.56 |
| Clean sink | 1.00 EA | | 0.00 | 7.39 | 0.00 | 1.48 | 8.87 |
| Clean toilet | 1.00 EA | | 0.00 | 12.55 | 0.00 | 2.52 | 15.07 |



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

CONTINUED - Bathroom

| DESCRIPTION | QTY | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| Totals: Bathroom | | | | | 32.30 | 275.32 | 1,651.75 |
| Total: Main Level | | | | | 154.36 | 1,595.06 | 9,569.83 |

**Labor Minimums Applied**

| DESCRIPTION | QTY | RESET | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| Cabinetry labor minimum | 1.00 EA | | 0.00 | 32.40 | 0.00 | 6.48 | 38.88 |
| Hazardous waste/mold rem. labor min | 1.00 EA | | 0.00 | 74.68 | 0.00 | 14.94 | 89.62 |
| Door labor minimum | 1.00 EA | | 0.00 | 90.30 | 0.00 | 18.06 | 108.36 |
| Tile / marble labor minimum | 1.00 EA | | 0.00 | 30.50 | 0.00 | 6.10 | 36.60 |
| Heat, vent, & air cond. labor minimum | 1.00 EA | | 0.00 | 95.15 | 0.00 | 19.04 | 114.19 |
| Totals: Labor Minimums Applied | | | | | 0.00 | 64.62 | 387.65 |
| Line Item Totals: 2013-08-06-1533 | | | | | 154.36 | 1,659.68 | 9,957.48 |

**Grand Total Areas:**

| | | |
|---|---|---|
| 1,261.53 SF Walls | 359.77 SF Ceiling | 1,621.30 SF Walls and Ceiling |
| 359.77 SF Floor | 39.97 SY Flooring | 153.50 LF Floor Perimeter |
| 0.00 SF Long Wall | 0.00 SF Short Wall | 178.66 LF Ceil. Perimeter |
| | | |
| 359.77 Floor Area | 410.35 Total Area | 1,261.53 Interior Wall Area |
| 1,017.28 Exterior Wall Area | 122.17 Exterior Perimeter of Walls | |
| | | |
| 0.00 Surface Area | 0.00 Number of Squares | 0.00 Total Perimeter Length |
| 0.00 Total Ridge Length | 0.00 Total Hip Length | |



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

## Summary

| | |
|---|---:|
| Line Item Total | 8,143.44 |
| Material Sales Tax | 154.36 |
| | |
| Subtotal | 8,297.80 |
| Overhead | 829.84 |
| Profit | 829.84 |
| | |
| **Replacement Cost Value** | **$9,957.48** |
| Net Claim | **$9,957.48** |

Will Rohleder



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

## Recap of Taxes, Overhead and Profit

|  | Overhead (10%) | Profit (10%) | Material Sales Tax (8.517%) | Manuf. Home Tax (8.517%) | Storage Rental Tax (8.517%) |
|---|---|---|---|---|---|
| Line Items | 829.84 | 829.84 | 154.36 | 0.00 | 0.00 |
| Total | 829.84 | 829.84 | 154.36 | 0.00 | 0.00 |



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

## Recap by Room

Estimate: 2013-08-06-1533

| Area: Main Level | | |
|---|---|---|
| Kitchen | 1,007.75 | 12.37% |
| Entry/Foyer | 2,985.92 | 36.67% |
| Hall/Utility | 573.66 | 7.04% |
| Mechanical | 1,599.64 | 19.64% |
| Bathroom | 309.31 | 3.80% |
| | 1,344.13 | 16.51% |
| Area Subtotal:  Main Level | 7,820.41 | 96.03% |
| Labor Minimums Applied | 323.03 | 3.97% |
| Subtotal of Areas | 8,143.44 | 100.00% |
| Total | 8,143.44 | 100.00% |



**24/7 Disaster Group**

phone 918.779.4900
www.247disastergroup.com

## Recap by Category

| O&P Items | Total | % |
|---|---|---|
| APPLIANCES | 303.48 | 3.05% |
| CABINETRY | 475.02 | 4.77% |
| CLEANING | 1,334.28 | 13.40% |
| CONTENT MANIPULATION | 107.44 | 1.08% |
| CONT: PACKING,HANDLNG,STORAGE | 97.38 | 0.98% |
| GENERAL DEMOLITION | 1,456.52 | 14.63% |
| DOORS | 128.40 | 1.29% |
| DRYWALL | 221.50 | 2.22% |
| FLOOR COVERING - CERAMIC TILE | 2,428.71 | 24.39% |
| FINISH CARPENTRY / TRIMWORK | 198.54 | 1.99% |
| HAZARDOUS MATERIAL REMEDIATION | 157.84 | 1.59% |
| HEAT, VENT & AIR CONDITIONING | 221.21 | 2.22% |
| MARBLE - CULTURED OR NATURAL | 252.36 | 2.53% |
| PLUMBING | 167.41 | 1.68% |
| PAINTING | 562.85 | 5.65% |
| TIL | 30.50 | 0.31% |
| O&P Items Subtotal | 8,143.44 | 81.78% |
| Material Sales Tax | 154.36 | 1.55% |
| Overhead | 829.84 | 8.33% |
| Profit | 829.84 | 8.33% |
| Total | 9,957.48 | 100.00% |

# EXHIBIT
# E

# TULLY LAW FIRM LLC

### SCOTT L. TULLY
ATTORNEY AT LAW
2017 S. Elm Place, Suite 107, Broken Arrow, OK 74012

| | |
|---|---|
| P.O. Box 2141 | (918) 872-8800 (W) |
| Broken Arrow, OK 74013-2141 | (918) 845-1874 (C) |
| scott@tullylawfirm.net | (866) 224-2303 (F) |
| | *Also Admitted in Alabama |

January 31, 2014

Shelter Insurance Companies
Jeff Hammons
PO Box 6008
Colombia, MO 65205

Fax:    888-742-5671
Email:  JTHammons@shelterinsurance.com

Re:    Claim:          HO0000001076116
       Insured:        Eric Strait
       Reported Loss:  6/18/13
       Loss Location:  2458 S. 107th East Ave., Tulsa, OK 74129

Dear Mr. Hammons:

Please be advised that I have been retained as counsel for Eric Strait in regard to your denial of his claim by letter of July 17, 2013, and subsequent below deductible letter of July 25, 2013. At this time, I am requesting the following within ten days:

1) **All emails between my client and any representative of Shelter Insurance Companies;**
2) **Certified copy of the applicable policy including all endorsements, application, and agent notes;**
3) **All letters to and from my client;**
4) **All letters to and from Shelter Insurance Companies regarding the subject loss;**
5) **All estimates completed on the subject loss;**
6) **All expert opinions relied upon in making your decision to deny the claim;**
7) **All recorded conversations of any representative of my client;**
8) **All photographs taken of the loss by your representative;**
9) *All relevant information used in denying the claim;*
10) **Complete copy of claims file.**

Thank you for your time and assistance in this matter.

Very truly yours,

Scott L. Tully

cc:    Eric Strait

# EXHIBIT F

RE:  HO0000001076116                    2 of 2

cc:

 

# SHELTER INSURANCE COMPANIES

Shelter Mutual Insurance Company - Shelter General Insurance Company

| | | | |
|---|---|---|---|
| Date: | 03/28/2014 | Invoice No.: | |
| Claim No.: | HO0000001076116 | Invoice Date: | 03/28/2014 |
| Loss Date: | 06/18/2013 | Service from: | |
| | | Service to: | |

Tully Law Firm LLC
P.O. Box 2141
Broken Arrow, OK   74013-2141

Attached below is our draft in the amount of $5,126.47 on the above claim.

PAYMENT DESCRIPTION:
   Actual Cash Value

COVERAGE(S):     DWELLING                    $5,126.47

PAYMENT NOTES:
   JA

*(Please retain this letter for your records.)*

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER

| CLAIM NO. | SHELTER INSURANCE COMPANIES | DATE | DRAFT NO. |
|---|---|---|---|
| HO0000001076116 | Columbia, Missouri 65218-0001 | 03/28/2014 | 011771581 |

UPON ACCEPTANCE PAY TO THE ORDER OF:

BOONE COUNTY NATIONAL BANK
Columbia, Missouri 65205
80-85
315

ERIC STRAIT and WELLS FARGO BANK NA #708 ISAOA and Tully Law Firm LLC

VOID IF NOT PRESENTED FOR
PAYMENT WITHIN 180 DAYS

AMOUNT

*Five thousand one hundred twenty six and 47/100 Dollars*          $5,126.47

SECURITY FEATURE
INCLUDED
DETAILS ON BACK

S. Daniel Clapp
*Authorized Signature*

THIS DOCUMENT IS PROTECTED AGAINST ALTERATIONS WITH CHECK PROTECT FEATURES

�011771581⑈ ⑆081500859⑉ 0012580⑈



**Shelter Insurance**
PO Box 6008
Columbia, MO 65205-6008
Fax: 888-742-5671

| Description | Quantity | Unit Price | Per | RC | Depreciation | ACV |
|---|---|---|---|---|---|---|
| **ESTIMATE:** Structure (Shelter Insurance) | | | | Claim #HO0000001076116, ERIC STRAIT | | |
| 📝 In progress | | | | | | |
| 🏠 **FLOORPLAN: Floorplan** | | | | | | |

🏠 **Kitchen**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Length:** 17'9" | **Width:** 9' | **Height:** 8' Flat | | | | |
| **Walls:** 428.00 SF | **Walls-subs:** 365.78 SF | **Walls-subs-cas-bsbd:** 306.86 SF | | | | |
| **Doors:** 0.00 SF | **Windows:** 0.00 SF | **Openings:** 62.22 SF | **Missing Walls:** 0.00 SF | | | |
| **Floor:** 159.75 SF | **Ceiling:** 159.75 SF | **Perim (F):** 44.17 LF | **Perim (C):** 53.50 LF | | | |

| | Description | Quantity | Unit Price | Per | RC | Depreciation | ACV |
|---|---|---|---|---|---|---|---|
| 1 | Minimum Charge, Paint | 1 | $200.00 | LS | $200.00 | $20.00 ✔ | $180.00 |
| 2 | Drywall Patch 1 to 4 SF | 1 | $80.38 | EA | $80.38 | $0.00 | $80.38 |
| 3 | Tear Out - Ceramic Floor, Thin Set 18"X18" | 125.75 | $0.94 | SF | $118.21 | $0.00 | $118.21 |
| 4 | Replace - Ceramic Floor, Thin Set 18"X18" | 138.33 | $4.91 | SF | $679.20 | $67.92 ✔ | $611.28 |
| | 🔲 Includes 10% waste on quantity. | | | | | | |
| 5 | Rem/Reset - Base Molding Hardwood, 1" X 4" | 27.17 | $2.04 | LF | $55.42 | $0.00 | $55.42 |
| 6 | Tear Out - Cabinet, Base (LF) | 15.00 | $4.71 | LF | $70.65 | $0.00 | $70.65 |
| 7 | Replace - Cabinet, Base (LF) | 15.00 | $171.76 | LF | $2,576.40 | $515.28 ✔ | $2,061.12 |
| 8 | Tear Out - Backsplash | 15.00 | $0.75 | LF | $11.25 | $0.00 | $11.25 |
| 9 | Replace - Backsplash | 15.00 | $5.74 | LF | $86.10 | $17.22 ✔ | $68.88 |
| 10 | Tear Out - Countertop, Laminate (LF) | 15.00 | $2.65 | LF | $39.75 | $0.00 | $39.75 |
| 11 | Replace - Countertop, Laminate (LF) | 15.00 | $42.19 | LF | $632.85 | $126.57 ✔ | $506.28 |
| 12 | Rem/Reset - Refrigerator, Side-By-Side | 1 | $58.85 | EA | $58.85 | $0.00 | $58.85 |
| 13 | Rem/Reset - Oven, Built-In, Electric | 1 | $63.24 | EA | $63.24 | $0.00 | $63.24 |
| 14 | Rem/Reset - Dishwasher | 1 | $117.80 | EA | $117.80 | $0.00 | $117.80 |
| 15 | Rem/Reset - Garbage Disposal | 1 | $66.80 | EA | $66.80 | $0.00 | $66.80 |
| 16 | Rem/Reset - Sink, Kitchen, Stainless Steel Double Bowl | 1 | $97.39 | EA | $97.39 | $0.00 | $97.39 |
| 17 | Finish - Stain Base Cabinet | 34.00 | $14.48 | SF | $492.32 | $147.70 ✔ | $344.62 |
| 18 | Clean - Antimicrobial Treatment, Topical 1 Application | 125.75 | $0.12 | SF | $15.10 | $0.00 | $15.10 |
| 19 | Floor Prep, Rough Sand/Scrape | 125.75 | $1.56 | SF | $196.17 | $19.62 ✔ | $176.55 |
| | **Kitchen - Subtotal** *(19 items)* | | | | **$5,657.88** | **$914.31** | **$4,743.57** |

🏠 **Entry**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Length:** 3'6" | **Width:** 9' | **Height:** 8' Flat | | | | |
| **Walls:** 200.00 SF | **Walls-subs:** 127.34 SF | **Walls-subs-cas-bsbd:** 122.84 SF | | | | |
| **Doors:** 0.00 SF | **Windows:** 0.00 SF | **Openings:** 72.66 SF | **Missing Walls:** 0.00 SF | | | |
| **Floor:** 31.50 SF | **Ceiling:** 31.50 SF | **Perim (F):** 15.41 LF | **Perim (C):** 18.41 LF | | | |

| | Description | Quantity | Unit Price | Per | RC | Depreciation | ACV |
|---|---|---|---|---|---|---|---|
| 20 | Tear Out - Ceramic Floor, Thin Set | 31.50 | $1.31 | SF | $41.27 | $0.00 | $41.27 |
| 21 | Replace - Ceramic Floor, Thin Set | 34.65 | $8.51 | SF | $294.87 | $29.49 ✔ | $265.38 |
| | 🔲 Includes 10% waste on quantity. | | | | | | |





# Shelter Insurance
PO Box 6008
Columbia, MO 65205-6008
Fax: 888-742-5671

| Description | Quantity | Unit Price | Per | RC | Depreciation | ACV |
|---|---|---|---|---|---|---|
| **ESTIMATE:** Structure (Shelter Insurance) | | | | Claim #HO0000001076116, ERIC STRAIT | | |
| 📋 In progress | | | | | | |

| 🗂 Entry(con't) | | | | | | |
|---|---|---|---|---|---|---|
| 22  Rem/Reset - Base Molding Hardwood, 1" X 4" | 15.41 | $2.04 | LF | $31.44 | $0.00 | $31.44 |
| 23  Clean - Antimicrobial Treatment, Topical 1 Application | 31.50 | $0.12 | SF | $3.78 | $0.00 | $3.78 |
| 24  Floor Prep, Rough Sand/Scrape | 31.50 | $1.56 | SF | $49.15 | $4.92 ✔ | $44.23 |
| **Entry - Subtotal** *(5 items)* | | | | **$420.51** | **$34.41** | **$386.10** |

| 🗂 Hallway | | | | | | |
|---|---|---|---|---|---|---|

**Length:** 3'2"   **Width:** 3'2"   **Height:** 8' Flat
**Walls:** 101.32 SF   **Walls-subs:** 30.66 SF   **Walls-subs-cas-bsbd:** 27.71 SF
**Doors:** 20.00 SF   **Windows:** 0.00 SF   **Openings:** 50.66 SF   **Missing Walls:** 0.00 SF
**Floor:** 10.03 SF   **Ceiling:** 10.03 SF   **Perim (F):** 3.17 LF   **Perim (C):** 6.34 LF

| | | | | | | |
|---|---|---|---|---|---|---|
| 25  Tear Out - Ceramic Floor, Thin Set | 10.03 | $1.31 | SF | $13.14 | $0.00 | $13.14 |
| 26  Replace - Ceramic Floor, Thin Set | 11.03 | $8.51 | SF | $93.87 | $9.39 ✔ | $84.48 |
| ☐ Includes 10% waste on quantity. | | | | | | |
| 27  Rem/Reset - Base Molding Hardwood, 1" X 4" | 3.17 | $2.04 | LF | $6.46 | $0.00 | $6.46 |
| 28  Clean - Antimicrobial Treatment, Topical 1 Application | 10.03 | $0.12 | SF | $1.20 | $0.00 | $1.20 |
| 29  Floor Prep, Rough Sand/Scrape | 10.03 | $1.56 | SF | $15.66 | $1.57 ✔ | $14.09 |
| **Hallway - Subtotal** *(5 items)* | | | | **$130.33** | **$10.96** | **$119.37** |
| **Floorplan - Subtotal** *(29 items)* | | | | **$6,208.72** | **$959.68** | **$5,249.04** |



**Shelter Insurance**
PO Box 6008
Columbia, MO 65205-6008
Fax: 888-742-5671

| ESTIMATE: Structure (Shelter Insurance) | Claim #HO0000001076116, ERIC STRAIT |
|---|---|

In progress

| | |
|---|---:|
| Total Materials: | $3,001.32 |
| Total Labor: | $3,175.61 |
| Total Equipment: | $31.79 |
| **Subtotal:** | **$6,208.72** |
| | |
| **Adjustments for minimum charges (taxes are applied):** | |
| Minimum Charge, Drywall 2 Trips: | $272.26 |
| Minimum Charge, Mitigation: | $148.43 |
| Minimum Charge, Carpentry, Finished: | $96.37 |
| Minimum Charge, Plumbing: | $96.44 |
| **Subtotal:** | **$6,822.22** |
| | |
| Sales Tax 8.517% (applies to materials and equipment): | $310.58 |
| **Replacement Cost Value:** | **$7,132.80** |
| | |
| Replacement Cost on Coverage HOME/DWELLING: | $7,132.80 |
| Less Recoverable Depreciation (includes taxes): | $(1,006.33) |
| **Net ACV on Coverage HOME/DWELLING:** | **$6,126.47** |
| **Amount Payable on Coverage HOME/DWELLING:** | **$6,126.47** |
| Net Coverage HOME/DWELLING after Deductible if Depreciation Is Recovered: | $7,132.80 |
| **Amount Payable on Coverage HOME/DWELLING if Depreciation Is Recovered:** | **$7,132.80** |
| | |
| Deductible: | $(1,000.00) |
| **Net Estimate:** | **$5,126.47** |
| | |
| Total Recoverable Depreciation: | $1,006.33 |
| **Net Estimate if Depreciation is Recovered:** | **$6,132.80** |

Finalization

# EXHIBIT N

# TULLY LAW FIRM LLC

### SCOTT L. TULLY
#### ATTORNEY AT LAW
2017 S. Elm Place, Suite 107, Broken Arrow, OK 74012

| | |
|---|---|
| P.O. Box 2141 | (918) 872-8800 (W) |
| Broken Arrow, OK 74013-2141 | (918) 845-1874 (C) |
| scott@tullylawfirm.net | (866) 224-2303 (F) |
| | *Also Admitted in Alabama |

March 31, 2014

Shelter Insurance Companies
Jamie Adams
PO Box 6008
Colombia, MO 65205

Fax:    888-742-5671
Email:  JAdams@shelterinsurance.com

Re:    Claim:           HO0000001076116
       Insured:         Eric Strait
       Reported Loss:   6/18/13
       Loss Location:   2458 S. 107th East Ave., Tulsa, OK 74129

Dear Ms. Adams:

Thank you for your letter of March 28, 2014 and payment of $5,126.47. My letter of March 4, 2014 had listed actual damages of:

## DAMAGES

Mr. Strait has incurred the following damages to date:

| | | |
|---|---|---|
| 1) | $10,000.00 | Williams Plumbing & Drain (see invoice) |
| 2) | $9,957.48 | 24/7 Disaster Group estimate for repairs |
| 3) | $475.00 | Herndon Engineering Report |
| 4) | $221.35 | Hotel Charges fro 7/13/13-7/17/13 (ALE) |
| 5) | $500.00 | Additional Meals and Living Expenses |

The total actual damages documented, and submitted, were $21,153.83. Your payment of $5,126.47 leaves a deficiency of $16,027.36. Obviously, you have denied costs that were submitted to you, but no policy explanation has been provided. Hopefully, you can appreciate our confusion since the path of this case Shelter has:

| | |
|---|---|
| 1) | Totally denied the claim, |
| 2) | Stated that the claim was below deductible, |
| 3) | Now, submitted payment for less than the total losses. |

My client has a right to know why you are not paying for his entire loss, and Shelter has a duty to provide an explanation. I would request that you specifically address the damages as they have been listed above when clarifying Shelter's position.

I want to refer you to my letter of March 24, 2014 wherein I requested an explanation why Shelter would not adopt the report of Herndon Engineering, and felt it necessary to have Ford Engineering inspect and report eight months after the loss?  I am aware that Shelter has used Mr. Herndon in the past and would like to know if his opinion is no longer credible with your company?  I will also rescan the Herndon report in color for you so that you will have the color photographs that you are requesting.

Please respond to this letter by April 7, 2014.  Thank you for your attention to this matter.

                                                Very truly yours,

                                                Scott L. Tully

cc:     Eric Strait

# EXHIBIT

# O

 **SHELTER INSURANCE COMPANIES**
SHELTER MUTUAL
SHELTER GENERAL

April 1, 2014

Tully Law Firm LLC
P.O. Box 2141
Broken Arrow, OK  74013-2141

RE:   Claim Number:   HO0000001076116
      Date of Loss:    06/18/2013
      Insured:         STRAIT, ERIC

Dear Mr. Tully:

Thank you for your March 31st letter.  Please reference the denial letter dated July 17, 2013.

1) $10,000.00   Williams Plumbing and Drain
        A payment was made to Mr. Strait of $400 on July 10th, 2013 to reimburse him for the
        leak detection.  The remaining balance is excluded per Mr. Strait's policy. Please see
        page 13 of the policy:

        "EXCLUSIONS APPLICABLE TO COVERAGES A & B
         We do not cover any loss or damage if it would not have occurred in the absence of
         any event or condition listed below. That loss or damage is excluded from coverage
         regardless of:

              (a) the proximate cause of that event or condition;

              (b) the fact that other events or conditions, which are not excluded, caused the
              loss or damage;

              (c) the fact that other events or conditions, which are not excluded, contributed to
              the loss or damage;

              (d) the sequence of the events or conditions that caused the loss or damage;

              (e) whether the events and conditions that caused the loss or damage occurred
              suddenly or gradually;

              (f) whether the loss or damage is isolated or widespread; or

(g) whether the loss or damage arises from natural forces, external forces, or a combination of such forces.

10. Wear and tear; marring or scratching; deterioration; inherent vice; latent defect; mechanical breakdown; leakage of any chemical or petroleum product from a storage container; rust; …We will apply this exclusion to accidental direct physical loss to the property, or part of the property, which was actually damaged by the excluded cause or event."

Specifically, Mr. Herndon's report confirms "excessive corrosion" to the pipes; however, the resulting water damage is not excluded.  Corrosion is wear and tear.

2) $9,957.48     24/7 Disaster Group
A payment of $5,126.47 was made on March 28th.  Mr. Herndon recommended the kitchen and entry hall area ceramic flooring be replaced because "sewage water soaked in beneath the tile".  Also the lower cabinets and countertops need to be replaced "to allow for disinfectant to be applied to the floor slab" per his report.  This amount does not include the $1,000 deductible owed by Mr. Strait nor $1,006.33 in recoverable depreciation available once the repairs have been completed.

The remaining damages on 24/7 Disaster Group's estimate are excluded due to the corrosion of the pipe as stated in the previous denial letter referencing the wear and tear exclusion.

3) $475.00      Herndon Engineering Report
Herndon Engineering, Inc. was hired by your client, not by Shelter.

4) $221.35      Hotel Charges from 7/13/2013-7/17/2013
Please reference page 20 of Mr. Strait's policy.

"COVERAGE D-ADDITIONAL LIVING EXPENSE AND LOSS OF RENTS INSURING AGREEMENT
If your residence premises sustains a covered loss that exceeds the applicable deductible and, as a direct result of that loss, your residence premises is uninhabitable, we will pay the increase in your living expense reasonably necessary to maintain your normal standard of living for the shortest time reasonably necessary:

1. to repair or replace the damaged property, or

2. for you to permanently relocate."

The ALE charges sought represent a period when the home was uninhabitable due to the corrosion and deterioration of the pipe, which is excluded in the policy; therefore, no additional living expense is available for the above dates.

5) $500.00      Additional Meals and Living Expenses
Per the above policy wording, additional living expense is available while the residence premises is uninhabitable due to a covered loss which would be while the kitchen is inoperable.

RE:  HO0000001076116                              3 of 3

An Additional Living Expense worksheet is enclosed to be filled out.  Please note this is for additional living expense over and above normal expenses.  Receipts for meals will need to be submitted for reimbursement over normal monthly expenses.

In reference to the remaining "recommended repairs" on the Herndon Engineering report (page 2, 1) and 2), the drain line damage, excavation and repairs are excluded by Mr. Strait's policy.  Please reference the wear and tear exclusion (#10) above.  The same exclusion applies to item 7) in Mr. Herndon's report.

Shelter has not questioned the credibility of Mr. Herndon.  Mr. Herndon's opinion is what allowed Shelter to approve the replacement of the lower cabinets and countertop along with the tile flooring in the kitchen and entry hall areas.  Shelter would have preferred to have had the Herndon report before March 4, 2014.

If additional damage is being claimed or there is a dispute in the damages on the estimate, we would ask to speak with Mr. Herndon directly.  Alternatively, Shelter simply requests to re-inspect the home with Ford Engineering.

Thank you for agreeing to forward the color photos from the Herndon Engineering report.

Sincerely,

Jamie Adams
Claims Department
Phone:   918-294-2242
Fax:        888-742-5671
Email:     JAdams@ShelterInsurance.com

cc:

# Insured's Pre-Loss Normal Living Expense Worksheet

Insured:   Eric Strait                                                    Claim No.:   HO1076116

Family Members:   _____

In the next section, insert all of your family's normal monthly living expenses typically incurred before the loss that will change (up or down) because of the loss. While receiving Additional Living Expense coverage, you will have to provide receipts for each one that you list here. If there are others that we don't list, please add them next to "Other." You may also add any comment.

| Normal Monthly Living Expenses | Normal Pre-Loss Monthly Expenses | Comments |
|---|---|---|
| Home Mortgage or Rent | | |
| Electric | | |
| Gas | | |
| Water/Sewer | | |
| Refuse/Trash | | |
| Television (Cable/Satellite) | | |
| Home Phone Charges | | |
| Mobile Phone Charges | | |
| Laundry Services | | |
| Dry Cleaning | | |
| Kennel | | |
| Groceries | | |
| Dining Out (if needed, use worksheet below) | | |
| Other | | |
| Other | | |
| Other | | |
| Other | | |
| Other | | |

This section will calculate the normal and regular mileage your household typically drove before the loss. Enter where you regularly drive (work, school, etc), its address, distance from your insured home, and number of trips each month. Below that, insert the address where you will be living during the ALE period.

| Places You Regularly Drive To | Address | Roundtrip Distance | No. of Trips per Month | Normal Pre-Loss Miles |
|---|---|---|---|---|
| | | miles | | 0 |
| | | miles | | 0 |
| | | miles | | 0 |
| | | miles | | 0 |
| | | miles | | 0 |
| | | miles | | 0 |

| Residence Address During ALE Period | |
|---|---|
| | |

| *Dining Out Worksheet* (OPTIONAL) | This section is optional. Use it only if you want to figure your monthly "Dining Out" costs by averaging the cost of meals away from home each month. Under "Meals Out" enter the typical number of meals each month that those in your household normally ate away from home before the loss. You can do this as a "Family" or separately for "Husband," "Wife," and "Kids." Under "Avg. Cost" enter the amount typically spent (on average) for each of those meals. The total will show on the right. |
|---|---|

| Dining Out | | | | Monthly Total |
|---|---|---|---|---|
| | Meals Out | | Avg. Cost | |
| Husband | | x | | 0 |
| Wife | | x | | 0 |
| Kids | | x | | 0 |
| Family | | x | | 0 |
| | | | **Total** | 0 |

Your policy determines what is covered. This form must be filled out accurately and helps us determine the increase in your living expense reasonably necessary to maintain your normal standard of living. Please sign and date below to confirm the accuracy of the information provided. (You may type your name as confirmation if filling this out electronically.)

**WARNING:  Any person who knowingly and with intent to injure, defraud, or deceive an insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete, or misleading information commits a criminal offense that is punishable by imprisonment and/or fine.  Any insurance company or agent who knowingly provides false, incomplete, or misleading information for the purpose of defrauding a policyholder or claimant in a claim settlement must be reported to the State Division of Insurance.**

Insured's Signature _____     Date _____

# EXHIBIT P

# TULLY LAW FIRM LLC

### SCOTT L. TULLY
ATTORNEY AT LAW
2017 S. Elm Place, Suite 107, Broken Arrow, OK 74012

| | |
|---|---|
| P.O. Box 2141 | (918) 872-8800 (W) |
| Broken Arrow, OK 74013-2141 | (918) 845-1874 (C) |
| scott@tullylawfirm.net | (866) 224-2303 (F) |
| | *Also Admitted in Alabama |

August 25, 2014

Shelter Insurance Companies
Jamie Adams
PO Box 6008
Colombia, MO 65205

Fax:    888-742-5671
Email:  JAdams@shelterinsurance.com

Re:   Claim:          HO0000001076116
      Insured:        Eric Strait
      Reported Loss:  6/18/13
      Loss Location:  2458 S. 107th East Ave., Tulsa, OK 74129

Dear Ms. Adams:

Please be advised that since your April 1, 2014, I have submitted the entire package of information regarding the above claim to insurance expert, Richard Cary. At this time, we are placing you on notice that a breach of contract has occurred, as well as bad faith claims handling. I have previously submitted:

### *DAMAGES*

*Mr. Strait has incurred the following damages to date:*

| | | |
|---|---|---|
| *1)* | *$10,000.00* | *Williams Plumbing & Drain (see invoice)* |
| *2)* | *$9,957.48* | *24/7 Disaster Group estimate for repairs* |
| *3)* | *$475.00* | *Herndon Engineering Report* |
| *4)* | *$221.35* | *Hotel Charges fro 7/13/13-7/17/13 (ALE)* |
| *5)* | *$500.00* | *Additional Meals and Living Expenses* |

*The total actual damages documented, and submitted, were $21,153.83.  Your payment of $5,126.47 leaves a deficiency of $16,027.36.*

Based upon Mr. Cary's report, we believe that punitive damages would be assessed in this case up to the maximum threshold of $500,000.00. There will also be attorney fees awarded should this proceed to litigation. In an effort to settle this claim, we are prepared to make an offer of $250,000.00 to settle all claims in full at this time. If this is not agreeable, we would offer mediation to you as an alternative.

A lawsuit has been prepared and will be filed if I do not hear from you by September 15, 2014.  A copy of the draft lawsuit is also enclosed for your review.  Thank you for your consideration in this matter.


Very truly yours,

Scott L. Tully

cc:    Eric Strait
enc:   Cary Report
       Lawsuit Draft

# Richard N. Cary
12120 Silver Sun Dr.
Oklahoma City, OK  73162
405-819-8788

July 16, 2014


Scott L. Tully, Attorney at Law
P.O. Box 2141
Broken Arrow, OK  74011

RE:  Eric Strait v. Shelter Mutual Ins. Co.

Dear Mr. Tully:

This is my report of this case based upon what we know at this time.

**FACTS:**  Eric Strait purchased a homeowner's insurance policy from Shelter Mutual Insurance Company.  The policy number was 35-71-007230831-0001.  The policy was in effect at the time of their loss which occurred on June 28, 2013 and coverage is in order.

Mr. Strait noticed water coming into the kitchen causing damage and contacted Shelter Mutual Ins. Co. to report a claim.

Shelter Mutual Insurance Company set up a claim which is identified as claim number HO0000001076116.  An adjuster was sent to Mr. Strait's home at 2458 S. 107th East Ave., Tulsa, OK to inspect the property.  Shelter refused to pay for the damages and denied the claim on July 17, 2013.

Mr. Strait asked Shelter to reconsider the claim.  Shelter responded with a letter on July 25, 2013 which stated the loss did not exceed the policy deductible of $1,000 and they denied any payment for the Additional Living Expense loss.

On September 11, 2013, attorney Diane Lee sent a letter to Shelter advising why the loss was covered and why Shelter should reconsider their decision to deny payment to their insured.

On January 31, 2014, attorney Scott Tully provided a letter to Shelter advising he was representing Mr. Strait and he requested certain information from them including a certified copy of the insurance policy.

Additional correspondence was exchanged between the parties over the following weeks. Finally, on March 3, 2014, Mr. Tully submitted a letter to Shelter which included an engineering report that supported the contention this was a covered loss along with a

demand for $21,153.83 for damages resulting from the water loss. On March 17th, Mr. Tully sent another letter to Shelter demanding full payment of the loss.

On March 28, 2014, Shelter sent a letter to Mr. Tully along with a partial payment in the amount of $5,126.47. Also attached to the letter and check was an estimate prepared by Shelter in the amount of $7,132.80.

Mr. Tully sent a letter to Shelter on March 31, 2014 asking why they did not pay the full amount of the loss. Shelter responded on April 1, 2014 by saying the majority of the loss was excluded alleging corrosion of the pipes, continued and repeated seepage or leakage, and wear and tear of the plumbing pipe. They further alleged in the letter they did not owe ALE because the dwelling was uninhabitable due to the corrosion and deterioration of the pipe which is excluded by the policy.

**CONCLUSION:** Shelter Mutual Insurance Company is wrong in their interpretation of the wording of the insurance contract. Any time that water escapes from a plumbing system and the loss is reported promptly, as was the case in this claim, the resulting water damage is covered. The only part of the loss which is excluded is the cost of replacing the actual piece of pipe that failed from which the water escaped. That part of the claim may have been less than $100. But, all of the other damages are covered and should have been paid promptly. Also covered is the amount the insured would have incurred for Additional Living Expense if the claim would have been handled correctly.

It is unreasonable for Shelter to take the position that:

1) The amount of loss was less than the policy deductible of $1,000.

2) That any part of the loss is excluded other than repair to the pipe which failed.

3) The damages can be repaired for $7,132.80.

4) ALE is excluded.

5) Dragging the claim out for several months is acceptable.

6) Failure to complete a thorough and timely investigation is okay.

7) That a partial payment of $5,126.47 should be considered adequate.

8) That failure to pay the full amount of covered damages promptly amounts to good claims handling.

Shelter's refusal to pay all of the covered damages promptly certainly rises to the level of bad faith.

It is likely that I will have additional opinions once the discovery of this case is complete and I reserve the right to amend my opinions upon completion and review of the discovery.

Sincerely,

Richard N. Cary